UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.

JASON MCBRIDE, Derivatively on Behalf of
Nominal Defendant THE ADT
CORPORATION,

                Plaintiff,

     vs.

NAREN GURSAHANEY, KATHRYN
MIKELLS, MICHAEL GELTZEILER,
THOMAS COLLIGAN, TIMOTHY
DONAHUE, ROBERT DUTKOWSKY,
BRUCE GORDON, BRIDGETTE HELLER,
KATHLEEN HYLE, DINESH PALIWAL,
KEITH MEISTER, and CORVEX
MANAGEMENT LP,

                Defendants,

     and

THE ADT CORPORATION, a Delaware
Corporation,

                Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, Jason McBride ("Plaintiff"), by and through his undersigned counsel, hereby

submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of The ADT

Corporation ("ADT" or the "Company") and against certain current and former officers and directors

of the Company for breaches of fiduciary duties, corporate waste, abuse of control, unjust

enrichment, and aiding and abetting thereof.  Plaintiff makes these allegations upon personal

knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information

and belief derived from the investigation of counsel, which included, without limitation: a) review

and analysis of public filings made by ADT and other related parties and non-parties with the U.S.

Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Individual Defendants (defined herein) and other related non-parties; c) review of news articles, shareholder communications, and postings on ADT's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Henningsen v. The ADT Corporation, et al.*, No. 9:14-cv-80566 (S.D. Fla.) (the "Securities Class Action"); and e) review of other publicly available information concerning ADT and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.      This action arises out of the Individual Defendants' violations of state law in connection with certain false and misleading statements and omissions the Individual Defendants either made, caused, or allowed the Company to make between November 27, 2012 and January 29, 2014 (the "Relevant Period") regarding its financial condition and future business prospects, including statements concerning the Company's outlook for fiscal 2013 and 2014.  During the Relevant Period, with the Company's stock artificially inflated, the Individual Defendants also caused the Company to repurchase millions of its own shares spending over a billion dollars in the process.

2.      ADT provides electronic security, interactive home and business automation, and related monitoring services to approximately 6.5 million residential and small business customers in the United States and Canada.  ADT is incorporated under the laws of Delaware and headquartered in Boca Raton, Florida.

3.      ADT's service offerings include the installation and monitoring of residential and small business security and premises automation systems that react to movement, smoke, carbon monoxide, flooding, temperature, and other environmental conditions and hazards, as well as to address personal emergencies, such as injuries, medical emergencies or incapacitation.  The vast

majority of the Company's annual revenue – approximately 90% – is driven by the services ADT provides, which are governed by multi-year contracts that generate recurring revenue.

4.      In 1997, ADT – which was at that time in its long history a private company – was acquired by Tyco International Ltd. ("Tyco") via a reverse merger.  In September 2011, Tyco announced that it would split into three companies with ADT being one of the three.  On September 28, 2012, ADT was spun off from Tyco as The ADT Corporation and became an independent publicly traded company listed on the NYSE under the symbol "ADT."

5.      After less than a month as a publicly traded company, ADT started receiving pressure from one of its largest shareholders at the time, hedge fund Corvex Management LP ("Corvex"), to buy back its stock.

6.      Corvex is led by its managing partner Keith Meister ("Meister").  Meister, a former executive for Carl Icahn's investment companies, called for ADT to reduce its share count by 30% complaining that, in essence, ADT stock was mispriced and that the Company misunderstood the market.

7.      Specifically, Meister criticized ADT's conservative approach to debt referring to ADT's capital structure as "indefensible" during a presentation that accompanied Corvex's disclosure of a 5.02% stake in the Company.[1]

8.      Indeed, in that same presentation to investors, filed with the SEC by ADT on October 25, 2012 as part of a Schedule 13D announcing that Corvex acquired over 5% of the outstanding ADT common stock, Meister argued that increasing leverage to repurchase shares would, purportedly, push the price of ADT common stock up to $60-80 per share.

---

[1] This stake included shared voting power from 575,000 shares owned by Soros Fund Management LLC, which is controlled by billionaire investor George Soros.

9.    Then, on November 27, 2012, caving to pressure from Meister to buy back its stock, ADT announced that the Company's Board of Directors (the "Board") approved a mammoth share repurchase program, authorizing the Company to repurchase $2.0 billion of its common stock by November 27, 2015.[2]

10.    According to Morningstar, Inc. ("Morningstar"), a research firm, the announced buyback plan would shrink the Company's share count by approximately 17% by 2015, which was less than the 30% sought by Corvex.  Morningstar also noted that ADT was willing to raise its net debt-to-pretax income ratio, or leverage ratio, to about two times its then-current ratio of 1.5 times. Corvex advocated for ADT to raise its leverage ratio to three times which, if the Company were to oblige, would double ADT's debt load to approximately $5 billion.

11.    The announcement of a stock buyback program is unusual for a new public company.  Indeed, Carol Levenson, an analyst for Gimme Credit LLC ("Gimme Credit"), a corporate debt research service, stated in a note to clients that "[n]ever have we seen a spinoff in as much of a hurry to reward shareholders at the expense of credit quality as ADT."

12.    Credit rating firms were also skeptical.  Following the announcement of the stock repurchase program, Fitch Ratings ("Fitch") lowered its rating on ADT to triple B from triple B plus, just two notches above junk rating territory.  Moody's Investor Service ("Moody's"), while not lowering its rating on the Company, did drop its outlook from stable to negative, noting that "[t]he genesis for this buyback was the activist shareholder" and that "[t]he concern is that the board has not met all of the activist's demands and it's going to face continued pressure."

13.    Indeed, according to Moody's, Corvex's suggested leverage ratio would likely drop ADT's credit rating below investment grade.

_____

[2]  The repurchase program could be terminated at any time.

14.     Then, on December 17, 2012, the Board allowed the fox in the henhouse, announcing that Meister had been appointed to the Company's Board.

15.     Unfortunately, the harm ADT would face as a result of the Individual Defendants' conduct was just beginning.  Indeed, during the Relevant Period, the Individual Defendants either issued or caused the Company to issue materially false and misleading statements regarding ADT's financial condition and future business prospects, including the outlook for fiscal 2013 and 2014.

16.     Specifically, during the Relevant Period the Individual Defendants caused the Company to state, among other things that:

- "We expect recurring revenue to continue to grow at the rate we've seen over the past several quarters at approximately 4.9% to 5.2%";

- "Attrition has stabilized . . . [and] competitors continue to have little impact on attrition and in fact, we think the level of concern that has been expressed by some over the past few weeks is overblown . . . [T]o date nothing has really changed";

- "[W]e are affirming our guidance [that recurring revenue growth for] fiscal year 2013 . . . will be about 5%. . . [W]e expect cost-to-serve to be flat . . . [and] margins should modestly improve as we continue to grow the revenue base . . . [We] expect [] to come in at the high end of our full-year EBITDA margin guidance";

- "[A]nything we do at this stage is going to be consistent with the $2 billion three-year share repurchase program that we announced back in November . . .[W]e are at our target leverage . . . [and] are sticking to what we laid out back in November."

17.     In truth, however, the Individual Defendants knew or deliberately disregarded the following facts:

(a)     Despite the Individual Defendants' emphatic representations concerning the Company's current financial condition and bullish forecasts of future financial results, ADT was experiencing reduced non-Pulse demand, accelerated churn rate and attrition, and increased advertising and service costs, all of which were negatively impacting ADT's recurring revenue,

margins, and earnings;

(b)      ADT had been relying on its aggressive share repurchases to artificially inflate reported earnings per share, thereby disguising an overall growth slowdown; and

(c)      In light of these known facts, the Company did not have a reasonable basis for its 2013 and 2014 quarterly and full year financial forecasts.

18.      As a result of the Individual Defendants' false and misleading statements and omissions, the Company's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $49.73 per share on March 13, 2013.  All the while, the Individual Defendants continued to cause the Company to spend hundreds of millions of dollars to repurchase its own shares at artificially inflated prices.

19.      Then on November 25, 2013, the Individual Defendants caused ADT to announce in a press release that the Company would repurchase 10.24 million of Meister's Corvex ADT common shares – representing the vast majority of Corvex's position in ADT – at an above-market price of $44.01 per share.  Further, notwithstanding Meister having just joined the Board less than one year earlier – he tendered his resignation from ADT's Board effective immediately.

20.      Not surprisingly, investors' faith in ADT, its management, and its Board was shaken and investors began to question the veracity of ADT's bullish earnings forecasts.

21.      Indeed, following the announcement of the repurchase of the Corvex shares, the price of ADT stock sank almost 10% from its high point on November 22, 2013 of $44.40 per share to close at $40.85 per share on November 26, 2013 on unusually heavy trading volume.

22.      On December 2, 2013, ADT announced that it had completed the repurchase of the Meister/Corvex ADT common stock position.  On this news, investor confidence and consequently the price of ADT shares continued to slide, dropping to $38.80 per share on December 13, 2013.

23.     Then, on January 30, 2014 – just several weeks after Meister and Corvex pocketed $450 million from the completed repurchase of the Corvex shares (and Meister dashed off the Board) – ADT issued a press release announcing first quarter 2014 results which fell far short of ADT's own bullish EPS guidance and Wall Street analyst consensus.

24.     On this disappointing news, investors punished ADT, driving the price of ADT shares down approximately 17% from $37.81 per share to $31.40 per share on unusually high trading volume.

25.     As a result of the Individual Defendants' false and misleading statements and omissions, ADT's shares traded at artificially inflated prices during the Relevant Period.  Upon the disclosure of the Company's true financial condition, ADT's share price plummeted causing tens of millions of dollars in damages to ADT investors.  Included in those devastated by the Individual Defendants' false and misleading statements and omissions was ADT itself, who the Individual Defendants caused to repurchase millions of shares of its own artificially inflated stock for more than a billion dollars.

26.     Unlike the Company's other shareholders - and the Company itself - Meister was left unscathed.  Indeed, Meister escaped the henhouse with over $125 million more than he would have received for Corvex's ADT investment had he stuck around for just a few more weeks.

27.     ADT's Board has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to ADT for making, authorizing, or failing to correct the false and misleading statements alleged herein.  Accordingly, a pre-suit demand upon ADT's Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate ADT's rights against its wayward fiduciaries and hold them responsible for the damages they have caused ADT.  More specifically, Plaintiff brings

this derivative action to: (i) recover damages against ADT's officers and directors for the benefit of the Company; and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect ADT and its shareholders from a repeat of the damaging events described herein.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over all claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

29.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Florida, or is an individual who has sufficient minimum contacts with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Individual Defendants either resides in or maintains executive offices in this District, including Nominal Defendant ADT, a substantial portion of the transactions and wrongs complained of herein – including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to ADT – occurred in this District, and the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

31.     In connection with the acts and conduct alleged herein, the Individual Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

32.     Plaintiff is a stockholder of ADT and has been so, continuously, since October 2012.  Plaintiff is a citizen of Canada.

33.     Nominal Defendant ADT is a Delaware corporation with its principal place of business located at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT describes itself as "a leading provider of electronic security, interactive home and business automation and alarm monitoring services in the U.S. and Canada" with more than six million residential and small business customers.[3]  The Company's stock is traded on the NYSE under the ticker symbol "ADT." The Company had more than 180 million shares issued and outstanding during the Relevant Period.

34.     Defendant Naren Gursahaney ("Gursahaney") has been President, Chief Executive Officer ("CEO"), and a director of ADT since it was spun off from Tyco in September 2012.  Prior to that, Gursahaney served as President of Tyco Security Solutions, the largest operating segment of Tyco, which included ADT Security Services.  As an officer and director of ADT, Gursahaney either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Gursahaney participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders, and participated in conference calls with analysts and investors.  As a member of the

---

[3] http://beta.adt.com/content/dam/adt/downloads/about-adt/AboutADTFactSheet.pdf.

Board, Gursahaney also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Gursahaney is a defendant in the pending Securities Class Action.  Gursahaney received $7,170,763 in total compensation from ADT in 2013 and $4,949,818 in total compensation from ADT in 2012.  Gursahaney is a citizen of New Jersey.

35.     Defendant Kathryn Mikells ("Mikells") was Chief Financial Officer ("CFO") of ADT from May 2012 to May 2, 2013, when she left to become CFO of Xerox Corporation.  As an officer of ADT, Mikells either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith.  Until her departure on May 2, 2013, Mikells participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders, and participated in conference calls with analysts and investors.  Mikells is a defendant in the pending Securities Class Action.  Mikells received $2,321,897 in total compensation from ADT in 2013 and $1,825,372 in total compensation from ADT in 2012.  Mikells is a citizen of Illinois.

36.     Defendant Michael Geltzeiler ("Geltzeiler") has been CFO of ADT since November 2013.  Prior to joining ADT, Geltzeiler served as CFO and Group Executive Vice President of NYSE Euronext.  As an officer of ADT, Geltzeiler either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future

business prospects because of his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Since becoming CFO in November 2013, Geltzeiler participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders. Geltzeiler is a defendant in the pending Securities Class Action. Geltzeiler is a citizen of New York.

37. Defendant Thomas Colligan ("Colligan") has been a director of ADT since September 2012. During the Relevant Period, Colligan was Chairperson of the Audit Committee and a member of the Nominating and Governance Committee. As a director of ADT, Colligan either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Colligan either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders. As a member of the Board, Colligan also authorized the repurchase of millions of ADT shares at artificially inflated prices. Colligan is a citizen of Pennsylvania.

38. Defendant Timothy Donahue ("Donahue") has been a director of ADT since September 2012. During the Relevant Period, Donahue was a member of the Compensation Committee. As a director of ADT, Donahue either knew, consciously disregarded, was reckless and

grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Donahue either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Donahue also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Donahue is a citizen of Florida.

39.     Defendant Robert Dutkowsky ("Dutkowsky") has been a director of ADT since September 2012.  During the Relevant Period, Dutkowsky was a member of the Compensation Committee.  As a director of ADT, Dutkowsky either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Dutkowsky either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Dutkowsky also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Dutkowsky is a citizen of Florida.

40.     Defendant Bruce Gordon ("Gordon") has been a Chairman of the Board of ADT since September 2012.  During the Relevant Period, Gordon was the Chairperson of the Nominating and Governance Committee.  As a director of ADT, Gordon either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Gordon either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Gordon also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Gordon is a citizen of Maryland.

41.     Defendant Bridgette Heller ("Heller") has been a director of ADT since September 2012.  During the Relevant Period, Heller was a member of the Audit Committee.  As a director of ADT, Heller either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to her in connection therewith.  During the Relevant Period, Heller either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press,

securities' analysts, and ADT stockholders.  As a member of the Board, Heller also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Heller is a citizen of New Jersey.

42.     Defendant Kathleen Hyle ("Hyle") has been a director of ADT since September 2012.  During the Relevant Period, Hyle was a member of the Audit Committee.  As a director of ADT, Hyle either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to her in connection therewith.  During the Relevant Period, Hyle either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Hyle also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Hyle is a citizen of Maryland.

43.     Defendant Dinesh Paliwal ("Paliwal") was a director of ADT until his resignation effective on the date of the Company's 2014 Annual Meeting of Stockholders, held on March 13, 2014.  During the Relevant Period, Paliwal was the Chairperson of the Compensation Committee and a member of the Nominating and Governance Committee.  As a director of ADT, Paliwal either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided

to him in connection therewith.  During the Relevant Period, Paliwal either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board during the Relevant Period, Paliwal also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Paliwal is a citizen of Connecticut.

44.     Defendant Meister is the founder, Managing Director, and Partner of Corvex. Meister was a member of ADT's Board  from December 2012 to November 24, 2013, when he resigned in connection with the Company's repurchase of 10.24 million shares of ADT stock owned by Corvex for $44.01 per share.   As a director of ADT, Meister either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During his tenure on the Board, which covers most of the Relevant Period, Meister either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  Also during his tenure on the Board, Meister authorized the repurchase of millions of ADT shares at artificially inflated prices.  Meister is a defendant in the pending Securities Class Action.  Meister is a citizen of New York.

45.     Defendant Corvex is a hedge fund formed on December 8, 2010.  From October 2012 to November 2013, Corvex owned or controlled over 5% of ADT's outstanding common stock.

Corvex is controlled by Meister who is its founder and Managing Director and who, from December 17, 2012 to November 24, 2013, served on ADT's Board.  Since Corvex is controlled by Meister, a Board member during most of the Relevant Period, it either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of Meister's access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to Meister in connection therewith.  Corvex is a defendant in the pending Securities Class Action.  Corvex is incorporated under the laws of Delaware with its principal place of business located at 712 Fifth Avenue, 23rd Floor, New York, NY 10019.

46.    Defendants identified in ¶¶ 34-45 are sometimes referred to herein collectively as the "Individual Defendants."

47.    Defendants identified in ¶¶ 34 and 37-42 are sometimes referred to herein collectively as the "Director Defendants."

48.    Defendants identified in ¶¶ 37, 41, and 42 are sometimes referred to herein collectively as the "Audit Committee Defendants."

### SUBSTANTIVE ALLEGATIONS[4]

*Background*

49.    ADT is an alarm and securities system company incorporated under the laws of Delaware and headquartered in Boca Raton, Florida.  Today, through a variety of brands including ADT, ADT Pulse, and Companion Services, ADT provides electronic security, interactive home and

---

[4] All emphasis is added, unless otherwise stated.

business automation, and related monitoring services to approximately 6.5 million residential and small business customers in the United States and Canada.

50.     ADT's service offerings include the installation and monitoring of residential and small business security and premises automation systems that react to movement, smoke, carbon monoxide, flooding, temperature and other environmental conditions and hazards, as well as to address personal emergencies, such as injuries, medical emergencies or incapacitation.  The vast majority of the Company's annual revenue – around typically 90% – is driven by the services ADT provides, which are governed by multi-year contracts that generate recurring revenue.

51.     In 1874, 57 district telegraph delivery companies affiliated with one another and became known as American District Telegraph, or ADT.  ADT became a public company listed on the NYSE in 1969.

52.     In 1987, the Company was taken private and renamed ADT Security Systems, Inc. In 1997, the then private Company was acquired by Tyco via a reverse merger.

53.     In September 2011, Tyco announced that it would split into three companies with ADT being one of the three, and on October 1, 2012, ADT was spun off from Tyco as The ADT Corporation, again becoming an independent, public company listed on the NYSE under the symbol "ADT."

54.     After less than a month as a publicly traded company, ADT started receiving pressure from one of its largest shareholders at the time, hedge fund Corvex, to buy back its stock.

55.     Corvex is led by its managing partner Meister.  Meister, a former executive for Carl Icahn's investment companies, called for ADT to reduce its share count by 30% complaining that, in essence, ADT stock was mispriced and that the Company misunderstood the market.

56.     Specifically, Meister criticized ADT's conservative approach to debt referring to

ADT's capital structure as "indefensible" during a presentation that accompanied Corvex's disclosure of a 5.02% stake in the Company.[5]

57.     Indeed, in that same presentation to investors, filed with the SEC by ADT on October 25, 2012 as part of a Schedule 13D announcing that Corvex acquired over 5% of the outstanding ADT common stock, Meister argued that increasing leverage to repurchase shares would, purportedly, push the price of ADT common stock up to $60-80 per share.

**_Improper Statements_**

58.     On November 27, 2012, the Individual Defendants caused ADT to issue a press release titled "ADT REPORTS FOURTH QUARTER AND FISCAL 2012 RESULTS," reporting financial results and issuing revenue and earnings forecast for fiscal 2013:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.40 for the fourth quarter of 2012, and diluted earnings per share before special items of $0.43 . . . Recurring revenue, which made up over 90% of total revenue in the quarter, was up 5.2%, driven by 4.4% growth in average revenue per customer, which rose to $38.87, and 1.1% net growth in customer accounts. . . .
>
> *          *          *
>
> Total revenue of $812 million increased 2.3%, compared to the fourth quarter of 2011. Attrition was up 30 basis points sequentially to 13.8% with the majority of the increase coming from voluntary disconnects, in part due to the higher level of price escalations implemented in the second and third quarters. ADT added 284,000 new customers and closed the quarter with 6.4 million customer accounts, 1.1% higher than last year.
>
> *          *          *
>
> Commenting on the company's results for the fourth quarter, Gursahaney added, "***We delivered solid recurring revenue growth fueled by the continued success of Pulse in the residential and small business security markets. Our focus for 2013 is to deliver meaningful shareholder value by leveraging our competitive strengths to accelerate growth and through the efficient deployment of capital***."

59.     The Company's November 27, 2012 press release also provided ADT's financial

---

[5] This stake included shared voting power from 575,000 shares owned by Soros Fund Management LLC, which is controlled by billionaire investor George Soros.

forecast for fiscal 2013:

**FISCAL YEAR 2013 GUIDANCE**

- Recurring revenue growth of 4.9%-5.2%

- EBITDA margin before special items of 49.5%-50.5%

- Free cash flow before special items of $375-$425 million

- Steady-state free cash flow before special items of $950 million-$1.0 billion

60.     Also on November 27, 2012, in the same press release announcing the Company's fourth quarter 2012 results and providing the Company's financial forecast for fiscal 2013, the Individual Defendants – caving in to pressure from Meister and Corvex - caused ADT to announce that the Board approved a mammoth share repurchase program, authorizing the Company to repurchase $2.0 billion of its common stock by November 27, 2015.[6]

61.     Later that day, the Company hosted a conference call for analysts and investors during which Gursahaney touted the strength of the Company's recurring revenue and signaled that ADT agreed with the capital restructuring thesis initially articulated in the October 25, 2012 Schedule 13D by Meister and Corvex and that the Company expected recurring revenue to continue to grow:

> [Gursahaney:] We strongly believe that our capital structure must be appropriate for both our business model and the key strategies we are pursuing. ***In our case, we have a business model that generates strong recurring revenues and attractive financial returns***.
>
> *       *       *
>
> [Mikells:] Now I'd like to focus on . . . our guidance for fiscal 2013. ***We expect recurring revenue to continue to grow at the rate we've seen over the past several quarters at approximately 4.9% to 5.2%, with the underlying recurring revenue growth drivers being consistent with recent trends*** . . . .

62.     Analysts were skeptical of both the Meister/Corvex capital restructuring thesis and

---

[6] The repurchase program could be terminated at any time.

the epic stock repurchase program on which the Company was about to embark.

63.     As noted by Carol Levenson, an analyst for Gimme Credit, a corporate debt research service, it is unusual for a new public company, like ADT, to embark on a stock buyback program.  Indeed, Levenson specifically stated that "[n]ever have we seen a spinoff in as much of a hurry to reward shareholders at the expense of credit quality as ADT."

64.     Credit rating firms were also skeptical of ADT's plans.   Following the announcement of the stock repurchase program, Fitch lowered its rating on ADT to triple B from triple B plus, just two notches above junk rating territory.  Moody's, while not lowering its rating on the Company, did drop its outlook from stable to negative, noting that "[t]he genesis for this buyback was the activist shareholder" and that "[t]he concern is that the board has not met all of the activist's demands and it's going to face continued pressure."

65.     According to research firm Morningstar, the announced buyback plan would shrink the Company's share count by approximately 17% by 2015, which was less than the 30% sought by Corvex.  Morningstar also noted that ADT was willing to raise its net debt-to-pretax income ratio, or leverage ratio, to about two times its then-current ratio of 1.5 times.  Corvex advocated for ADT to raise its leverage ratio to three times which, if the Company were to oblige, would double ADT's debt load to approximately $5 billion.

66.     In fact, according to Moody's, Corvex's suggested leverage ratio would likely drop ADT's credit rating below investment grade.

67.     Nonetheless, between November 27, 2012 and December 31, 2012, following the Company's earnings release, guidance, and share repurchase announcement, the Company's share price traded at artificially inflated levels reaching as high as $47.00 per share.

68.     On December 17, 2012, the Individual Defendants caused the Company to

announce that Meister had been appointed to the Company's Board:

> BOCA RATON, Fla. — December 17, 2012 — The ADT Corporation (NYSE: ADT), a leading provider of electronic security, interactive home and business automation and alarm monitoring services, today announced the appointment of Keith Meister, the Founder and Managing Partner of Corvex Management LP, to the Company's Board of Directors.

69.     On January 7, 2013, the Individual Defendants caused the Company to issue a press release announcing that it had priced a private offering of senior notes **worth in excess of $700 million** stating, in relevant part:

> BOCA RATON, Fla. -- January 7, 2013 -- The ADT Corporation (NYSE:ADT) today announced the pricing of its offering of $700 million aggregate principal amount of 4.125 percent Senior Notes due 2023. ***ADT intends to use the net proceeds from the offering primarily for the repurchase of outstanding shares of ADT common stock***. Any net proceeds not used for such share repurchases are intended to be used for general corporate purposes. The offering is expected to close on or about January 14, 2013, subject to the satisfaction of various customary closing conditions.

70.     On January 30, 2013, the Individual Defendants caused the Company to issue a press release announcing ADT's first quarter fiscal 2013 financial results.  In addition to reporting strong earnings and margin results and continued strong growth in recurring revenue, ***the Company announced the acceleration of the share repurchase program*** and reaffirmed fiscal 2013 financial forecasts as follows:

> BOCA RATON, Fla.– January 30, 2013 – The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.44 for the first quarter of 2013, and diluted earnings per share before special items of $0.44. Using the company's cash tax rate, EPS before special items was $0.70.  Naren Gursahaney, ADT's Chief Executive Officer, said, "***We are pleased to start the new fiscal year with a very solid quarter characterized by continued strong growth in recurring revenue and EBITDA margin, along with stabilization in attrition rates***."
>
> *          *          *
>
> Recurring revenue, which made up 92% of total revenue in the quarter, was up 5.1%. Recurring revenue growth was driven by a 4.7% increase in ending average revenue per customer, which rose to $39.27, and 0.5% net growth in ending customer accounts.

*       *       *

*Attrition was flat sequentially at 13.8%.*  ADT added 257,000 new customers and closed the quarter with 6.4 million customer accounts.

### SHARE REPURCHASE PROGRAM

Under its previously announced $2 billion authorization, during the quarter the company repurchased 567 thousand of its shares for $26 million, and in January the company repurchased an additional 1.6 million of its shares for $74 million.  The company announced today that it has entered into an accelerated share repurchase agreement with Credit Suisse International, *under which it will repurchase approximately $600 million of its common stock*.  The company will acquire the shares under its previously authorized share repurchase program *and will fund the repurchase using proceeds from its recently concluded debt offering*. Under the terms of the agreement with Credit Suisse International, ADT will pay Credit Suisse International $600 million on February 4, 2013 and on that date will receive initial deliveries of approximately 10 million shares, representing a substantial majority of the shares expected to be retired over the course of the agreement.

71.     The January 30, 2013 press release also reaffirmed the Company's financial guidance for fiscal 2013:

### AFFIRMING FISCAL YEAR 2013 GUIDANCE

•       Recurring revenue growth of 4.9%-5.2%

•       EBITDA margin before special items of 49.5%-50.5%

•       Free cash flow before special items of $375-$425 million

•       Steady-state free cash flow before special items of $950 million - $1.0 billion

72.     On the same day, January 30, 2013, the Company hosted a conference call for analysts and investors during which Gursahaney and Mikells touted the strength of the Company's recurring revenue and downplayed risk of increased competition:

> [Mikells] [F]rom our perspective, *the competitive environment really hasn't changed* . . . We are seeing the same level of overall competition . . . We continue to look at our results . . . [and] *the metrics are holding up very well*.

> [Gursahaney] I think Kathy hit the nail on the head. *We are not seeing any significant change*.

73.     On April 1, 2013, the Individual Defendants caused the Company to file a Form

22

424(b)(3) prospectus supplement with the SEC offering to exchange up to $2.5 billion worth of aggregate principal of its outstanding unregistered debt securities.

74.     On April 12, 2013, the Individual Defendants caused the Company to issue a press release stating that it had completed its previously announced accelerated stock repurchase program resulting in the repurchase of **_12.6 million shares_** from Credit Suisse International at the **_cost of $600 million_**.   The release also stated that the Company had purchased a total of an additional 4.2 million shares for a cost of $194 million in accordance with two separate Rule 10b5-1 trading plans, one of which was initiated in December 2012 and the other of which was initiated in February 2013.  Specifically, the release stated, in relevant part:

> **Boca Raton, Fla., April 12, 2013** – The ADT Corporation (NYSE: ADT) today announced it completed its accelerated share repurchase program on April 2, 2013. On January 29, 2013, the company entered into an accelerated share repurchase agreement under which it repurchased 12.6 million shares of its common stock for a total cost of $600 million.
>
> In addition to the accelerated share repurchase program, ADT may repurchase shares of its common stock on the open market in accordance with Rule 10b5-1 of the Securities and Exchange Act of 1934, as amended. In December 2012, ADT initiated a $100 million 10b5-1 share repurchase plan under which 2.2 million shares of ADT common stock were repurchased prior to its completion on January 23, 2013. In February 2013, ADT initiated an additional $100 million 10b5-1 share repurchase plan. As of April 11, 2013, ADT had repurchased 2 million shares of its common stock under this plan for a total cost of approximately $94 million.
>
> The company's share repurchases under both the accelerated share repurchase program and the 10b5-1 plans were made pursuant to ADT's three-year, $2 billion share repurchase program, which was approved by the company's board of directors on November 26, 2012.

75.     On April 18, 2013, the Individual Defendants caused the Company to file a Form 424(b)(3) prospectus supplement with the SEC offering to exchange $700 million worth of the Company's unregistered notes for new registered notes. On the same day, the Company issued a press release describing the offer as follows:

**THE ADT CORPORATION INITIATES EXCHANGE OFFER**

Boca Raton, Fla., April 18, 2013 – The ADT Corporation (NYSE: ADT) announced at 5 pm ET today its offer to exchange certain of its outstanding unregistered notes for new registered notes in accordance with the terms of its registration rights agreement with existing holders of those notes.  Under the exchange offer, ADT is offering to exchange (the "Exchange Offer") up to $700,000,000 aggregate principal amount of its outstanding $700,000,000 4.125% Notes due 2023 for a like principal amount of its new $700,000,000 4.125% Notes due 2023 (the "Exchange Notes").

76.     Between April 1, 2013 and April 30, 2013 ADT shares traded at artificially inflated prices of more than $43 per share reaching a high of $48.86 on April 1, 2013.

77.     On May 1, 2013, the Individual Defendants caused the Company to issue a press release announcing ADT's financial results for its second quarter fiscal 2013.  In addition to reporting strong earnings and financial results, the Company noted that it was experiencing solid growth in recurring revenue, had repurchased another 16.9 million shares of its common stock on the open market for $800 million:

BOCA RATON, Fla.- May 1, 2013 - The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.47 for the second quarter of 2013, and diluted earnings per share before special items of $0.41. Using the company's cash tax rate, EPS before special items was $0.631.  Naren Gursahaney, ADT's Chief Executive Officer, said, "*Our results this quarter reflect continued solid growth in recurring revenue, which is a key element of our business model, along with further improvement in take rates for ADT Pulse*.

Capital management continues to be a major focus for us, and thus far we have repurchased $800 million of our shares under the $2 billion authorization we announced last November."  Gursahaney added, "Over the balance of the fiscal year we will focus on continuing to grow our customer base, controlling costs to improve margins and returning excess cash to our shareholders."

Recurring revenue, which made up 92% of total revenue in the quarter, was up 5.0%. Recurring revenue growth was driven by a 4.4% increase in ending average revenue per customer, which rose to $39.66, and 0.6% net growth in ending customer accounts.

*Attrition was up 10 basis points sequentially at 13.9%*.  ADT added 303,000 new customers and closed the quarter with 6.5 million customer accounts.  EBITDA before special items was $409 million, 1.5% higher than the prior year, and EBITDA margin before special items was 49.8%, a 10 basis point decline.  Operating cash flow for the twelve month period ended March 29, 2013 was $1.6 billion.  Steady-state free cash flow before special items, calculated on a pre-tax and unlevered basis

for the twelve month period ended March 29, 2013 was $953 million.

78.     Additionally, the Individual Defendants, via the Company's May 1, 2013 press release, *again affirmed* the Company's 2013 financial guidance:

### AFFIRMING FISCAL YEAR 2013 GUIDANCE

- Recurring revenue growth of 4.9%-5.2%

- EBITDA margin before special items of 49.5%-50.5%

- Free cash flow before special items of $375-$425 million

- Steady-state free cash flow before special items of $950 million – $1.0 billion

79.     On the same day, May 1, 2013, the Company hosted a conference call for analysts and investors during which Gursahaney and Mikells touted the strength of the Company's recurring revenue and downplayed both the likelihood of increased debt to fund further share repurchases and the risk of increased competition affecting ADT's reported financial results:

[Gursahaney:] [W]e will continue to take a balanced approach to capital management. *We have a resilient predictable business model, which enable us to invest in growth and consistently return significant capital to shareholders over time through . . . share repurchases.* Overall, *this was another solid quarter for us with a number of continuing positive trends* in our business.

Recurring revenue grew by 5% to $756 million and accounted for 92% of our total revenue. Total revenue was $821 million, up 1.7% over the second quarter of last year . . . *Attrition has stabilized* over the last two quarters and was essentially flat at 13.9% versus last quarter.

New entry *competitors continue to have little impact on attrition and in fact, we think the level of concern that has been expressed by some over the past few weeks is overblown*. . . We attribute less than 10% of our total customer disconnect to lost competition . . . We continue to closely monitor the impact . . ., but *to date nothing has really changed.*

*[W]e are affirming our guidance for fiscal year 2013 . . . I expect we will be about 5% for recurring revenue growth in fiscal 2013* . . . As we look towards the back half of the year, *we expect cost-to-serve expenses to be flat to be up only modestly* with further investment in capability to be largely offset by productivity gains and other cost-reduction programs. As a result, *margins should modestly improve as we continue to grow the revenue base . . . I expect us to come in at the high end of our full-year EBITDA margin guidance*.

I feel very good about our performance this quarter as our results were in line with our

expectations. With our needed customer service investments in place, we will be focused on cost control in the second half of the year and I am optimistic about our prospects for continued growth at attractive returns and for generating excess cash flow that can be deployed efficiently over time.

*       *       *

[Analyst:]  [A]ny thoughts on the pace of share repurchase to expect over the remainder of the fiscal year and if you, at this point, plan for any additional debt issuance to fund your purchases in the near term?

[Gursahaney:]  *[A]nything we do at this stage is going to be consistent with the $2 billion three-year share repurchase program that we announced back in November.*

[Analyst:]  Okay, but based on that, it doesn't sound like you're anticipating at this point raising incremental debt to fund share purchase. It sounds like you have plenty of excess liquidity at this point to do what you want to do.

[Gursahaney:]  Yes, I think we have liquidity at this point and *we are at our target leverage.* So again I think *we are sticking to what we laid out back in November.*

80.     After the announcement of the May 1, 2013 financial results, the Company's shares continued to trade at inflated prices of over $42.00 per share.

81.     On July 31, 2013, the Individual Defendants caused ADT to issue a press release titled "ADT REPORTS THIRD QUARTER 2013 RESULTS[,] COMPANY PROVIDES UPDATE ON CAPITAL ALLOCATION STRATEGY, ANNOUNCES ACQUISITION OF DEVCON SECURITY."

82.     In this press release, the Individual Defendants again caused the Company to report strong recurring revenue growth and margin results, and restated its reported attrition rates to reflect metrics that were significantly more favorable than previously reported, stating, in relevant part:

The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.52 for the third quarter of 2013 . . .  Recurring revenue, which made up 92% of total revenue in the quarter, was up 4.2%.  *Recurring revenue growth was driven primarily by an increase in ending average revenue per customer, which rose to $40.08*.

*The company has determined that its net attrition rates for prior periods have been overstated due to the inaccurate capture of certain resale activity*.  The revised net

attrition rate for the current quarter was 13.8% and revised rates for the preceding quarters were: 13.5%, 13.4%, 13.5%, 13.2%, 12.9%, 12.7%, and 12.7% for the quarters ended March 29, 2013 through September 30, 2011, respectively. ADT closed the quarter with 6.5 million customer accounts.

\*         \*         \*

EBITDA before special items was $433 million, 5.1% higher than the prior year, and EBITDA margin before special items was 52.0%, a 140 basis point improvement. The margin expansion was mainly due to the favorable impact of the mix shift to more ADT-owned systems and cost control initiatives that helped to offset the impact of dis-synergies and public company costs resulting from the separation from Tyco International.

Operating cash flow for the twelve month period ended June 28, 2013 was $1.6 billion.  Steady-state free cash flow before special items, calculated on a pre-tax and unlevered basis for the twelve month period ended June 28, 2013 was $918 million.

\*         \*         \*

Naren Gursahaney, ADT's Chief Executive Officer, said, "Our results for the quarter reflect solid execution on our growth and cost control initiatives.  We continued to make significant progress in expanding sales of ADT Pulse with the trends in take rates demonstrating the broad appeal of the Pulse product set across all of our sales channels."

\*         \*         \*

**SHARE REPURCHASE PROGRAM**

Under its previously announced three-year, $2 billion authorization, the company repurchased 7 million of its shares for $296 million during the quarter.  Additionally, during April 2013, the company received 1.2 million additional shares of its common stock in conjunction with the completion of the $600 million accelerated share repurchase program initiated on January 29, 2013. ***From inception of the $2 billion program to date the company has repurchased 25.3 million shares for $1.15 billion***.

83.     The Company also reduced its financial forecast for 2013, including a reduction in

expected recurring revenue growth and steady free cash flow and increased its margins and free cash

from expectations:

**UPDATING FISCAL YEAR 2013 GUIDANCE**

- Recurring revenue growth of 4.5%-4.8%

- EBITDA margin before special items approximately 51.0%

- Free cash flow before special items of $450-$500 million

- Steady-state free cash flow before special items $900-$950 million

84.     On July 31, 2013, the Company hosted a conference call for analysts and investors to discuss third quarter 2013 results:

[Gursahaney:]   Overall this was another solid quarter for us with a number of positive trends in our business.  Recurring revenue grew by 4.2% to $764 million and accounted for 92% of our total revenue. Total revenue was $833 million, up 2.3% over the third quarter of last year.

85.     Following the release of ADT's results for fiscal third quarter 2013, ADT common stock traded at artificially inflated prices above $41 per share.

86.     On September 24, 2013, the Individual Defendants caused ADT to issue a press release titled "THE ADT CORPORATION PRICES PRIVATE OFFERING OF SENIOR NOTES." The press release announced the pricing of debt securities that would raise capital to, in part, repurchase outstanding shares of its common stock stating, in pertinent part:

The ADT Corporation (NYSE: ADT) announced the pricing of its offering of $1,000,000,000 of 6.250 percent senior unsecured notes due 2021.  ADT intends to use the net proceeds from the offering primarily to repay $150 million in borrowings under its revolving credit facility, *repurchase outstanding shares of its common stock* and for other general corporate purposes, including acquisitions.

87.     On November 20, 2013, the Individual Defendants caused ADT to issue a press release titled "ADT REPORTS FOURTH QUARTER AND FISCAL YEAR 2013 RESULTS Q4'13 RECURRING REVENUE UP 5%; Q4'13 GAAP DILUTED EPS UP 13%[;] COMPANY INCREASES RETURN OF CAPITAL TO SHAREHOLDERS" stating, in pertinent part:

The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.45 for the fourth quarter of 2013.  Excluding special items for the separation from Tyco, and merger and restructuring costs, diluted earnings per share was $0.46.  This compares to earnings per share excluding special items of $0.43 in the fourth quarter

of last year.

Recurring revenue, which made up 92% of total revenue in the quarter, was up 4.7%. Recurring revenue growth was driven by 388 thousand gross additions . . . . This was partially offset by customer attrition, which rose 10 basis points sequentially to 13.9%. ADT closed the quarter with 6.5 million customer accounts, 1.5% higher than last year. Total revenue of $846 million increased 4.2% compared to the fourth quarter of 2012.

*     *     *

ADT's Chief Executive Officer, Naren Gursahaney, commented on the company's results, "I am pleased with our progress during our first year as a standalone public company. We continue to build on our industry leading position . . . In the fourth quarter, we again delivered solid recurring revenue growth driven in large part by the success of Pulse and our acquisition of Devcon Security."

**RETURN OF CAPITAL**

Under its previously announced three-year, $2 billion share repurchase program, the company repurchased 5 million of its shares for $206 million during the fourth quarter. Additionally, since quarter end, the company repurchased 7 million shares for $300 million. ***From inception, the company has repurchased 35.5 million shares for $1.6 billion under this program***, resulting in a 15% reduction to outstanding shares.

The company announced today that it has ***entered into an accelerated share repurchase agreement with JPMorgan Chase Bank, under which it will repurchase approximately $400 million of its common stock.*** The company will acquire the shares under its previously authorized share repurchase program and will fund the repurchase from available cash on hand. Under the terms of the agreement with JPMorgan Chase Bank, ADT will pay JPMorgan Chase Bank $400 million on November 22, 2013 and on that date will receive initial deliveries of approximately 8 million shares, representing a substantial majority of the shares expected to be retired over the course of the agreement. The total number of shares ultimately repurchased under the agreement will generally be based on the volume-weighted average share price of the company's common stock during the calculation period of the accelerated share repurchase program, less a discount. The accelerated share repurchase program is expected to be completed by March 25, 2014, although the completion date may be accelerated at JPMorgan Chase Bank's option after an initial fixed period. The actual number of shares repurchased will be determined at the completion of the accelerated share repurchase program.

***Between the shares already repurchased and the accelerated share repurchase program, we expect to complete the three year, $2 billion share repurchase program in the first half of fiscal 2014. As a result, the company's board of directors has increased the current share repurchase authorization by an additional $1.0 billion, expiring on November 27, 2015 unless it is terminated***

*earlier by the company.*

88.     After the November 20, 2013 report of ADT's results for fiscal fourth quarter 2013, ADT common stock traded at prices above $44 per share.

## REASONS STATEMENTS WERE IMPROPER

89.     The true facts, which were known or were recklessly disregarded by the Individual Defendants but concealed from the investing public, were as follows:

(a)     Despite the Individual Defendants' representations concerning the Company's current financial condition and bullish forecasts of future financial results, ADT was experiencing reduced non-Pulse demand, accelerated churn rate and attrition, and increased advertising and service costs, all of which were negatively impacting ADT's recurring revenue, margins, and earnings;

(b)     ADT had been relying on its aggressive share repurchases to artificially inflate reported earnings per share, thereby disguising an overall growth slowdown; and

(c)     In light of these known facts, the Individual Defendants did not have a reasonable basis to cause the Company to issue the 2013 and 2014 quarterly and full year financial forecasts it released.

90.     As a result of the Individual Defendants' false and misleading statements and omissions, ADT shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial condition and future business prospects emerged, ADT stock crumbled from its Relevant Period high of $49.73, dropping approximately 37% from that price by the end of the Relevant Period.

## THE TRUTH EMERGES

91.     Just days after the Company's fourth quarter and fiscal 2013 results were announced, and before the market opened on November 25, 2013, the Individual Defendants caused

ADT to issue a press release titled "ADT ANNOUNCES REPURCHASE OF SHARES HELD BY CORVEX," which announced ADT's intention and agreement to repurchase the vast majority of Meister and Corvex's ADT common stock position in a private transaction at an above-market price.

92.     The Company also announced that Meister resigned from ADT's Board stating, in pertinent part:

> The ADT Corporation (NYSE: ADT) announced today that it has entered into an agreement to repurchase 10.24 million shares of ADT common stock beneficially owned by Corvex Management LP ("Corvex"), *at a purchase price of $44.01 per* share.   The purchase price equals the closing price of ADT common stock on November 22, 2013.
>
> Keith Meister, the Founder and Managing Partner of Corvex, has also submitted his resignation from ADT's Board of Directors, effective immediately.

93.     On the same day, November 25, 2013, Morningstar issued a report discussing the abrupt departure of Corvex and the sale of common stock back to the Company, noting:

> "The share sale by Corvex sends a negative signal to the market that ADT is no longer the great investment it was originally thought. *Corvex likely scored around a 10% gain on its stock purchases . . . but . . . [i]n its 50-slide presentation to investors a year ago, Corvex argued that ADT was worth anywhere from $61 to $83 . . .[.]*"

94.     This news had investors sounding the alarm as shares of ADT sank almost 10% from its high point on November 22, 2013 of $44.40 per share to close at $40.85 per share on November 26, 2013 on unusually heavy trading volume.

95.     On December 2, 2013, ADT filed a Form 8-K with the SEC confirming that the Company had repurchased 10,240,000 shares of ADT common stock from Meister and Corvex in a private transaction at an above-market price of $44.01 per share.

96.     News that the Company had indeed repurchased over 10 million shares in a private transaction from the *very insider* who had just a year prior pushed to increase leverage to repurchase millions of shares – all while trumpeting a $60-80 target price for the Company's stock - caused

investors to continue to sound the alarm bells, pushing the price of ADT shares down further to a closing price of $38.80 per share on December 13, 2013, far below the $44.01 Corvex received from the Company.

97.    Then, on January 30, 2014, the Individual Defendants caused ADT to issue a press release titled "ADT REPORTS FIRST QUARTER 2014 RESULTS," which badly missed the Company's guidance and analysts' consensus estimates and revealed a far-worse-than-forecasted financial condition and diminished future prospects.

98.    Namely, it was revealed that ADT was experiencing reduced demand, accelerated churn rate and attrition, and increased advertising and service costs, all of which were negatively impacting ADT's recurring revenue, margins, and earnings:

> The ADT Corporation (NYSE: ADT) today reported its financial results for the first quarter of 2014. The Company reported diluted earnings per share of $0.39 for the first quarter of 2014. Excluding special items for the separation from Tyco, merger and restructuring costs, and 2G radio conversion costs, diluted earnings per share was $0.43. This compares to diluted earnings per share excluding special items of $0.44 in the first quarter of 2013. Using the Company's cash tax rate, diluted earnings per share before special items was $0.66. Net income for the first quarter of 2014 was $77 million.

99.    On January 30, 2014, Barclays issued a report titled "ADT Corporation F1Q14: Thoughts + Model" which sharply criticized ADT's disappointing financial results and suspect repurchase of an insider's shares and questioned management's credibility, stating:

> *A far worse-than-expected quarter out of ADT which raises the question of management's credibility and the unusually structured deal the company made with a board member announced on 11/25/13.* For context, the company agreed to buy 10.24M shares directly from a board member's firm at a price set on the day before the company announced this shareholder was selling down the position and leaving the board.
>
> We had a number of questions from investors regarding the structure of this deal at the time it was made and *given today's earnings we suspect more questions will arise*. Beyond the credibility questions, this quarter's accelerating churn rate, shortfall in customer ads, and large margin miss only add to concerns over impacts from competition on growth and pricing.

100.     Stockholders apparently shared the same skepticism as they exited ADT in droves. Indeed, ADT shares declined from a close of $37.81 on January 29, 2013 to a close of $31.40 on January 30, 2014, with more than 36 million shares traded.

101.     On January 31, 2014, William Blair issued a report titled "The Wheels May Have Come Off its Operational Execution, but ADT's Pulse Remains Vibrant."  The report, discussing the Company's earnings and margin miss which caused ADT stock to decline approximately 17% on January 30, 2014 stated, in pertinent part that:

**The ADT Corporation**

**The Wheels May Have Come Off Its Operational Execution, but ADT's Pulse Remains Vibrant**

- ADT Corporation reported a significantly weaker quarter than anticipated, with GAAP EPS totaling $0.39 but adjusted EPS excluding one-time items of $0.43, down 2% from a year ago ***and well below consensus of $0.49 and our $0.52 forecast. Recurring revenue growth of 4.2% versus a year ago was weak and trailed our 4.9% forecast***.

- Better-than-expected Pulse take-rates and upgrades enabled stronger-than-expected ARPU, ***but new customer additions were shockingly weak for dealer and direct originated channels***, while net SAC surged 40%, driving ADT's net SAC creation multiple up 22% (or 20% excluding upgrade costs).

- ***The shares declined 17% to new lows on three primary concerns: the apparent misallocation of capital ($1.2 billion to repurchase 25.5 million shares or 12% of fully diluted shares at year end fiscal 2013 ending last September at an average price of $46.43 per share), surging SAC costs, and lower third-party new customer referrals due to heightened advertising by new entrant competitors***.

- ***Total revenues rose 3.7%, below our 4.9% projection, while EBITDA margins, targeted to rise 50 basis points this year, declined 70 basis points to 50.8% from a year ago, well below our 51.7% forecast and consensus of 51.3%.  Net customer attrition rose 30 basis points sequentially to 14.2% and 80 basis points from 13.4% a year ago***.

- ***New customer additions of 231,000 declined 9.4% from 255,000 a year earlier (versus our 268,000 forecast); dealer additions fell 16.0%*** and direct account additions declined 5.2%.  While ADT has encountered weak dealer origination problems over the past year, ***the emergence of a large decline in new direct customer additions was a material new problem attributed to lower third-party***

33

*referrals*.

102.    In the days immediately following the Company's earnings miss, investors fled ADT *en masse* as ADT traded at higher than usual volume, driving the price down over 23% from the closing price of $37.81 per share on January 29, 2014 to $28.83 per share on February 3, 2014.

103.    All told, as a result of the Individual Defendants' false and misleading statements and omissions, ADT shares traded at artificially inflated prices during the Relevant Period. However, after the above-alleged revelations of the true but undisclosed facts seeped into the market, the Company's shares experienced exorbitant selling pressure sending its price down nearly 37% from its Relevant Period high.

## THE IMPROPER STOCK REPURCHASES

104.    While the Individual Defendants were making or causing to be made materially false or misleading and improper statements, or omitting information rendering the statements made false and misleading, such that the price of the Company's stock was artificially inflated, they either directed or permitted the Company to overpay for its own stock through significant stock repurchases.

105.    Indeed, the Individual Defendants, including each Director Defendant, facilitated and allowed the Company to engage in an epic stock repurchase program whereby the Company was caused to purchase millions of its shares at artificially inflated prices.  Specifically the Individual Defendants caused the Company to go into significant debt in order to repurchase *more than a billion dollars* worth of artificially inflated Company stock during the Relevant Period.

106.    In fact, instead of halting the stock repurchase program altogether, the Individual Defendants actually *increased* the Company's repurchase authorization from $2.0 billion to $3.0 billion.  Notably, this decision to increase the repurchase authorization by another $1.0 billion was announced on November 20, 2013, just five days before ADT agreed to purchase the Corvex

shares and Meister resigned from the Board.

107.    Indeed, the Individual Defendants caused the Company to repurchase 10.24 million shares owned by Meister-controlled Corvex at $44.01 per share, causing the Company to expend more than *$450 million* on those shares alone.  Meister was a director of ADT until November 25, 2013 – the same day the repurchase of the Corvex shares was announced.

108.    The Individual Defendants knew or recklessly disregarded the fact that the Company's stock price was artificially inflated due to the false or materially misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.

109.    Each of the Individual Defendants, including the Director Defendants, either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects through access to internal corporate documents, conversations and connections with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.  Despite knowing that the Company's stock was inflated due to their own and/or others' improper and misleading statements, the Individual Defendants, including the Director Defendants, collectively directed or permitted ADT to expend more than *a billion dollars* to repurchase millions of shares of Company stock.

110.    In particular, pursuant to stock repurchase programs authorized by the Individual Defendants, the Board permitted the Company to repurchase millions of shares beginning in November 2012 even though they knew, or should have known that:

(a)    Despite the positive representations concerning the Company's then current financial condition and bullish forecasts of its future financial results, statements which the Individual

Defendants caused the Company to make during the Relevant Period, ADT was actually experiencing reduced non-Pulse demand, accelerated churn rate and attrition, and increased advertising and service costs, all of which were negatively impacting ADT's recurring revenue, margins, and earnings;

(b)     In reality, ADT was relying on its aggressive share repurchase program authorized by the Individual Defendants to artificially inflate reported earnings per share; and

(c)     In light of these known facts, the Company did not have a reasonable basis for its 2013 and 2014 quarterly and full year financial forecasts.

111.     The Individual Defendants either knew or recklessly disregarded that the Company's share price was inflated due to the false or materially misleading statements described herein.  Nevertheless, the Individual Defendants, including the Director Defendants, caused the Company to incur huge amounts of debt in order to pay large, artificially created premiums to repurchase its own stock, despite knowing (or recklessly disregarding) that the exposure of these false or materially misleading statements and omissions would cause the Company's stock price to drop significantly.  As such, the decision made by the Individual Defendants, including the Director Defendants, to repurchase the Company's stock was not the product of valid business judgment.

112.     Under the direction of the Individual Defendants, the Company bought back its shares at well over $40 per share.  For example, the Individual Defendants caused the Company to repurchase 12.6 million shares for $600 million from Credit Suisse International at a price per share of more than $47 in connection with an accelerated stock repurchase program and another 10.24 million shares for more than $450 million from Corvex – which was controlled by then-director Meister – at $44.01 per share.  ADT's closing price on January 30, 2014 – the day after the earnings miss was announced – was $31.40 per share.  Thus, just from the Credit Suisse

International and Corvex transactions *alone*, the Company lost approximately *$325 million*. Indeed, the Company incurred real economic loss from the shares it repurchased at inflated prices during the Relevant Period.

113.    Because the price of ADT's shares was artificially inflated by way of the Individual Defendants' false and misleading statements and omissions, the Company overpaid materially for its own stock. The stock repurchases had the effect of falsely signaling to ADT's stockholders and the public that the purchase of the Company's stock at those prices was reasonable and that ADT's decision to use debt to do so was also reasonable. Thus, the Individual Defendants, including the Director Defendants, committed corporate waste by causing ADT to purchase more than a billion dollars of its own shares at artificially inflated prices.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### *Fiduciary Duties*

114.    By reason of their positions as officers, directors, and/or fiduciaries of ADT and because of their ability to control the business and corporate affairs of ADT, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ADT in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ADT and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

115.    Each director and officer of the Company owes to ADT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### *Audit Committee Duties*

116.    In addition to these duties, the members of the Audit Committee owed specific duties to ADT under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

117.    In particular, according to the Company's Audit Committee Charter, its purpose is to assist the Board in monitoring:

a.    The integrity of the financial statements of the company;

b.    The external auditor's independence and qualifications;

c.    The performance of the Company's internal audit function and external auditors;

d.    The compliance by the Company with legal and regulatory requirements; and

e.    The effectiveness of the Company's internal controls.

118.    Further, according the Company's Audit Committee Charter, specific responsibilities of the Audit Committee include, among other things:

- Review and discuss the annual audited financial statements and unaudited quarterly financial statements, including the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") with management, the senior internal auditor and the external auditor, and recommend to the board whether the audited financial statements and MD&A should be included in the Company's annual report on Form 10-K with respect to the annual audited financial statements or recommend to the Committee whether the unaudited quarterly financial statements and MD&A should be included in the quarterly report on Form 10-Q.

- Discuss with management corporate policies with respect to earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

-    Meet periodically with management to review and discuss the Company's policies and guidelines with respect to risk assessment and risk management and risks, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

-    Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in the Company's internal controls.

-    Consider the effectiveness of the Company's internal control over annual and interim financial reporting, including information technology security and control.

119.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

### Control, Access, and Authority

120.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of ADT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ADT.

121.    Because of their advisory, executive, managerial, and/or directorial positions with ADT, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of ADT.

122.    At all times relevant hereto, each of the Individual Defendants was the agent of each other and of ADT, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

123.    To discharge their duties, the officers and directors of ADT were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ADT

were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)    remain informed as to how ADT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)    ensure that ADT was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

124.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to ADT and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of ADT's affairs, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ADT, the absence of good faith on their part, and a reckless disregard for their duties to

ADT and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to ADT.

125.    The Individual Defendants each breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to make false and misleading statements, or by failing to take any actions to correct the false and/or misleading statements. The false and misleading statements misled shareholders into believing that the Company's current financial condition and outlook for fiscal 2013 and 2014 was far more positive than what was actually the case. Further, the Individual Defendants used the aggressive repurchase program (funded in large part by debt) to artificially inflate reported earnings per share, masking the overall growth slowdown the Company was experiencing.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, ADT has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

126.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

127.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's current financial condition and outlook for fiscal 2013 and 2014 was far more positive than what was actually the case. Further, the Individual Defendants used the aggressive repurchase program (funded in large part by debt) to artificially inflate reported earnings per share,

masking the overall growth slowdown the Company was experiencing.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

128.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of state law, including breaches of fiduciary duties, unjust enrichment, waste of corporate assets, abuse of control, and aiding and abetting fiduciary violations; and (b) disguise and misrepresent the Company's current financial condition and future business prospects.

129.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

130.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO ADT

131.    As a result of the Individual Defendants' wrongful conduct, ADT disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated ADT's credibility.  ADT has been, and will continue to be, severely damaged and injured by the Individual Defendants'

misconduct.

132.    As a direct and proximate result of the Individual Defendants' actions as alleged above, ADT's market capitalization has been substantially damaged.

133.    Further, as a direct and proximate result of the Individual Defendants' conduct, ADT has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending ADT and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on ADT's artificially-inflated stock price and inflated revenues;

(c)    costs incurred from the Company buying back more than a billion dollars worth of shares of Company stock at prices inflated through the Individual Defendants' misconduct;

(d)    costs incurred by the leverage the Individual Defendants utilized to fund a large portion of the stock repurchases; and

(e)    costs incurred from the loss of the Company's customers' confidence in ADT's services.

134.    Moreover, these actions have irreparably damaged ADT's corporate image and goodwill.  For at least the foreseeable future, ADT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ADT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

135.   Plaintiff brings this action derivatively in the right and for the benefit of ADT to redress injuries suffered, and to be suffered, by ADT as a direct result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and corporate waste, as well as the aiding and abetting thereof, by the Individual Defendants.  ADT is named as a nominal defendant solely in a derivative capacity.

136.   Plaintiff will adequately and fairly represent the interests of ADT in enforcing and prosecuting its rights.

137.   Plaintiff was a shareholder of ADT common stock throughout the entire Relevant Period and has been continuously since.

138.   Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

139.   At the time this action was commenced, the Board of ADT consisted of the following eight directors: Colligan, Richard J. Daly ("Daly")[7], Donahue, Dutkowsky, Gordon, Gursahaney, Heller, and Hyle.  Each of these directors, except for Daly, is named as a defendant herein.

***Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability***

140.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its current financial condition and outlook for fiscal 2013 and 2014 as well as statements related to the Company's aggressive

---

[7] Daly joined the Board on January 9, 2014, and is a member of the Compensation Committee.

repurchase program were true and not materially misleading.  Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

141.    Further, the Director Defendants abused their control and wasted ADT's corporate assets by authorizing and effectuating the repurchase of more than a billion dollars worth of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated. Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

142.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

143.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing

and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of ADT to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

### *Demand is Futile as to the Audit Committee Defendants*

144.    The Audit Committee Defendants were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, for overseeing ADT's internal controls over financial reporting, and for discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

### *Demand is Futile as to Defendant Gursahaney for Additional Reasons*

145.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Gursahaney because Gursahaney is not an independent director.

146.    Gursahaney also cannot disinterestedly consider a demand to bring suit against himself because Gursahaney is a named defendant in the Securities Class Action which alleges that he made many of the same misstatements described above in violation of the federal securities laws.

Thus, if Gursahaney were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

147.    Demand is futile for the additional reason that Gursahaney is an employee of the Company who derives substantially all of his income from his employment with ADT, making him, as acknowledged by the Company in its most recent Definitive Proxy dated January 27, 2014,  not independent.  As such, Gursahaney cannot independently consider any demand to sue himself for breaching his fiduciary duties to ADT, because that would expose him to liability and threaten his livelihood.

### Demand is Futile as to All Director Defendants for Additional Reasons

148.    If ADT's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this complaint by directors and officers liability insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by ADT against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of ADT, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

149.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting ADT by prosecuting this action. Therefore, demand on ADT and its Board is futile and is excused.

150.    ADT has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### *Against the Individual Defendants for Breach of Fiduciary Duties*

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants owed and owe ADT fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe ADT the highest obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

153.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

154.    The Individual Defendants each knowingly, recklessly, or negligently: (i) made false and/or misleading statements that misrepresented or failed to disclose material information concerning the Company, (ii) approved the issuance of such false and/or misleading statements, and/or (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155.    As a direct and proximate result of the Individual Defendants' failure to perform

their fiduciary obligations, ADT has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## COUNT II

### *Against All Individual Defendants for Unjust Enrichment*

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ADT.

159.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to ADT.

160.    Further, Corvex, which was and is controlled by Meister, was unjustly enriched as it received value for millions of its ADT shares that it knew far exceeded what the actual value of those shares would have been but for the Individual Defendants' false and misleading statements and omissions.  Indeed, Corvex received $44.01 per share of ADT stock for 10.24 million shares, or approximately $450 million.  Mere weeks later, once the truth was revealed regarding the Company's actual financial outlook and business prospects, those very shares would have been worth approximately $125 million less than the Company was forced to pay for them.

161.    Plaintiff, as a shareholder and representative of ADT, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

162.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## COUNT III

### *Against the Individual Defendants for Waste of Corporate Assets*

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.    As detailed above, the Individual Defendants diverted corporate assets for improper and unnecessary purposes.  Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies expended by ADT.

165.    The Individual Defendants wasted ADT's corporate assets by authorizing and effectuating the repurchase of more than a billion dollars of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

166.    The Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors during the Relevant Period, despite their breaches of fiduciary duties, exposing ADT to civil liability, and causing the Company to incur potentially millions of dollars in legal costs.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

167.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## COUNT IV

### *Against the Individual Defendants for Abuse of Control*

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ADT, for which they were and are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing ADT to issue statements that improperly portrayed the Company's financial condition and future business prospects, including issuing improper statements concerning the Company's outlook for fiscal 2013 and 2014.

171.    Further, the Individual Defendants abused their control and influence of ADT by authorizing and effectuating the repurchase of more than a billion dollars worth of Company stock at prices they knew, or recklessly were unaware, were artificially inflated.  Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

172.    Additionally, causing the Company to repurchase the Corvex ADT shares when Corvex was controlled by Meister, at prices the Individual Defendants either knew or were recklessly unaware, were artificially inflated was an abuse of control.

173.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## COUNT V

### *Against All the Individual Defendants for Aiding and Abetting Fiduciary Violations*

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    The wrongful conduct alleged herein was continuous, connected, and on-going since November 2012.  The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

177.    The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by ADT and the decision to repurchase stock that was artificially inflated, and had the power and/or ability directly or indirectly to control or influence one another.

178.    Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

179.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

180.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, corporate waste, abuse of control, and unjust enrichment;

B.    Directing ADT to take all necessary actions to reform and improve its corporate

governance and internal procedures to comply with applicable laws and to protect ADT and its

shareholders from a repeat of the damaging events described herein, including, but not limited to,

putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a provision to permit the shareholders of ADT to nominate at least three candidates for election to the Board;

- a proposal to form a standing finance committee of the Board who shall be responsible for, among other things, overseeing and reviewing financial matters affecting the Company including reviewing financial transactions involving the issuance of debt or equity securities for the purposes of raising funding or refinancing indebtedness or other obligations of ADT, and entrance into new credit facilities, leases, and other forms of financing;

- a proposal to ensure the accuracy of the qualifications of ADT's directors, executives, and other employees; and

- a provision to appropriately test and then strengthen the internal disclosure and control functions;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state

statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

on, or otherwise restricting the Individual Defendants', including Corvex's, assets so as to assure that

Plaintiff, on behalf of ADT, has an effective remedy;

D.      Awarding to ADT restitution from the Individual Defendants, and each of them, and

ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual

Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 29, 2014              LEE & AMTZIS, P.L.

                       *s/Eric Lee*

Eric Lee (Bar No. 961299)
lee@leeamlaw.com
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: (561) 981-9988

JOHNSON & WEAVER, LLP
Frank J. Johnson
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
JOHNSON & WEAVER, LLP
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Jason McBride, hereby verify that I am a shareholder of The ADT Corporation (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.


Date: 04/14/2014

DocuSigned by:

*Jason McBride*

84E1AA04D5754C9...

Jason McBride