**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Lead Case No. 14-80570-CIV-DIMITROULEAS/SNOW

IN RE THE ADT CORPORATION DERIVATIVE
LITIGATION

_____

This Document Relates To:

      ALL ACTIONS

**<u>VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  SUMMARY OF THE ACTION ................................................................................1

II.  JURISDICTION AND VENUE ............................................................................8

III.  PARTIES ...............................................................................................................9

    A.  Plaintiffs ...................................................................................................9

    B.  Nominal Defendant ................................................................................10

    C.  Individual Defendants ............................................................................10

    D.  Defendant Corvex ...................................................................................17

IV.  DUTIES OF THE INDIVIDUAL DEFENDANTS ..........................................18

    A.  Fiduciary Duties Owed to the Company ................................................18

    B.  The Company's Code of Conduct ...........................................................20

    C.  The Company's Board Governance Principles .......................................21

    D.  The Company's Nominating and Governance Committee Charter ..................23

    E.  The Company's Audit Committee Charter ..............................................26

    F.  The Company's Compensation Committee Charter ...............................30

    G.  Control, Access, and Authority ..............................................................34

    H.  Reasonable and Prudent Supervision ....................................................34

V.  FACTUAL ALLEGATIONS ...............................................................................35

    A.  Background of ADT ................................................................................35

    B.  The Individual Defendants Cause ADT to Issue Improper Statements ..............37

    C.  The Truth Regarding the Individual Defendants' Wrongful Course of Conduct Begins to Emerge ....................................................................65

VI.  THE IMPROPER STOCK REPURCHASES ...................................................76

VII.  DAMAGES TO ADT CAUSED BY THE INDIVIDUAL DEFENDANTS ................79

VIII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................................81

i

**TABLE OF CONTENTS (cont.)**

Page

A.    Demand on the ADT Board Would Have Been Futile ......................................81

B.    Defendants Face A Substantial Likelihood of Liability ...................................82

1.    The Audit Committee Defendants Face a Substantial Likelihood of Liability..............................................................................................84

2.    The Compensation Committee Defendants Face a Substantial Likelihood of Liability...........................................................................85

3.    The Nominating and Governance Committee Members Face a Substantial Likelihood of Liability ........................................................86

C.    The Individual Defendants Lack Independence .................................................86

D.    Demand is Futile as to All Director Defendants for Additional Reasons...........90

IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ............91

X.    CAUSES OF ACTION .......................................................................................93

COUNT I  (Against Defendants Colligan, Donahue,Dutkowsky, Gordon, Heller, Hyle, Gursahaney and Paliwal for Violations Of § 14(A) of The Exchange Act) .................93

COUNT II  (Against the Individual Defendants for Breach of Fiduciary Duty).......................94

COUNT III  (Against All the Individual Defendants for Contribution and Indemnification)..................................................................................................96

COUNT IV  (Against All the Individual Defendants for Waste of Corporate Assets) .............96

COUNT V_(Against All the Individual Defendants for Abuse Of Control)............................98

COUNT VI  (Against the Individual Defendants and Corvex for Unjust Enrichment) .............98

COUNT VII  (Against the Individual Defendants and Corvex for Aiding  and Abetting Fiduciary Violations) ........................................................................................99

PRAYER FOR RELIEF ................................................................................................100

JURY DEMAND ..........................................................................................................102

Plaintiffs Jason McBride ("McBride"), Teamsters Local 456 Annuity Fund ("Teamsters"), and Charles Zimmerman ("Zimmerman") (together, "Plaintiffs"), by and through their undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint") against Defendants named herein.

## I.      SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant The ADT Corporation ("ADT" or the "Company"), against certain current and former members of the Company's Board of Directors (the "Board") and certain current and former of its executive officers (collectively, the "Individual Defendants") seeking to remedy the Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, unjust enrichment, corporate waste and issuing materially false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), during the period beginning, at the latest, November 27, 2012 through the present (the "Relevant Period").

2.      Defendants' violations arise from a course of misconduct whereby Defendants allowed dissemination of false and misleading statements to the investing public about the Company's financial condition and future business prospects for the Company's fiscal years 2013 and 2014, including representations concerning the Company's strong current financial condition and bullish forecasts of future financial results.  Defendants also engaged in a foolish and self-serving, debt-fueled share buyback spree all the while failing to inform investors that business was trending much worse than what investors were led to believe.  To add insult to injury, ADT purchased shares back from hedge fund Corvex Management LP ("Corvex") and its managing partner, Keith Meister ("Meister"), at artificially inflated prices, allowing the very

proponent of the disastrous strategy to escape from its exposure to ADT prior to the Company disclosing its true financial condition.  Shareholders and the Company continue to suffer from the Individual Defendants' wrongdoing.

3.      As one example, Meister criticized ADT's conservative approach to debt and referred to ADT's capital structure as "indefensible" during a presentation that accompanied Corvex's disclosure of a 5.02% stake in the Company in October 2012.  Meister argued that increasing leverage to repurchase shares would, purportedly, drive up the price of ADT's common stock to $60-80 per share.

4.      Although the Individual Defendants had caused the Company to represent that its financial and business outlook was healthy and robust, ADT was plagued by increased competition in the home security market, growing attrition rates, and increased subscriber acquisition costs resulting from take rates/upgrades with regard to the Company's Pulse Automation Solutions ("Pulse") division.  With knowledge of ADT's true financial position and business prospects, the Company loaded up with debt after succumbing to threats by Corvex and Meister that they would, among other things, wage a proxy battle and unseat the current Board if their demands were not satisfied.

5.      In response, the Individual Defendants (1) welcomed Meister to the Board in December 2012 and invited him to serve on the Audit Committee, (2) raised the Company's leverage ratio to three times, risking the Company's investment grade rating, and (3) approved an enormous $3 billion share repurchase program.  The Individual Defendants undertook this course of conduct, not for the benefit of ADT and its shareholders, but to protect their positions as directors and executives of the Company.  ADT220-0000274-275, 293 (presentation to Board prepared by Credit Suisse in connection with December 13 and 14, 2012 Board meetings where

ADT's tactical response to Corvex's overtures were discussed with primary considerations being "[c]hanges in Board dynamics," and "Board composition . . .").

6.       Criticism of ADT's plan was widespread, as discussed in a November 29, 2012 *Dow Jones* report.[1]  The article noted that "*[a]nalysts say ADT's pursuit of buybacks is unusual for a company so new to the market.*"[2]  Specifically, Carol Levenson, an analyst for corporate debt research service Gimme Credit LLC, noted to her clients that "[n]ever have we seen a spinoff in as much of a hurry to reward shareholders at the expense of credit quality as ADT."  Credit-rating firms were critical as well.  "Fitch Ratings . . . lowered its rating on ADT to triple-B -- two  notches above junk territory -- from triple-B-plus.  Fitch left its outlook on ADT at stable.  Moody's Investors Service ("Moody's"), meanwhile, did not lower its rating on ADT, but dropped its outlook  on the company to negative from stable."  Moody's  Senior Analyst Suzanne Wingo stated that "*[t]he genesis for this buyback was the activist shareholder . . . [t]he concern is that the board has not met all of the activist's demands and it's going to face continued pressure.*"  Research firm Morningstar Inc. ("Morningstar") estimated that "ADT's buyback plan would shrink the  company's share count by about 17% by 2015, less than the 30% reduction sought by Corvex."

7.       Less than one month after Meister's appointment, on January 7, 2013, ADT issued a press release announcing that it had placed a private offering of senior notes worth in excess of $700 million.  ADT stated that it intended to use the net proceeds from the offering primarily for the repurchase of outstanding shares of ADT common stock.  In April 2013, the

---

[1]  *See* Tita, Robert, "Alarm Service ADT Under Spotlight for Stock Buybacks", DOW JONES, (Nov. 29, 2012), *available at* http://www.automatedtrader.net/real-time-dow-jones/119827/alarm-service-adt-under-spotlight-for-%20stock-buybacks.

[2]  Emphasis is added in quotations unless otherwise noted.

Company announced an exchange offer whereby certain unregistered notes were exchanged for new registered notes.

8.      On September 24, 2013, ADT announced another private offering of Senior Notes in the amount of $1 billion.  The Company stated that it intended to use the proceeds from the offering primarily to repay $150 million under its revolving credit facility, repurchase outstanding shares of its common stock, and for other general corporate purposes, including acquisitions.

9.      Then, on November 25, 2013, ADT shocked investors announcing in a press release that the Company would repurchase the vast majority of common stock owned by Meister and Corvex at an inflated price of $44.01 per share for a total purchase price of $450,662,400, and that, notwithstanding Meister having joined the Board less than one year earlier, he was resigning from ADT's Board.  On this news, investors began to question the accuracy of ADT's earnings forecasts, with the price of ADT common stock dropping nearly 10% to $40.85 per share on November 26, 2014.  What the Individual Defendants did not disclose to investors was the fact that they authorized the repurchase of Corvex's shares to hasten Meister's departure from the Board and ensure that their own positions with the Company were secure.

10.     That same day, Morningstar issued a report discussing the abrupt departure of Meister and the sale of common stock, noting that the "share sale by Corvex sends a negative signal to the market that ADT is no longer the great investment it was originally thought"; and that "***Corvex likely scored around a 10% gain on its stock purchases . . . but . . . [i]n its 50-slide presentation to investors a year ago, Corvex argued that ADT was worth anywhere from $61 to $83 . . ..***"

11.     On December 2, 2013, ADT announced the completion of its Corvex buyback. On this news, ADT shares fell further, landing at $38.80 per share on December 13, 2013.

12.     Then, on January 30, 2014, before the market opened, ADT issued a press release announcing disappointing first quarter 2014 results for the three months ending December 27, 2013[3], failing to meet ADT's previous bullish earnings per share ("EPS") guidance and Wall Street's consensus estimate.  Investors reacted swiftly, and the price of ADT  stock fell 17% from $37.81 per share to $31.40 per share.  In regards to this stock drop, one analyst noted that "*[i]f you just looked at the stock price and know that ADT is a security company, you might just think that ADT's corporate headquarters had been broken into.*"[4]  Tellingly, the response to ADT's actions with its share buyback program and Corvex's exit from the Company has been utterly dismal.  Jeffrey Ubben, founder of $14 billion activist hedge fund firm ValueAct Capital, cited ADT as an example of destructive activism.[5]  Ubben, citing ADT, stated that "*In the vernacular of the media, it's a win, the activist triumphs.   It's a loss — the company's worse off.  We have to be more balanced in how we talk about this  stuff because there are some real failures out there.*"

13.     Al Lewis, who has been a financial journalist since 1985 and writes columns for *The Wall Street Journal Sunday* and *MarketWatch* observed that "*ADT Corp wants to protect your home, but it couldn't even protect itself from a corporate raider.*"[6]  Herb  Greenberg,

---

[3]  ADT ended its 2013 Fiscal Year on September 27, 2013.

[4]  *See* Ogg, Jon, "ADT Brings the Death of Growth," 24/7 WALL ST., (Jan. 30, 2014), *available at* http://247wallst.com/services/2014/01/30/adt-brings-the-death-of-growth/.

[5]   Delevingne, Lawrence, "Hedge honcho: Activists killing 'golden goose,'" CNBC, (April 30, 2014), *available at* http://www.cnbc.com/id/101626635.

[6]  Lewis, Al, "Corporate Raider Trips the Alarm at ADT," *available at* http://www.tellittoal.com/corporate-raider-trips-the-alarm-at-adt/.

financial journalist for over thirty years, was a little more blunt referring to ADT as "appalling" and stating that "[o]ver the past year, *rather than investing more cash in its business than it otherwise might have, ADT has spent billions buying back shares at prices well above where the stock now trades* — with the distortion even greater in the wake of today's earnings miss."[7]  Greenberg added in his article in *The Street* that the "Corvex buyback" is "*a classic example of activists gone wild*" and "*smacks of new-age greenmail.*"

14.     A Wall St. Cheat Sheet article entitled "Is Your Money Safe in ADT?" stated that "*[s]uch an aggressive buyback is highly suspicious*.  On the surface, it appears as if ADT's board, with Meister as its ring leader, executed a classic 'pump and dump.'  This means that *the company mislead investors and analysts who were led to believe that the numbers would be better than they thought they would be*."[8]

15.     James Krapfel, a financial analyst at Morningstar clearly summarized ADT's management's actions, giving the company a Poor stewardship rating:

> We assign ADT a Poor stewardship rating largely as a result of a substantial amount of value-destructive shareholder purchases.  With the prodding of activist investor Corvex Management (run by one of Carl Icahn's longtime associates Keith Meister), ADT increased its debt leverage from 1.5 times EBITDA post-spin to 2.6 times at December 2013 quarter-end and used the proceeds to buy a boatload of shares.  Through March 28, we estimate *ADT has repurchased $2.5 billion of stock at a $42.20 per share* average price, *well above our $27 fair value estimate.* The vast majority of the shares were repurchased *prior to* the firm's reporting disappointing December quarter results in late January.  This results in about *$1 billion of value destruction or about $5 per share.* The valuation destruction is still significant if we compare the stock repurchases to the current quote in the mid-30s. *Corvex did not suffer*

[7]  *See* Greenberg, Herb, "Greenberg: Why ADT is Appalling," THE STREET, (Jan. 30, 2014), available at http://www.thestreet.com/story/12286889/1/greenberg-why-adt-is-appalling.html?puc=yahoo&cm_ven=YAHOO.

[8]  Kramer-Miller, Ben, "Is Your Money Safe in ADT?," WALL ST. CHEAT SHEET, (Feb. 03, 2014), *available at* http://wallstcheatsheet.com/stocks/is-your-money-safe-in-adt.html/?a=viewall.

***with the rest of ADT's shareholder base, though***. The activist firm shrewdly sold the majority of its equity stake (10.2 million shares) to ADT ahead of the share decline at $44.22 per share in November 2013, and at a premium to ADT's prevailing share price.[9]

16.     In addition, during an investor's conference call held in April of 2014, Omega Advisors Inc., a large shareholder represented by Leon Cooperman, showed all his anger with management: "You guys have bought back . . . stock at very inappropriate prices . . . Management owes the shareholders an explanation."   In response, ADT's Chief Executive Officer ("CEO") Naren Gursahaney ("Gursahaney") stated that: "We feel that the valuation is significantly higher than where it is."[10]

17.     Throughout the Relevant Period, the Individual Defendants were well aware or were severely reckless in not knowing the true facts regarding the Company's financial health, business, operations, and prospects.   In blatant disregard of and in breach of their fiduciary duties, the Individual Defendants misrepresented and failed to disclose adverse facts, which were known to the Individual Defendants or recklessly disregarded by them, including that: (i) ADT was experiencing reduced non-Pulse demand, accelerating churn rate and attrition, and increasing advertising and service costs, all of which were negatively impacting ADT's recurring revenue, margins, and earnings; (ii) the Company has been relying on its aggressive share repurchases to artificially inflate reported EPS, thereby masking an overall growth slowdown and inflating the value of stock options granted to Company insiders; (iii) the Board and management were allowing business decisions regarding ADT's capital structure and share

---

[9]  Krapfel, James, "ADT's competitive pressures continues to make us cautious," Morningstar's Editorial Polices, (07/30/2014) *available at* http://analysisreport.morningstar.com/stock/research?t=ADT&culture=en-US&cur=USD&productcode=MLE.

[10]  News article quoting portions of the April 2014 Investor's Conference Call, *available at* *http://online.wsj.com/articles/activist-funds-dust-off-greenmail-playbook-1402527339.*

repurchase plan to be unduly influenced by Corvex and Meister; and (iv) ADT did not have a reasonable basis for its 2013 and 2014 quarterly full-year financial forecasts.

18.     ADT's Board has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to ADT for making, authorizing, or failing to correct the false and misleading statements alleged herein.  Accordingly, a pre-suit demand upon ADT's Board is a useless and futile act.  Thus, Plaintiffs rightfully bring this action to vindicate ADT's rights against its wayward fiduciaries and hold them responsible for the damages they have caused ADT.  More specifically, Plaintiffs bring this derivative action to, among other things, recover damages including, but not limited to, fees, costs, loss of goodwill, and business opportunities, as well as loss in market value and shareholder equity, caused by the Individual Defendants' unlawful courses of conduct and breaches of fiduciary duty and to require the Company to reform and improve its corporate governance and internal procedures to protect ADT and its shareholders from a repeat of the damaging events described herein.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, corporate waste, contribution and indemnification, aiding and abetting fiduciary violations, and unjust enrichment.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.  Plaintiffs are, and were at all relevant times, shareholders of nominal defendant ADT.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action

is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. §1331.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with Florida so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to ADT, occurred in this District and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## III.   PARTIES

### A.     Plaintiffs

23.     Plaintiff McBride is and at all relevant times was a shareholder of Nominal Defendant ADT.

24.     Plaintiff Local 456 is and at all relevant times was a shareholder of Nominal Defendant ADT.

25.     Plaintiff Zimmerman is and at all relevant times was a shareholder of Nominal Defendant ADT.

**B.     Nominal Defendant**

26.     Nominal Defendant ADT is incorporated under the laws of the state of Delaware and maintains its principal place of business at 1501 Yamato Road in Boca Raton, Florida 33431.   ADT is a leading provider of electronic security, interactive home and business automation and monitoring services for residences and small businesses in the United States and Canada.  ADT's shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol ("ADT").   ADT had more than 180 million shares issued and outstanding during the Relevant Period.

**C.     Individual Defendants**

27.     Defendant Gursahaney is President, Chief Executive Officer and a Director of ADT.   Prior to the separation from Tyco International Ltd. ("Tyco") in September 2012, Gursahaney served as President of Tyco's ADT North American Residential business segment. Prior to the restructuring of the segment in fiscal year 2012, he was the President of Tyco Security Solutions, the world's largest electronic security provider to residential, commercial, industrial, and governmental customers and the largest operating segment of Tyco. Gursahaney joined Tyco in 2003 as Senior Vice President of Operational Excellence.  He then served as  President of Tyco Engineered Products and Services and President of Tyco Flow Control.    As an officer and director of ADT, Gursahaney either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and

contacts with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Gursahaney participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders, and participated in conference calls with analysts and investors.  As a member of the Board, Gursahaney also authorized the repurchase of millions of ADT shares at artificially inflated prices.  Gursahaney is a defendant in the pending Securities Class Action.[11]  Gursahaney received $4,949,818 in total compensation from the Company in 2012 and $7,170,763 in total compensation in 2013.

28.    Defendant Kathryn A. Mikells ("Mikells") was Chief Financial Officer ("CFO") of ADT from May 2012 to May 2, 2013, when she left to become CFO of Xerox Corporation. As an officer of ADT, Mikells either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, communications, and contacts with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith.  Until her departure on May 2, 2013, Mikells participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders, and participated in conference calls with analysts and investors.  Mikells is a defendant in the pending Securities Class Action.  Mikells received

---

[11]  The "Securities Class Action" is *Henningsen v. The ADT Corporation et al.*, Case No 9:14-cv-80566 (S.D. Fla.), filed on April 28, 2014.

$1,825,372 in total compensation from ADT in 2012 and $2,321,897 in total compensation in 2013.

29.     Defendant Michael S. Geltzeiler ("Geltzeiler") has been the CFO of ADT since November 2013.  Prior to joining ADT, Geltzeiler served as CFO and Group Executive Vice President of NYSE Euronext.  As an officer of ADT, Geltzeiler either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.  Since becoming CFO in November 2013, Geltzeiler participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders. Geltzeiler is a defendant in the pending Securities Class Action.

30.     Defendant Meister is the founder, Managing Director and a Partner of Corvex, a hedge fund that from October 2012 to November 2013 owned over 5% of ADT's outstanding common stock. Defendant Meister was a member of ADT's Board from December 2012 to November 2013.  Defendant Meister resigned from the Board on November 24, 2013.  As a director of ADT, Meister either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings

thereof, as well as reports and other information provided to him in connection therewith. During his tenure on the Board, which covers most of the Relevant Period, Meister either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  Also during his tenure on the Board, Meister authorized the repurchase of millions of ADT shares at artificially inflated prices.  Meister is a defendant in the pending Securities Class Action.

31.     Defendant Thomas Colligan ("Colligan") has served as an ADT Director since September 2012.   Defendant Colligan is the chair of the Audit Committee and member of the Nominating and Governance Committee.  As a director of ADT, Colligan either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith.   During the Relevant Period, Colligan either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Colligan also authorized the repurchase of millions of ADT shares at artificially inflated prices.

32.     Defendant Timothy Donahue ("Donahue") has served as an ADT Director since September 2012.   Defendant Donahue is the chair of the Compensation Committee and a member of the Nominating and Governance Committee.  During the Relevant Period, Donahue

was a member of the Compensation Committee.  As a director of ADT, Donahue either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Donahue either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Donahue also authorized the repurchase of millions of ADT shares at artificially inflated prices.

33.    Defendant Robert Dutkowsky ("Dutkowsky") has served as an ADT Director since September 2012.  Defendant Dutkowsky is a member of the Compensation Committee. During the Relevant Period, Dutkowsky was a member of the Compensation Committee.  As a director of ADT, Dutkowsky either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Dutkowsky either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member

14

of the Board, Dutkowsky also authorized the repurchase of millions of ADT shares at artificially inflated prices.

34.     Defendant Bruce Gordon ("Gordon") has served as an ADT Director since September 2012.  Defendant Gordon is the chair of the Nominating and Governance Committee. During the Relevant Period, Gordon was the Chairperson of the Nominating and Governance Committee.  As a director of ADT, Gordon either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Gordon either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Gordon also authorized the repurchase of millions of ADT shares at artificially inflated prices.

35.     Defendant Bridgette Heller ("Heller") has served as a Director of the Company since September 2012.  Defendant Heller is a member of the Audit Committee.  During the Relevant Period, Heller was a member of the Audit Committee.  As a director of ADT, Heller either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, communications, and contacts with corporate officers and employees,

attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to her in connection therewith.  During the Relevant Period, Heller either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Heller also authorized the repurchase of millions of ADT shares at artificially inflated prices.

36.     Defendant Kathleen Hyle ("Hyle") has served as a director of the Company since September 2012.  Defendant Hyle is a member of the Audit Committee.  During the Relevant Period, Hyle was a member of the Audit Committee.  As a director of ADT, Hyle either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of her access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to her in connection therewith.  During the Relevant Period, Hyle either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders.  As a member of the Board, Hyle also authorized the repurchase of millions of ADT shares at artificially inflated prices.

37.     Defendant Dinesh Paliwal ("Paliwal") served as a director of the Company until his resignation effective on the date of ADT's 2014 Annual Meeting of Stockholders on March 13, 2014.  On January 8, 2014, Dinesh Paliwal notified the Board of his decision not to stand for re-election as a director.  Defendant Paliwal was the chair of the Compensation Committee and

is a former member of the Nominating and Governance Committee. During the Relevant Period, Paliwal was the Chairperson of the Compensation Committee and a member of the Nominating and Governance Committee. As a director of ADT, Paliwal either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects because of his access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Paliwal either participated in or caused the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities' analysts, and ADT stockholders. As a member of the Board during the Relevant Period, Paliwal also authorized the repurchase of millions of ADT shares at artificially inflated prices.

### D.   Defendant Corvex

38.   Defendant Corvex is a hedge fund that owned over 5% of ADT's outstanding stock from October 2012 to November 2013. Corvex is incorporated under the laws of Delaware and maintains a principal place of business at 712 Fifth Avenue, 23rd Floor, New York, New York 10019.

39.   Defendants Colligan, Donahue, Dutkowsky, Gordon, Gursahaney, Heller and Hyle are sometimes collectively referred to herein as the "Director Defendants."

40.   Defendants Colligan, Heller and Hyle are sometimes collectively referred to herein as the "Audit Committee Defendants."

41.   Defendants Donahue and Dutkowsky are sometimes collectively referred to

herein as the "Compensation Committee Defendants."

42.     Defendants Colligan, Donahue and Gordon are sometimes collectively referred to herein as the "Nominating and Governance Committee Defendants."

43.     Defendants Gursahaney, Mikells, Geltzeiler, Meister, Colligan, Donahue, Dutkowsky, Gordon, Heller, Hyle, and Paliwal are sometimes collectively referred to herein as the "Individual Defendants."

44.     The Individual Defendants, Corvex and the Nominal Defendant are sometimes collectively referred to herein as the "Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties Owed to the Company

45.     By reason of their positions as officers, directors and/or fiduciaries of ADT during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed ADT and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of ADT and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes ADT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ADT, were able to and did, directly and/or indirectly, exercise control

over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with ADT, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

47.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of ADT were required to, among  other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### B.      The Company's Code of Conduct

48.      ADT's Code of Conduct,[12] which outlines ADT Team Members' "commitments to [ADT] customers, [ADT] investors, [ADT] communities, and to one another," sets forth numerous expectations that ADT has for its team members, including the Individual Defendants.  The Code  of Conduct states in pertinent part as follows:

**Our Investors**
*Like our customers, our investors place their trust in us*. They trust that we will protect the company's assets and use them to create long term shareholder value. *It is our responsibility to make sure our actions protect that trust.*

*Conflicts of Interest*
*Conflicts of interest exist when your personal interests or activities interfere, or appear to interfere, with the interests of the company. A conflict of interest affects your judgment, objectivity, or loyalty to ADT. Such conflicts can arise in many different situations and relationships, and are not always obvious. It is important that your decisions and actions be based on ADT's business needs – not what serves your own personal interests or those of a third party*.

To make certain that we act in ADT's best interests, Team Members are required to disclose any actual or potential conflict of interest. Even if you do not have an actual conflict, others may think you do. To avoid even the appearance of a conflict, seek guidance from your manager, a human resources representative, the ADT Ethics Line or the ADT Ethics Office. The company will work with you to determine appropriate action.

**Outside Employment**
You may not work for a competitor, customer, or supplier while employed at ADT. Any Team Member desiring to take outside employment, including on a self employed basis, must first obtain written approval from his or her manager. There are times when outside employment may be appropriate, as long as your outside responsibilities do not interfere with your responsibilities at ADT. Such employment must never involve the use of ADT's tools, vehicles, facilities, time, property, or other resources, including computers, software, and customer information.

**Personal Relationships and Family Members**
You must disclose family or close personal relationships that interfere, or could appear to interfere, with your ability to make objective decisions. You should

---

[12]  The Code of Conduct can be found at:
http://investors.adt.com/phoenix.zhtml?c=251389&p=irol-govconduct.

never hire, supervise, or have influence over a family member or friend without the prior approval of ADT's management. You must disclose any financial interests, employment or third party (such as a vendor or customer) relations, including service on a Board of Directors that you or an immediate family member have with a competitor, customer or supplier of ADT. Any time you do business with family and friends as an ADT Team Member, you must also disclose this interest through proper reporting channels.

*       *       *

**Business Opportunities**
If you discover a business opportunity, such as a real estate deal or a potential investment through your work at ADT**, you must put ADT's interest before your own**. You must never take advantage of a corporate opportunity without approval through the proper reporting channels.

### C.      The Company's Board Governance Principles

49.      According to ADT's Board Governance Principles,[13] the Director Defendants, as members of the Board are charged with the "***directing, and providing oversight of, the management of ADT's business in the best interests of the stockholders and consistent with good corporate citizenship***."  In meeting these responsibilities, the Board "selects and monitors top management, ***provides o v e r sight f o r financial reporting and legal compliance***, determines ADT's governance principles and implements its governance policies."

50.      Further, according to ADT's Board Governance Principles, the Individual Defendants, both the Board and management, are tasked with "establishing the firm's operating values  and code of conduct and for ***setting strategic direction and priorities***."

51.      ADT states in its Board Governance Principles "that every employee, without exception, is responsible for the conduct and success of the enterprise.  This includes full, accurate, candid, and timely disclosure of information, and compliance with all laws and regulatory standards."  Moreover, "[t]he Board is responsible for setting the ethical tenor for

---

[13]  The Board Governance Principles can be found at:
http://investors.adt.com/phoenix.zhtml?c=251389&p=irol-govhighlights.

21

management and the company. That ethical tenor works on the expectation that employees understand where the lines are that they should not cross and stay widely clear of those lines."

52.    Importantly, the Board Governance Principles states in pertinent part, the following in regards to the Board's mission and responsibilities:

**Mission of the Board of Directors: What the Board Intends to Accomplish**

The mission of ADT's Board of Directors (the "Board") is to ***promote the long-term value and health of the company in the interests of the stockholders***, its employees and its other stakeholders and set an ethical "tone at the top." To this end, the Board provides management with strategic guidance, and also ensures that management adopts and implements procedures designed to promote both legal compliance and ***the highest standards of honesty, integrity and ethics throughout the organization***.

Governance Principles: How the Board Oversees the Company

1.    ***Active Board:*** The directors are well informed about the company and vigorous  in their oversight of management.

2.    ***Company Leadership***: The directors, together with management, set ADT's strategic direction, review financial objectives, and establish a high ethical tone  for the management and leadership of the company.

3.    ***Compliance with Laws and Ethics***: The directors ensure that procedures and practices are in place designed to prevent and identify illegal or unethical conduct  and to permit appropriate and timely redress should such conduct occur.

4.    ***Inform and Listen to Investors and Regulators:*** The directors take steps to see  that management discloses appropriate information fairly, fully, timely, and  accurately to investors and regulators, and that the company maintains a two-way communication channel with its investors and regulators.

5.    ***Continuous Improvement***: The directors remain abreast of  new developments in corporate governance, and they implement new procedures and practices as they  deem appropriate.

**Board Responsibilities**

The Board is responsible for:

- ***Reviewing and approving management's strategic and business plans.***

- ***Reviewing and approving financial plans, objectives, and actions including significant capital allocations and expenditures.***

- ***Monitoring management execution of corporate plans and objectives.***

- ***Advising management on significant decisions and reviewing and approving major transactions.***

- Recommending director candidates for election by stockholders.

- Appraising the company's major risks and overseeing that appropriate risk management and control procedures are in place.

- Selecting, monitoring, evaluating, compensating, and if necessary replacing the CEO and other senior executives, and seeing that management development and succession plans are maintained for these executive positions.

- Determining the CEO's compensation, and approving senior executives' compensation, based on performance in meeting pre-determined standards and objectives.

- Determining that procedures are in place designed to promote compliance with laws and regulations and setting an ethical "tone at the top."

- ***Determining that procedures are in place designed to promote integrity and candor in the audit of the company's financial statements and operations, and in all financial reporting and disclosure.***

- ***Designing and assessing the effectiveness of its own governance practices and procedures.***

- Periodically monitoring and reviewing shareholder communications sent to the company.

**D.     The Company's Nominating and Governance Committee Charter**

53.     According to ADT's Nominating and Governance Committee Charter,[14] the

Nominating and Governance Committee has the following purpose and responsibilities:

---

[14]   The Nominating and Governance Committee Charter can be found at:
http://investors.adt.com/phoenix.zhtml?c=251389&p=irol-govhighlights.

**Purpose**

The Nominating and Governance Committee (the "Committee") is appointed by the board of directors (the "board") of The ADT Corporation (the "Company") to:

    a. Identify individuals qualified to become board members, consistent with criteria approved by the board;

    b. Recommend that the board select director nominees for the annual meeting of stockholders;

    c. Develop and recommend to the board a set of corporate governance principles applicable to the Company;

    d. Oversee the evaluation of the board and management;

    e. Play a leadership role in the Company's corporate governance policies; and

    f. ***Any related matters required by federal securities laws.***

*    *    *

**Responsibilities**

Among its specific responsibilities, the Committee shall:

    1. Establish criteria and qualifications for board membership, including standards for assessing independence. These criteria and qualifications shall include, among other things:

    a. ***The highest ethical standards and integrity;***

    b. ***A willingness to act on and be accountable for board decisions***;

    c. An ability to provide wise, informed, and thoughtful counsel to top management on a range of issues;

    d. A history of achievement that reflects superior standards for the director candidate and others;

    e. ***Loyalty and commitment to driving the success of the Company;***

    f. An ability to take tough positions while at the same time working as a team player; and

    g. A background that provides a portfolio of experience and knowledge commensurate with the Company's needs.

24

2.    Identify and consider candidates, including those recommended by the Company's stockholders and others pursuant to the procedures set forth in the Company's Board Governance Principles and described in the Company's annual proxy statement, to fill positions on the board, and assess the contributions and independence of incumbent directors in determining whether to recommend them for reelection to the board.

3.    Recommend to the board candidates for election or reelection at each annual meeting of stockholders.

4.    Recommend to the board candidates for appointment to the Compensation and Audit Committees and their committee chairs and consider periodic rotation of committee members. The full board shall select candidates for appointment to the Committee.

5.    Annually review the Company's corporate governance processes and its governance principles, including such issues as the board's organization, membership terms, and the structure and frequency of board meetings, and recommend appropriate changes to the board.

6.    ***Consider questions of possible conflicts of interest involving board members and senior executives***, in collaboration with the Audit Committee, and initiate appropriate action to address any such conflicts.

7.    Establish, in collaboration with the Compensation Committee, compensation for directors.

8.    Review periodically the succession plan relating to the position of CEO, and make recommendations to the board regarding the selection of possible successors to fill this position.

9.    Oversee the orientation program for new directors and continuing education of current directors.

10.   Monitor the functions of the board and its committees, as set forth in their respective charters, and coordinate and oversee annual self-assessments of the board's and each committee of the board's performance and procedures. In particular, the self-assessment will solicit feedback from the directors about:

    a.    Overall effectiveness

    b.    Composition and structure

    c.    Culture

    d.    Focus

> e.  Information and resources
>
> f.  Process
>
> The Chairman, in consultation with all other board members, will conduct an  assessment of individual board members on an annual basis. Feedback from  this process will be  provided to board members, as appropriate.

11.  Assess annually the Committee's and individual members' performance of the  duties specified in this Charter and report its findings to the board.

12.  Oversee the  Company's Environmental, Health,  &  Safety management program.

13.  Ensure the appropriate process is  in  place to perform and  review  the Company's enterprise-wide risk assessments.

14.  Periodically review stockholder communications sent to the Company.

15.  Annually review and assess the adequacy of this Charter and recommend any  proposed changes to the board.

16.  Approve the Company's Guidelines for Related Party Transactions and any  revisions, amendments or exceptions thereof and review and approve  any  transaction between the Company and any related person (as  defined  in  Item  404  of  Regulation S-K)  in  accordance with the Guidelines.

**E.      The Company's Audit Committee Charter**

54.     According to the Company's Audit Committee Charter,[15] the Audit Committee

has the following purpose and responsibilities:

**Purpose**

The Audit Committee (the "Committee") is appointed by the board of directors (the "board") of The ADT Corporation (the "Company") to (subject to the section captioned "Responsibilities" below) assist the board in monitoring:

a.    ***The integrity of the financial statements of the company;***

b.    The external auditor's independence and qualifications;

---

[15]  The Audit Committee Charter can be found at: http://investors.adt.com/phoenix.zhtml?c=251389&p=irol-govhighlights.

    c.    The performance of the Company's internal audit function and external auditors;

    d.    The compliance by the Company with legal and regulatory requirements; and

    e.    ***The effectiveness of the Company's internal controls.***

The Committee is also responsible for:

    a.    Preparing the audit committee report required to be included in the Company's annual proxy statement pursuant to the rules of the U.S. Securities and Exchange Commission ("SEC"), and

    b.    ***Overseeing the Company's policies, practices and compliance regarding its  Code of Conduct.***

**Authority**

The Committee has authority to conduct or authorize investigations into  any matters within its scope of responsibility. Such authority includes but is not limited to:

    a.    Retain outside counsel, accountants, outside advisors, consultants, or others to  assist in the conduct of an investigation or as it determines appropriate to  advise or assist in the performance of its functions.

    b.    Seek any information it requires from employees or external parties. Employees and external parties will be directed to cooperate and comply with  the Committee's requests.

    c.    Meet with the senior internal auditor, Company officers, external auditors, or  outside counsel, as necessary.

*    *    *

**Responsibilities**

The Committee will carry out the following responsibilities:

*Financial Statements*

    1)    Review and discuss the annual audited financial statements and unaudited  quarterly financial statements, including the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") with management, the senior internal auditor and the external auditor, and recommend to the board whether the audited financial statements  and MD&A should be included

in the Company's annual report on Form 10-K with respect to the annual audited financial statements or recommend to the Committee whether the unaudited quarterly financial statements and MD&A should be included in the quarterly report on Form 10-Q.

2) *Discuss with management corporate policies with respect to earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.*

3) *Review the process for the required SEC management certifications to be included as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable*.

4) Review from time to time (but in no event less often than annually) with the external auditor and management, as appropriate:

- *Significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements;*

- Major issues regarding the Company's accounting and auditing principles and practices and financial statement presentations, including critical accounting policies, and major changes in auditing and accounting principles and practices suggested by the external auditor, senior internal auditor or management;

- Matters required to be discussed by Statement on Auditing Standards No. 114, *The Auditor's Communication with Those Charged with Governance* relating to the conduct of the audit;

- The results of the audit, which should include a review of any audit problems or difficulties encountered by the external auditor in the course of the audit work, including any restrictions on the scope of activities or access to required personnel or information, and any disagreements with management; and

- Principles of accounting proposed or promulgated by regulatory accounting authorities.

\*       \*       \*

*Compliance*

1) Select, monitor, evaluate, compensate and, if necessary, replace the Corporate Ombudsman.

2)  Advise the board with respect to the Company's Code of Conduct and compliance and ethics program. Annually review and assess the adequacy of the Code of Conduct and implementation and effectiveness of the compliance and ethics program and recommend any proposed changes to the board. Specifically, the Committee shall, no less than annually, discuss with management, the Company's senior internal auditor, the General Counsel and the Chief Compliance Counsel, the Company's implementation and effectiveness of its compliance and ethics program, including compliance with its Code of Conduct. The discussion shall cover any insider and affiliated party transactions as well as the Company's procedures that are in place to monitor compliance generally throughout the Company.

3)  ***Advise the board with respect to the Company's policies and procedures regarding compliance with applicable law and regulations.***

4)  Review the effectiveness of procedures for the receipt, retention, resolution and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and for employees to make confidential and anonymous submissions of concern regarding questionable accounting or auditing matters. This should also include a review of management follow-up, including disciplinary action, for any significant actions of noncompliance.

5)  Receive regular reports from the General Counsel and Chief Compliance Counsel regarding any significant compliance matters that may arise. Both the General Counsel and the Chief Compliance Counsel have direct reporting obligations and express authority to promptly communicate personally to the Committee about significant compliance matters that may affect the Company, including any matter involving criminal conduct or potential criminal conduct.

*Internal Controls*

1)  ***Meet periodically with management to review and discuss the Company's policies and guidelines with respect to risk assessment and risk management and risks, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.***

2)  Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in the Company's internal controls.

3) Consider the effectiveness of the Company's internal control over annual and interim financial reporting, including information technology security and control.

4) Understand the scope of internal and external auditor's review of internal control over financial reporting, and obtain reports on significant findings and recommendations, together with management responses.

*Reporting*

1) Regularly report to the board about Committee activities, issues and related recommendations.

2) Report annually to the Company's stockholders, describing the Committee's composition, responsibilities, and how they were discharged, and any other information required by the SEC and NYSE.

**F.    The Company's Compensation Committee Charter**

55.    According to the Company's Compensation Committee Charter,[16] the

Compensation Committee has the following purpose, responsibilities and duties:

**Purpose**

The Compensation Committee (the "Committee") is appointed by the board of directors (the "board") of The ADT Corporation (the "Company") to (subject to the section captioned "Responsibilities and Duties" below):

a.    Carry out the board's responsibilities relating to compensation of the Company's executives;

b.    Establish and oversee the executive compensation and employee benefit programs for the Company;

c.    Evaluate the executive compensation and employee benefit programs to determine whether they are properly administered and achieving the intended purpose;

d.    Evaluate and approve the compensation policies, plans and programs for the Company's CEO, Section 16(b) Officers and Senior Executives ("Section 16(b) Officer" and "Senior Executive" are defined under the Company's separate Delegation of Authority);

e.    Review and approve the Company's equity-based compensation plans; and

---

[16]  The Compensation Committee Charter can be found at:
http://investors.adt.com/phoenix.zhtml?c=251389&p=irol-govhighlights.

f.      Administer any other related responsibilities and duties delegated to it by the board from time to time.

*        *        *

**Responsibilities and Duties**

The Committee shall undertake an independence assessment prior to selecting any compensation consultant, outside counsel or other advisers that will provide advice to the Committee as may be required by the NYSE from time to time. The Committee shall evaluate, on at least an annual basis, whether any work provided by the Committee's compensation consultant raised any conflict of interest.

The Committee shall:

1.   Oversee the Company's overall compensation structure, policies and programs, and assess whether the Company's compensation structure establishes appropriate incentives for management and employees;

2.   Establish and annually review the executive compensation philosophy ensuring that it:

   a)      *supports the Company's overall strategy and objectives including the alignment of management's interests with stockholders;*

   b)      links total compensation to defined performance goals;

   c)      balances the need to motivate appropriate risk taking, without encouraging or rewarding excessive risk;

   d)      attracts and retains key executives; and

   e)      provides competitive total compensation opportunities at a reasonable cost while meeting the aforementioned goals.

3.   Review and approve corporate goals and objectives relevant to CEO compensation.

4.   Meet in executive session to annually review and evaluate the CEO's performance, in light of such goals and objectives, and based upon this evaluation, the Committee will determine, and recommend for approval by the independent directors, the compensation of the CEO, including, without limitation, the CEO's annual salary, bonus, equity-based and non-equity-based incentive compensation and other benefits, direct and indirect.

5.  Annually review the performance of the Company's Section 16(b) Officers and Senior Executives. In addition, the Committee will review and approve the compensation of the Section 16(b) Officers and Senior Executives, including, without limitation, each individual's annual salary, bonus, equity-based and nonequity-based incentive compensation and other benefits, direct or indirect.

6.  Review and approve the comparator group(s) (e.g., direct competitors and survey sources) for benchmarking compensation levels and pay practices, as well as performance, for the Company's CEO, Section 16(b) Officer, and Senior Executive positions.

7.  Annually review the talent development and succession plans for Section 16(b) Officer and Senior Executive positions other than the CEO and make recommendations to the board regarding possible successors for these positions.

8.  Review and approve benefit and perquisite programs for Section 16(b) Officers and Senior Executives.

9.  Review and approve employment, retirement, severance and change-in-control agreements/arrangements for Section 16(b) Officers.

10. Review and approve the Company's incentive plans and equity incentive plans that are subject to the approval of the board, including, without limitation, the review and grant of stock option and other equity incentive grants to Section 16(b) Officers and Senior Executives.

11. Review and approve all equity compensation plans of the Company that are not otherwise subject to the approval of the Company's stockholders.

12. Review and oversee the design, participation, adequacy, competitiveness, internal equity, and cost effectiveness for the Company's broadly-applicable benefit programs, including, without limitation, defined benefit and contribution retirement plans; delegate administrative and other fiduciary functions to the appropriate fiduciary committee or officer, as appropriate; and review the Committee's findings, determinations and actions regarding the same with the board, as appropriate.

13. Establish, in collaboration with the Nominating and Governance Committee, compensation for directors.

14. Monitor compliance by officers and directors with the Company's stock ownership guidelines.

32

15. At least once a year, meet with the Company's internal and/or external auditors and management to hear a report from the auditors on management compliance with the Company's compensation and benefit programs and insider transaction policies under the Committee's jurisdiction.

16. ***Conduct an annual risk assessment of the Company's compensation programs for all employees, including non-executive officers, and review and discuss with management to assess whether risks arising from the Company's compensation programs are reasonably likely to have a material adverse effect on the Company.***

17. Oversee and administer the Company's pay recoupment policy.

18. Review the Company's human resources strategy and controls, including, without limitation, Sarbanes-Oxley Section 404 compliance, payroll and operational matters and design of performance management and development programs across the Company.

19. Annually assess the performance of the Committee and its individual members, and report the results to the board.

20. Annually review and assess the adequacy of this Charter and recommend any proposed changes to the board.

21. Oversee the preparation of the Company's Compensation Discussion and Analysis ("CD&A") for inclusion in the Company's annual proxy statement or annual report on Form 10-K, as applicable, in accordance with the rules of the U.S. Securities and Exchange Commission ("SEC"). Review and discuss with management the CD&A, evaluate the CD&A, and, based on that review and evaluation, make recommendations to the board regarding the inclusion of the CD&A in the Company's annual proxy statement or annual report on Form 10-K, as applicable.

22. Review and recommend for approval by the board (a) the Company's approach with respect to the stockholder advisory vote on named executive officer compensation (a "say-on-pay") and (b) how frequently the Company should permit stockholders to have a say-on-pay, taking into account the results of stockholder votes on the frequency of say-on-pay resolutions of the Company. The Committee shall also review and discuss the results of the say-on-pay vote and consider any implications.

23. Prepare the annual compensation committee report on executive compensation as required by the SEC to be included in the Company's annual proxy statement or annual report on Form 10-K as filed with the SEC.

56.     As discussed below, the Individual Defendants failed to meet their responsibilities as detailed above.  The Individual Defendants' illegal course of conduct constituted violations of the federal securities laws and breaches of their fiduciary duties and has resulted in significant harm to the Company.

### G.     Control, Access, and Authority

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ADT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ADT.

58.     Because of their advisory, executive, managerial, and/or directorial positions with ADT, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of ADT.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each other and of ADT, and was at all times acting within the course and scope of such agency.

### H.     Reasonable and Prudent Supervision

60.     To discharge their duties, the officers and directors of ADT were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ADT were required to, among other things:

a.      refrain from acting upon material inside corporate information to benefit themselves;

b.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

e.      remain informed as to how ADT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

f.      ensure that ADT was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.      FACTUAL ALLEGATIONS

### A.      Background of ADT

61.     ADT, originally the American District Telegraph Company, was founded in 1874, by a consortium of 57 telegraph operators.  ADT came under the control of AT&T in 1909, beginning the Company's transition to the signal business — the forerunner of ADT Security Services.  ADT became a public company listed on the NYSE in 1969.  In 1987, the Company was purchased by the Hawley Group, Ltd. and renamed ADT Security Systems, Inc.  In 1997,

the Company was acquired by Tyco.   In 2010, the Company's largest competitor, Broadview Security, was acquired by ADT.

62.     On September 19, 2011, Tyco announced plans to split into three independent, publicly traded companies: (i) ADT; (ii) Tyco Fire and Security; and (iii) Flow Control.   On September 28, 2012, Tyco spun-off and distributed all of the shares of ADT to its shareholders on a pro-rata basis, making ADT again an independent, publicly traded company.   On October 1, 2012, the Company debuted and began trading on the NYSE under the symbol "ADT."

63.     The Company's key brands are ADT, ADT Pulse and Companion Service — all respected, trusted and well-known in the electronic security industry.   ADT's electronic security and home/business automaton offerings involve the installation and monitoring of residential and small business security and premises automation systems designed to detect intrusion, control access, react to movement, detect environmental conditions and hazards including smoke, carbon monoxide, flooding, and address personal emergencies, including injuries, medical emergencies or incapacitation.

64.     The Company touts itself as one of the most trusted and well-known brands in the electronic security industry.   ADT's electronic security services include its ADT Companion Service, which provides a wireless home medical alert system; the ADT home security system, which provides 24/7 monitoring for burglary and fire; the ADT Pulse Automation Solutions, which allows customers to remotely control their security system and lighting and temperature settings; and ADT's business security system.

65.     The majority of the monitoring and home/business automation services and maintenance services are governed by multi-year contracts with automatic renewal provisions.

For the year ended September 27, 2013, approximately 92% of ADT's revenue came from such services.

66.     After less than a month as a publicly traded company, ADT captured the attention of Corvex and its founder, Meister.  Meister conducted a presentation on ADT in San Francisco, California at the Excellence in Investing event on October 24, 2012.[17]  Meister believed that ADT could repurchase approximately 30% of the Company at attractive prices and argued in his presentation that ADT was undervalued.

67.     The presentation was included in the Schedule 13D that Corvex filed with the SEC jointly with Soros Fund Management LLC ("Soros") on October 25, 2012.  Corvex also disclosed a 5.02% ownership stake in ADT with 11,541,021 shares and Soros announced a 0.25% stake in ADT with 575,000 shares.  Soros also entered into an agreement to vote its shares in any manner directed by Corvex.

**B.     The Individual Defendants Cause ADT to Issue Improper Statements**

68.     Unbeknownst to investors, ADT's financial condition and future financial results were materially overstated throughout the Relevant Period.  Throughout the Relevant Period, ADT maintained that its financial and business outlook was healthy and robust.  The Company engaged in an aggressive share buy-back program while contiguously touting its prospects.

69.     The Individual Defendants, because of their connections to and positions within the Company, possessed the power and authority to control the contents of ADT's quarterly reports, press releases and presentations to the market, including securities analysts, money and portfolio managers and investors.  Because of their positions within the Company, and their access to material non-public information available to them but not to the public, the Individual

---

[17]  *See* Market Folly "Keith Meister's Corvex Management Presentation Goes Activist on ADT: Slideshow Presentation" (Oct. 31, 2012), *available at* http://www.marketfolly.com/2012/10/keith-meisters-corvex-management-goes.html.

Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public.

70.     The Relevant Period begins on November 27, 2012.  On this date, ADT issued a press release entitled "ADT Reports Fourth Quarter and Fiscal 2012 Results" reporting the Company's fourth quarter 2012 results, as well as issuing revenue and earnings forecast for fiscal 2013:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.40 for the fourth quarter of 2012, and diluted earnings per share before special items of $0.43.  Naren Gursahaney, ADT's Chief Executive Officer, said, "With our recent spin-off from Tyco International we entered the new fiscal year as a standalone public company with a clear leadership position in residential and small business security in North America. We are excited about the opportunities ahead of us to build on our leadership position and drive ongoing profitable growth." Commenting on the company's results for the fourth quarter, Gursahaney added, "***We delivered solid recurring revenue growth fueled by the continued success of Pulse in the residential and small business security markets. Our focus for 2013 is to deliver meaningful shareholder value by leveraging our competitive strengths to accelerate growth and through the efficient deployment of capital***."
>
> Recurring revenue, which made up over 90% of total revenue in the quarter, was up 5.2%, driven by 4.4% growth in average revenue per customer, which rose to $38.87, and 1.1% net growth in customer accounts. Non-recurring revenue declined 21.3% as the Company's mix continues to shift toward more ADT-owned systems, increasing deferred revenue and reducing current period installation revenue. Total revenue of $812 million increased 2.3%, compared to the fourth quarter of 2011. Attrition was up 30 basis points sequentially to 13.8% with the majority of the increase coming from voluntary disconnects, in part due to the higher level of price escalations implemented in the second and third quarters. ADT added 284,000 new customers and closed the quarter with 6.4 million customer accounts, 1.1% higher than last year.
>
> *        *        *
>
> **FISCAL YEAR 2013 GUIDANCE**
>
> - Recurring revenue growth of 4.9%-5.2%
>
> - EBITDA margin before special items of 49.5%-50.5%
>
> - Free cash flow before special items of $375-$425 million

- Steady-state free cash flow before special items of $950 million - $1.0 billion

71.     In addition to the Company's financial results and guidance, the Company announced that "the Board of Directors has approved a share repurchase program, authorizing the Company to purchase $2.0 billion of its common stock.  The program expires on November 27, 2015 and may be terminated at any time."  Indeed, as the Company's own records indicate, ADT had officially succumbed to the pressure that Meister and Corvex had been exerting on the Board.

72.     Specifically, the minutes of the Board meeting which took place on November 26, 2012, reveal that while the Company was touting its aggressive share repurchase plan, Meister was working behind the scenes, scheming to secure a position on ADT's Board and to convince the Company to load up on additional debt to fund repurchases.  ADT220-0000236-245 (Board minutes from November 26, 2012 meeting, noting that during a meeting with Corvex that included certain members of ADT management and selected Board members, Meister stated he was interested in joining the ADT Board and conveyed Corvex's view that "ADT could enhance shareholder value through the incurrence of incremental leverage").

73.     On November 27, 2012, the Company also filed with the SEC its annual report for the fiscal year ended September 28, 2012 on Form 10-K.  The Form 10-K was signed by Defendants Mikells, Gursahaney, Colligan, Donahue, Dutkowsky, Gordon, Heller, Hyle and Paliwal, and repeated the Company's previously announced financial results.

74.     In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Gurshaney and Mikells, stating that the financial information contained in the Form 10-K was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form

10-K contained additional certifications by Defendants Gurshaney and Mikells asserting that the report "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*[.]"

75.     Also on November 27, 2012, ADT held a "Q4 2012 ADT Corporation Earnings Conference Call" during which Defendants Gursahaney and Mikells touted the strength of the Company's recurring revenue, signaled that ADT had agreed with Meister/Corvex's October 2012 capital restructuring thesis and that the Company expected recurring revenue to continue to grow:

> [Mikells]: Now, I'd like to focus on Slide 13, our guidance for fiscal 2013. We expect recurring revenue to continue to grow at the rate we've seen over the past several quarters at approximately 4.9% to 5.2%, with the underlying recurring revenue growth drivers being consistent with recent trends.
>
> *              *              *
>
> [Gursahaney]: We strongly believe that our capital structure must be appropriate for both our business model and the key strategies we are pursuing. *In our case we have a business model that generates strong recurring revenues and attractive financial returns*.

76.     Criticism of ADT's plan was widespread, as noted in a November 29, 2012 *Dow Jones* report. The article noted that "*[a]nalysts say ADT's pursuit of buybacks is unusual for a company so new to the market*." Specifically, Carol Levenson, an analyst for corporate debt research service Gimme Credit LLC, noted to her clients that "[n]ever have we seen a spinoff in as much of a hurry to reward shareholders at the expense of credit quality as ADT." Credit-rating firms were critical as well: "Fitch Ratings on Tuesday lowered its rating on ADT to triple-B -- two notches above junk territory -- from triple-B-plus. Fitch left its outlook on ADT at stable. Moody's, meanwhile, did not lower its rating on ADT, but dropped its outlook on the

company to negative from stable."  Moody's Senior Analyst Suzanne Wingo stated that "[t]he genesis for this buyback was the activist shareholder . . . *[t]he concern is that the board has not met all of the activist's demands and it's going to face continued pressure*."  Research firm Morningstar estimated that ADT's buyback plan would shrink the company's share count by about 17% by 2015, less than the 30% reduction sought by Corvex.

77.     Regardless, between November 27, 2012 and December 31, 2012, the Company's share price traded at artificially inflated levels above $46.00 per share — with a close as high as $46.49 on December 31, 2012.

78.     On December 17, 2012, the Individual Defendants caused the Company to issue a press release announcing that ADT appointed Meister to ADT's Board of Directors.

79.     Approximately one month later, on January 7, 2013, ADT issued a press release announcing that it had placed a private offering of senior notes worth in excess of $700 million. ADT stated that it intended to use the net proceeds from the offering primarily for the repurchase of outstanding shares of ADT common stock.

80.     By January 2013, the Individual Defendants had secured their positions with the Company by yielding to Meister's and Corvex's demands.   The Board's Nominating & Governance Committee recommended to the Board that Meister be nominated to serve as a director of the Company at the 2013 Annual Meeting and that Meister also be appointed to serve as a member of the Audit Committee.  ADT220-0000496-497.  At its January 10, 2013 meeting, the Board adopted the recommendation of the Nominating & Governance Committee.  ADT220-0000521-525.

81.     On January 28, 2013, ADT filed a Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2013 Proxy"),[18] and asked shareholders to vote on the following matters:

- Election of the Directors:  Colligan, Donahue, Dutkowsky, Gordon, Gursahaney, Heller, Hyle, Meister and Paliwal;

- The ratification of the appointment of Deloitte & Touche LLP as ADT's independent registered public accounting firm for fiscal year 2013;

- To approve, by non-binding vote, named executive officer compensation; and

- To recommend, by non-binding vote, the frequency of named executive officer compensation votes.

82.     The 2013 Proxy described director responsibilities, the duties of each committee, Board risk management, and information about the nominees.  The 2013 Proxy also stated that:

> ADT's Board of Directors is responsible for directing, and providing oversight of, the management of ADT's business in the best interests of the stockholders and consistent with good corporate citizenship. In carrying out its responsibilities, the Board of Directors selects and monitors top management, provides oversight for financial reporting and legal compliance, determines ADT's governance principles and implements its governance policies. The Board of Directors, together with management, is responsible for establishing the firm's operating values and code of conduct and for setting strategic direction and priorities.

83.     However, the 2013 Proxy was false and misleading as it failed to disclose to investors the material information regarding the Company's repurchase plan, its dealings with Meister and Corvex, the Company's financial condition and future business prospects, and their impact on the Company that would affect shareholders' votes on the proposed items.

84.     In fact, the Board held meetings on December 13 and 14, 2012 at which it discussed at length the fact that Corvex and Meister were placing significant pressure on ADT to execute on its capital structure proposal.  ADT220-0000475-476 (Board minutes from December

---

[18]   The 2013 Proxy included ADT's 2012 Annual Report, which includes a copy of ADT's Annual Report on Form 10-K.

13, 2012 meeting, referencing discussion regarding the "pros and cons of Keith Meister's request to join the ADT Board of Directors" and noting that "if Mr. Meister is not asked to join the Board then Corvex Management will likely make a shareholder proposal to elect Mr. Meister and possibly others as directors of ADT at ADT's 2013 annual meeting of stockholders."); ADT220-0000477-484 (Board minutes from December 14, 2012 meeting, noting that "Mr. Gordon requested that Mr. Bleisch attempt to negotiate mutually satisfactory standstill and confidentiality agreements with Mr. Meister, Corvex Management and the other Corvex-related parties.").

85.     In a Credit Suisse presentation to the Board during the December 13 and 14, 2012 meetings, it is readily apparent that the Board's real concern was not the best interests of ADT and its shareholders, but in securing their positions with the Company.  ADT220-0000246-293. The presentation makes specific reference to the fact that its "[a]nnually elected Board makes directors vulnerable and accountable for their actions" and Corvex would likely seek to "[a]dd new outside directors or replace existing directors" and make an "attack on CEO or [demand] other changes in management" if the Company did not agree to Meister's capital structure changes and offer him a Board seat.  ADT220-0000273.  Indeed, the Individual Defendants recognized that to avoid risking their executive and directorial positions at ADT, they would need to give Meister and Corvex exactly what they wanted.  ADT220-0000274 (reciting benefits of negotiating with Crovex, all of which foster entrenchment, ensuring that "[a]ll current directors stay on Board").  A Lazard presentation dated December 3, 2012 reveals that the Board knew it would need to "[f]ully (or partially) implement Corvex's capital structure and capital allocation proposals" by increasing leverage to 3x return capital to shareholders, but that "[a]t

least some additional capitulation [might] be required to substantiate a Corvex claim of 'victory' and encourage exit." ADT220-0000305-474.

86.     On January 28, 2013, prior to (1) the issuance of the 1Q'13 earnings release, (2) the earnings call and (3) the filing of the Form 10-Q, the Audit Committee held a meeting during which it reviewed a draft of the press release, the earnings call script and the draft Form 10-Q. ADT220-0000655-753.

87.     On January 30, 2013, the Company issued a press release reporting its financial and operating results for the first quarter of 2013 in which the Company reported strong earnings and margin results, continuing strong growth in recurring revenue and the acceleration of the share repurchase program.  The press release stated the following, in pertinent part:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.44 for the first quarter of 2013, and diluted earnings per share before special items of $0.44. Using the company's cash tax rate, EPS before special items was $0.70.
>
> Naren Gursahaney, ADT's Chief Executive Officer, said, "***We are pleased to start the new fiscal year with a very solid quarter characterized by continued strong growth in recurring revenue and EBITDA margin, along with stabilization in attrition rates***. During the quarter we also began to execute on our previously announced share repurchase program, further supported by the implementation of an accelerated share repurchase initiative, announced today." Gursahaney added, "Looking ahead to the balance of the year we will continue to focus on our ultimate objective of creating long-term value for our shareholders by reinvesting in our business to drive profitable growth, and returning excess cash to our shareholders."
>
> Recurring revenue, which made up 92% of total revenue in the quarter, was up 5.1%. Recurring revenue growth was driven by a 4.7% increase in ending average revenue per customer, which rose to $39.27, and 0.5% net growth in ending customer accounts. Non-recurring revenue declined 25.3% as the company's mix of newly installed systems continues to shift toward more ADT-owned systems, increasing deferred revenue and reducing current period installation revenue. Total revenue of $809 million increased 1.8%, compared to the first quarter of 2012. ***Attrition was flat sequentially at 13.8%.*** ADT added 257,000 new customers and closed the quarter with 6.4 million customer accounts.

*       *       *

**SHARE REPURCHASE PROGRAM**

Under its previously announced $2 billion authorization, during the quarter the company repurchased 567 thousand of its shares for $26 million, and in January the company repurchased an additional 1.6 million of its shares for $74 million.

The company announced today that it has entered into an accelerated share repurchase agreement with Credit Suisse International, under which it will repurchase approximately $600 million of its common stock. The company will acquire the shares under its previously authorized share repurchase program and will fund the repurchase using proceeds from its recently concluded debt offering. Under the terms of the agreement with Credit Suisse International, ADT will pay Credit Suisse International $600 million on February 4, 2013 and on that date will receive initial deliveries of approximately 10 million shares, representing a substantial majority of the shares expected to be retired over the course of the agreement. The total number of shares ultimately repurchased under the agreement will generally be based on the volume-weighted average share price of the company's common stock during the calculation period of the accelerated share repurchase program, less a discount, and subject to a cap provision that will establish a minimum number of shares repurchased. The accelerated share repurchase is expected to be completed by July 26, 2013, although the completion date may be accelerated at Credit Suisse International's option after an initial fixed period. The actual number of shares repurchased will be determined at the completion of the accelerated share repurchase program.

**AFFIRMING FISCAL YEAR 2013 GUIDANCE**

- Recurring revenue growth of 4.9%-5.2%

- EBITDA margin before special items of 49.5%-50.5%

- Free cash flow before special items of $375-$425 million

- Steady-state free cash flow before special items of $950 million - $1.0 billion

88.    On the same day, ADT held a "First Quarter 2013 ADT Corporation Earnings Conference Call" during which Defendants Gursahaney and Mikells boasted about the Company's recurring revenue strength and downplayed the risk of increased competition:

[Mikells]: I'd say if we then turn the comment toward the competitive environment from our perspective *the competitive environment really hasn't changed*…we are seeing the same level of overall competition. We continue to look at our results…*the metrics are holding up very well*.

45

[Gursahaney]: I agree. I think Kathy hit the nail on the head. ***We're not seeing any significant change*** . . ..

89.     On January 31, 2013, the Company filed its quarterly report for the period ended December 28, 2012 on Form 10-Q with the SEC that was signed by Defendant Mikells and Gursahaney, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Mikells and Gursahaney, stating that the financial information contained in the Form 10-Q was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form 10-Q contained additional certifications by Defendants Mikells and Gursahaney asserting that the report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***[.]"

90.     On that same day, January 31, 2013, a Dow Jones newswire[19] reiterated that ***"ADT's buyback plan hasn't been popular with ratings agencies and credit analysts, who have criticized the company for sacrificing its credit profile to appease an activist shareholder's desire for a higher stock price."***  The article included the following additional analyst skepticism:

> "The use of an accelerated share repurchase intensifies the financial damage by sending the borrowed cash out the door all at once instead of gradually over time," said Carol Levenson, director of research for Gimme Credit LLC, in an email. "It probably will be insufficient to placate activist shareholders. We expect more actions of this nature in the future."
>
> Morningstar analyst James Krapfel said ADT would jeopardize its investment-grade credit rating if it racks up additional debt for buybacks. He expects the

---

[19]   *See* Tita, Robert, "ADT to Spend $900 Million This Year On Buying Back Stock," DOW JONES, (Jan. 31, 2013), *available at* http://www.euroinvestor.com/news/2013/01/31/adt-to-spend-900-million-this-year-on-buying-back-stock/12188867.

remaining $1 billion or so of the buybacks planned after this year to be mostly paid for with cash.

But Mr. Krapfel warned that throttling back on buybacks could be difficult for ADT executives following the surge in the company's stock price from the initial phase of the buyback program. ADT's stock is up 28% since October and 14% in the past three months.

91.     On March 13 and 14, 2013, the Board held meetings, during which it received the Q2'13 Business Update which revealed: (1) an increase in attrition, with Q2'13 T12M at 13.9%, 20 bps higher than plan, driven by relocations and nonpayment; (2) Pulse take rates and competitive environment driving subscriber acquisition costs up; (3) continued pressure on lead generation (Direct) and Dealer softness impacting gross adds and recurring revenue; and (4) recurring revenue shortfall putting pressure on margin rates.  ADT220-758-782.  The Board also evaluated ADT's competitive environment, noting that "Consumers increasingly have more options – not only from competitors that are positioning themselves directly against ADT, but also from new formidable entrants launching in the space."  ADT220-0000855.  ADT was also facing "competitive pressures" that inhibited dealer marketing and prospecting efficiency. ADT220-0000864.   In particular, the Board discussed "changes in the market environment, including changing customer behavior toward TV and mobile Internet viewing, increases in the number of sources viewed by consumers before making purchase decisions, and increased competitor advertising that [was] reducing ADT's share of voice in overall marketing by electronic security companies."  ADT220-0000975.  All of the directors were present at the March 13 and 14, 2012 Board meetings.  ADT220-0000972.

92.     According to the March 13, 2013 Board meeting minutes, not only were Pulse take rates resulting in an increase in subscriber acquisition costs, but promotions and discounting were as well.  The Board minutes note that "pressure on the recurring revenue margin is the

biggest issue for the quarter . . . [and] the Company continues to see overall pressure on attrition . . ."  ADT220-0000972-978.

93.      At the March 13, 2013 Board meeting, the Board was also presented with the details for the P&L year-over-year and relative to plan which revealed that "non-recurring revenue [was] declining due to the shift of ADT ownership of more installed systems and that the higher costs of Company owned equipment result[ed] in higher amortization in the depreciation and amortization line."  ADT220-0000973.

94.      On April 1, 2013, the Company issued a press release announcing "its offer to exchange certain of its outstanding unregistered notes for new registered notes in accordance with the terms of its registration rights agreement with existing holders of those notes."  The Company filed a Form 424B3 prospectus supplement with the SEC offering to exchange up to $2.5 billion aggregate principal of its outstanding unregistered debt securities.

95.      On April 12, 2013, ADT issued a press release relating to the completion of its accelerated share repurchase program on April 2, 2013. Specifically, the press release stated the following:

> On January 29, 2013, the company entered into an accelerated share repurchase agreement under which it repurchased 12.6 million shares of its common stock for a total cost of $600 million.
>
> In addition to the accelerated share repurchase program, ADT may repurchase shares of its common stock on the open market in accordance with Rule 10b5-1 of the Securities and Exchange Act of 1934, as amended. In December 2012, ADT initiated a $100 million 10b5-1 share repurchase plan under which 2.2 million shares of ADT common stock were repurchased prior to its completion on January 23, 2013. In February 2013, ADT initiated an additional $100 million 10b5-1 share repurchase plan. As of April 11, 2013, ADT had repurchased 2 million shares of its common stock under this plan for a total cost of approximately $94 million.

The company's share repurchases under both the accelerated share repurchase program and the 10b5-1 plans were made pursuant to ADT's three-year, $2 billion share repurchase program, which was approved by the company's board of directors on November 26, 2012.

96.      On April 18, 2013, ADT announced "its offer to exchange certain of its outstanding unregistered notes for new registered notes in accordance with the terms of its registration rights agreement with existing holders of those notes."  Specifically, "[u]nder the exchange offer, ADT is offering to exchange (the "Exchange Offer") up to $700,000,000 aggregate principal amount of its outstanding $700,000,000 4.125% Notes due 2023 for a like principal amount of its new $700,000,000 4.125% Notes due 2023 (the 'Exchange Notes')."

97.      On April 29, 2013, the Audit Committee held a meeting at which it received, among other things, the draft Form 10-Q, the draft Q2'13 earnings call script and a comprehensive business update for Q2'13 and Q3'13, and a FY'13 outlook.  ADT220-0000987-1137.  The Audit Committee also received materials describing the accounting considerations associated with Pulse upgrades.  ADT220-00001059-1066.  Notably, upgrades were forecasted to significantly increase beginning in the second half of FY13, for a forecasted total net cost of $48.3 million as of FY13.  ADT220-00001060.  As explained in the materials, accounting considerations include "[p]otential [i]mpairment of [r]eplaced [a]ssets [because] [e]xisting equipment, such as control panel and keypads, at the customer site may need to be replaced to allow for ADT Pulse services to be provided."  ADT220-00001061.  "Estimated impairments to date [were] deemed immaterial.  However, due to significant increase in upgrades forecasted in future periods, amounts [were] expected to become material."  ADT220-00001062.  As a result, the Audit Committee discussed implementation of a write-off process prospectively beginning Q3'13.  Accounting considerations noted also included the depreciable life of new assets installed as part of Pulse upgrades.  ADT220-00001061.  A determination was made, as

presented in the Audit Committee materials, that the Company would implement change in depreciable life prospectively beginning also in Q3'13.   ADT220-00001064.   Defendants Colligan, Heller, Hyle, Meister, Gursahaney, and Mikells attended the April 29, 2013 Audit Committee meeting.  ADT220-00001138.

98.     Between April 1, 2013 and April 30, 2013, ADT shares traded at prices of more than $43 per share, closing at a high of $48 on April 1, 2013.

99.     On May 1, 2013, the Company issued a press release reporting its financial and operating results for the second quarter fiscal 2013 in which the Company reported solid growth in recurring revenue, strong earnings and positive financial results.   The press release also reported that, "[u]nder its previously announced $2 billion authorization, the company repurchased 16.9 million of its shares for $800 million through April under two separate $100 million 10b5-1 programs and the $600 million accelerated share repurchase program that was completed on April 2nd."

100.     Furthermore, the May 1, 2013 press release stated the following information in relevant part:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.47 for the second quarter of 2013, and diluted earnings per share before special items of $0.41. Using the company's cash tax rate, EPS before special items was $0.63[1].
>
> Naren Gursahaney, ADT's Chief Executive Officer, said, "*Our results this quarter reflect continued solid growth in recurring revenue, which is a key element of our business model, along with further improvement in take rates for ADT Pulse*. One out of every  three new customers in our residential direct channel is a Pulse subscriber and our efforts to increase penetration of Pulse in the small business and dealer channels are showing great success, with very strong growth in each of those channels. Capital management continues to be a major focus for us, and thus far we have repurchased $800 million of our shares under the $2 billion authorization we announced last November." Gursahaney added, "Over the balance of the fiscal year we will focus on continuing to grow our

customer base, controlling costs to improve margins and returning excess cash to our shareholders."

Recurring revenue, which made up 92% of total revenue in the quarter, was up 5.0%. Recurring revenue growth was driven by a 4.4% increase in ending average revenue per customer, which rose to $39.66, and 0.6% net growth in ending customer accounts. Non-recurring revenue declined 25.3% as the company's mix of newly installed systems continues to shift toward more ADT-owned systems, increasing deferred revenue and reducing current period installation revenue. Total revenue of $821 million increased 1.7% compared to the second quarter of 2012. Attrition was up 10 basis points sequentially at 13.9%. ADT added 303,000 new customers and closed the quarter with 6.5 million customer accounts.

**AFFIRMING FISCAL YEAR 2013 GUIDANCE**

- Recurring revenue growth of 4.9%-5.2%

- EBITDA margin before special items of 49.5%-50.5%

- Free cash flow before special items of $375-$425 million

- Steady-state free cash flow before special items of $950 million - $1.0 billion

101.    On the same day, ADT held a "Q2 2013 ADT Corporation Earnings Conference Call" during which Defendant Gursahaney touted the strength of ADT's recurring revenue and downplayed the likelihood of increased debt to fund further share repurchases and the risk of increased competition affecting ADT's reported financial results:

[Gursahaney]: [W]e will continue to take a balanced approach to capital management. *We have a resilient, predictable business model which enables us to invest in growth and consistently return significant capital to shareholders over time through both dividends and share repurchases. Overall, this was another solid quarter for us with a number of continuing positive trends in our business.*

*      *      *

Recurring revenue grew by 5% to $756 million and accounted for 92% of our total revenue. Total revenue was $821 million, up 1.7% over the second quarter of last year.

*      *      *

51

Attrition has stabilized over the last 2 quarters and was essentially flat at 13.9% versus last quarter.

*     *     *

New entry competitors continue to have little impact on attrition.  In fact, we think the level of concern that has been expressed by some over the past few weeks is overblown. Based on customer surveys, we attribute less than 10% of our total customer disconnects to loss to competition, and only about 1% to new entrants. We continue to closely monitor the impact of new entrants, but to date,  nothing has really changed on the ground.

*     *     *

*We are affirming our guidance for fiscal year 2013…I expect we will be about 5% for recurring revenue growth in fiscal 2013.*

*     *     *

As we look towards the back half of the year, we expect cost to serve expenses to be flat to up only modestly, with further investment in capability to be largely offset by productivity gains and other cost reduction programs. As a result, *margins should modestly improve as we continue to grow the revenue base*…I expect us to come in at the high end of our full year EBITDA margin guidance.

*     *     *

I feel very good about our performance this quarter as our results were in line with our expectations. With our needed customer service investments in place, we'll be focused on cost control in the second half of the year. I'm optimistic about our prospects for continued growth at attractive returns and for generating excess cash flow that can be deployed efficiently over time.

*     *     *

[Analyst]: [A]ny thoughts on the pace of share repurchase to expect over the remainder of the fiscal year. And if you, at this point, plan for any additional debt  issuance to fund your purchases in the near term?

 *[Gursahaney]:* . . .**[A]nything we do at this stage is going to be consistent with the $2 billion 3-year share repurchase program that we announced back in  November. . . .**

[Analyst:] Okay, so -- but based on that, it doesn't sound like you're anticipating at this point, raising incremental debt to fund share r e purchase. Sounds like you have additional – you have  plenty of excess liquidity at this point to do what you want to do.

[Gursahaney:] I think we have liquidity at this point, and *we are at our target leverage*. So again, I think we're **sticking to what we laid out back in November.**

102.     After the Company's May 1, 2013 announcement, ADT stock continued to trade at over $42 per share.

103.     Also on May 1, 2013, the Company filed with the SEC its quarterly report for the period ended March 29, 2013 on Form 10-Q.  The Form 10-Q was signed by Defendants Mikells and Gursahaney and repeated the Company's previously announced quarterly financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Mikells and Gursahaney, stating that the financial information contained in the Form 10-Q was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form 10-Q contained additional certifications by Defendants Mikells and Gursahaney asserting that the report "**does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**[.]"

104.     According to an email dated May 2, 2013 from Defendant Dursahaney to certain of the Individual Defendants, including the entire Board, the previous day's 2Q'13 earnings report "was the first time [ADT had] openly discussed any impact from competition."  ADT220-00001141-1187.  At the latest, the Board knew in early March 2013 that there was pressure on sales from competition.

105.     On   May  3,  2013,  the  Company  issued  a  press  release  entitled  "The   ADT Corporation Announces Exchange Offer Completion" which stated the following:

The  final  results  of  its  offer  to  exchange  (the  "Exchange  Offer")  up  to $2,500,000,000 aggregate principal amount of its outstanding (i) $750,000,000 2.250% Notes due 2017 (the "Outstanding 2017 Notes"), (ii) $1,000,000,000 3.500% Notes due 2022 (the "Outstanding 2022 Notes") and (iii) $750,000,000

4.875% Notes due 2042 (the "Outstanding 2042 Notes" and collectively, the "Outstanding Notes") for a like principal amount of its new (i) $750,000,000 2.250% Notes due 2017, (ii) $1,000,000,000 3.500% Notes due 2022 and (iii) $750,000,000 4.875% Notes due 2042 (collectively, the "Exchange Notes").

The Exchange Offer expired at 5:00 p.m., Eastern Time, on April 29, 2013. As of the expiration date, tenders of (i) $747,900,000, or 99.7%, of the Outstanding 2017 Notes, (ii) $1,000,000,000, or 100.0%, of the Outstanding 2022 Notes and (iii) $746,000,000, or 99.5%, of the Outstanding 2042 Notes had been received. ADT accepted all of the Outstanding Notes tendered in exchange for the Exchange Notes and settlement occurred on May 3, 2013.

106.    On May 17, 2013, ADT announced "that it [would] extend its offer to exchange (the 'Exchange Offer') up to $700,000,000 aggregate principal amount of its outstanding $700,000,000 4.125% Senior Notes due 2023 (the 'Outstanding Notes') for a like principal amount of its new $700,000,000 4.125% Senior Notes due 2023 (the 'Exchange Notes').  All other terms of the Exchange Offer, as described in the prospectus dated April 18, 2013, remain unchanged."

107.    On or about May 9, 2013, the Board held another meeting at which it discussed the Company's Q2'13 results and the Q3 and FY'13 outlook.   ADT220-00001320-1326; ADT220-00001188-1249.  The competitive market and attrition continued to be a focus of the Board's discussions.  ADT220-00001240-1248.  In addition, the Board received Goldman Sachs' summary observations relevant to the Company's continuing review of its optimal capital structure − a transparent effort to provide justification for implementation of Meister and Corvex's reckless demands.   Matt McClure, a representative of Goldman Sachs led the discussion:

Mr. McClure described ADT's stock price performance, noting that it had previously been trading at a premium multiple to its peers.  Mr. McClure stated that most analysts appeared to be focusing on SSFCF and discounted cash flow as the primary methodologies for valuing ADT.  Mr. McClure stated that ADT currently has about $3.2 billion in debt which results in a leverage multiple of about 2.0 times total debt to earnings before interest tax depreciation and amortization ("EBITDA"), and that ADT cannot take on material additional debt if

54

it desires to maintain its investment grade credit rating. Mr. McClure stated that ADT's weighted average cost of capital ("WACC") is approximately 8% and that increasing its leverage ratio would not significantly impact ADT's WACC because of the current low interest rates, and that ADT could continue to service its debt commitments under a downside scenario of higher attrition, increased subscriber acquisition costs and reduced new revenue per user even if it increased its leverage to 3.0 times total debt to EBITDA.

Mr. McClure next provided an in-depth update on ADT's share price performance since its separation from Tyco, including its performance versus selected peers, research perspectives on ADT, and investor feedback, noting that there were many shorts on ADT's stock up to its last earnings release…

*       *       *

Mr. McClure then presented the advantages and considerations of maintaining an investment grade or noninvestment grade credit rating, noting that maintaining an investment grade credit rating maximizes access to debt markets and that intentionally moving to a non-investment grade credit rating should be viewed as a permanent decision.

ADT220-0001320-1326. All of the directors attended the May 9, 2013 Board meeting.

108.    On May 23, 2013, the Company issued a press release entitled "The ADT Corporation Completes Exchange Offer" which stated the following:

The ADT Corporation (NYSE: ADT) today announced the final results of its offer to exchange (the "Exchange Offer") up to $700,000,000 aggregate principal amount of its outstanding $700,000,000 4.125% Notes due 2023 (the "Outstanding Notes") for a like principal amount of its new $700,000,000 4.125% Notes due 2023 (the "Exchange Notes").

The Exchange Offer expired at 5:00 p.m., Eastern Time, on May 17, 2013. As of the expiration date, tenders of $699,700,000, or 99.96%, of the Outstanding Notes had been received. ADT accepted all of the Outstanding Notes tendered in exchange for the Exchange Notes and settlement occurred on May 23, 2013.

109.    On June 15, 2013, Defendant Gursahaney sent an email to certain of the Individual Defendants, including the members of the Board. In the email he noted that the Company had closed the books on May, but "thought it might be useful to provide [] a quarter to date update on [ADT's] financial performance." Defendant Gursahaney stated that "[t]hrough two months, we are slightly ($1M) behind our revenue forecast as unit production is below

forecast and attrition is continuing to run high . . ..  As we look to the rest of the quarter and year, we are anticipating continued pressure on gross adds and attrition."  ADT220-0001327-1328.

110.    On July 12, 2013, in advance of the release of 3Q'13 results, Defendant Gursahaney sent another email to certain of the Individual Defendants, including the members of the Board, this time warning that there were "three primary gaps" in ADT's financials of which he wanted to "make you aware of in advance of your review of the materials."   The "gaps" including the following, all of which should have provided further glaring warnings to the Individual Defendants that ADT's outlook was not nearly as positive as they were leading the investing community to believe:

- In FY14, we will be implementing an enhanced customer credit screening process to help reduce non-pay disconnects.  Based on our pilots, we expect this to impact our gross adds in our direct sales channel by 8%.  Needless to say, we understand we need to offset more of this than is currently reflected in the model and are working to do so.  We also need to make sure our attrition rate reflects the benefit of this screening, however much of the benefit will be realized after FY14.  We are confident this is the right thing for the business to do and we understand we need to find offsets to the gross adds shortfall this creates,

- Also in FY14, our SSFCF is about $20M below where I believe we should be, even after considering our increase in interest payments. . . .

- Finally, in the out years (FY17&FY18) the investments required to support the growth programs are yet to be defined in enough detail to provide meaningful estimates at the project level.  For our modeling purposes, we have assumed a level of capax that is consistent with this year.

ADT220-0001329-1330.

111.    On July 18 and 19, 2013, the Board held meetings during which it discussed ADT's capital structure, strategic plan, its share repurchase plan, and business risks facing the Company, including increased competition in the marketplace, and an "attrition trend [that] continues to grow, offsetting benefits from planned initiatives" (ADT220-0001475).  ADT220-0001331-1642  (Board  packet  for  July  18-19,  2013  meeting);  ADT220-0001643-1733

(Presentation materials prepared by Goldman Sachs for July 18-19, 2013 Board meeting); ADT220-0001734-1740 (Board minutes for July 18, 2013 meeting); ADT220-0001741-1752 (Board minutes for July 19, 2013 meeting).   Defendants Gordon, Colligan, Donahue, Gursahaney, Heller, Hyle, Meister, and Paliwal attended the July 18 and 19, 2013 meetings.

112.   In spite of the clear challenges facing ADT's business, the Goldman Sachs presentation observed the importance of outwardly maintaining "[c]onfidence in the Company's ability to support increased leverage while continuing to execute on its strategic plan."  ADT220-0001649 (slide entitled "Potential Messaging to Investors").  Indeed, maintaining the appearance of a strong business model, strong cash flow generation and a strong liquidity position were essential to execute on Meister's demands.  *Id.*  The plan was to "[f]ocus [the] July earnings call on financial and operational performance and signal shift in rating target and capital allocation strategy that [would] be fully articulated in September."  ADT220-0001671.  In so doing, the Q3 earnings call should emphasize "strong operating results for the quarter" and strategically "signal [a] shift in rating conviction while avoiding piece-meal disclosure of strategy/capital allocation plan."  ADT220-0001680.  In targeting leverage of 3.0x, the Individual Defendants were well aware that the result would "likely [be] loss of management credibility in the eyes of rating agencies and debt holders as we had reaffirmed our commitment to investment grade in Nov-12."  ADT220-0001701.  Mindful of the potential harm to the Company, the Individual Defendants nevertheless stayed the course, intent on giving Meister and Corvex exactly what they wanted – encumbering the Company with debt in order to make ill-advised share repurchases – all in order to secure their leadership positions with the Company and hasten Meister's departure from the Board.

113.    On July 29, 2013, the Audit Committee met to review a draft press release, the earnings call script and the Form 10-Q to be filed in connection with the Company's issuance of results for 3Q'13.  ADT220-0001753-1838 (Audit Committee presentation materials for July 29, 2013 meeting); ADT220-0001839-1841 (Audit Committee minutes for July 29, 2013 meeting). Defendants Colligan, Heller, Hyle, Meister, and Gursahaney attended the July 29, 2013 Audit Committee meeting.

114.    On July 31, 2013, the Defendants caused the Company to issue a press release reporting its financial and operating results for the third fiscal quarter 2013 in which it provided an update on its capital allocation strategy and announced the acquisition of Devcon Security. The  press release also reported strong recurring revenue growth and margin results, and restated its  reported attrition rates to reflect metrics that were significantly more favorable than previously reported.   The press release read, in relevant part:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.52 for the third quarter of 2013, and diluted earnings per share before special items of $0.53. Using the company's cash tax rate, EPS before special items was $0.80[1].
>
> Recurring revenue, which made up 92% of total revenue in the quarter, was up 4.2%. Recurring revenue growth was driven primarily by an increase in ending average revenue per customer, which rose to $40.08.
>
> The company has determined that its net attrition rates for prior periods have been overstated due to the inaccurate capture of certain resale activity. The revised net attrition rate for the current quarter was 13.8% and revised rates for the preceding quarters were: 13.5%, 13.4%, 13.5%, 13.2%, 12.9%, 12.7%, and 12.7% for the quarters ended March 29, 2013 through September 30, 2011, respectively. ADT closed the quarter with 6.5 million customer accounts.
>
> EBITDA before special items was $433 million, 5.1% higher than the prior year, and  EBITDA margin before special items was 52.0%, a 140 basis point improvement. The margin expansion was mainly due to the favorable impact of the mix shift to more ADT-owned systems and cost control initiatives that helped to offset the impact of dis-synergies and public company costs resulting from the separation from Tyco International.

Operating cash flow for the twelve month period ended June 28, 2013 was $1.6 billion. Steady-state free cash flow before special items, calculated on a pre-tax and unlevered basis for the twelve month period ended June 28, 2013 was $918 million[1].

ADT has entered into a definitive agreement to acquire Devcon Security for total cash consideration of $148.5 million. The acquisition includes approximately 117,000 customer sites with total recurring monthly revenue of approximately $3.6 million. The transaction is expected to close in early August.

Naren Gursahaney, ADT's Chief Executive Officer, said, "Our results for the quarter reflect solid execution on our growth and cost control initiatives. We continued to make significant progress in expanding sales of ADT Pulse with the trends in take rates demonstrating the broad appeal of the Pulse product set across all of our sales channels."

*      *      *

## SHARE REPURCHASE PROGRAM

Under its previously announced three-year, $2 billion authorization, the company repurchased 7 million of its shares for $296 million during the quarter. Additionally, during April 2013, the company received 1.2 million additional shares of its common stock in conjunction with the completion of the $600 million accelerated share repurchase program initiated on January 29, 2013. From inception of the $2 billion  program to date the company has repurchased 25.3 million shares for $1.15 billion.

## UPDATING FISCAL YEAR 2013 GUIDANCE

Recurring revenue growth of 4.5%-4.8%

EBITDA margin before special items approximately 51.0%

Free cash flow before special items of $450-$500 million

Steady-state free cash flow before special items $900-$950 million

115.    On the same day, ADT held a "Q3 2013 ADT Corporation Earnings Conference Call" discussing the third quarter results for fiscal 2013.  The call included Gursahaney stating that "[o]verall, this was another solid quarter for us with a number of positive trends in our business."  He later added that "[r]ecurring revenue grew by 4.2% to $764 million and accounted

for 92% of our total revenue.  Total revenue was $833 million, up 2.3% over the third quarter of last year."

116.    On July 31, 2013, the Company filed with the SEC its quarterly report for the period ended June 28, 2013 on Form 10-Q.  The Form 10-Q was signed by Defendant Gursahaney and Senior Vice President, Controller and Chief Accounting Officer Michele Kirse ("Kirse"), and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendant Mikells and Kirse, stating that the financial information contained in the Form 10-Q was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form 10-Q contained additional certifications by Gursahaney and Kirse asserting that the report "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*[.]"

117.    Following the release of ADT's results for the third quarter of fiscal year 2013, ADT common stock traded above $41 per share.

118.    On September 8, 2013, Jim Cramer, a CNBC television personality and former hedge fund manager,  released an article in *The Street* entitled "Cramer:  Outing the Perpetual Losers – Part I."  In it Cramer wanted to highlight disappointing companies,  one of which was ADT:

> Enough. Let's just call 'em out already. I'm talking about the serial disappointers, the companies that just can't seem to deliver no matter what happens. I think we just need to out them right here. I am taking this Open House weekend to do what I have wanted to do for months now -- just vent my spleen on these underperformers that have hurt so many portfolios, and *whose management teams seem to have no knowledge of how poorly run their enterprises really are*.

60

*Here are 10 companies run by people who actually think they are doing a good job. They aren't, of course, and they need to be put on notice* that they are just members of a gang that couldn't shoot straight. I am putting them in alphabetical order because they've all been, at one time or another, super discouraging stocks to own. We all know that about these companies.

This is a list of losers that, in sports, would be considered a no-brainer to assemble. They're just a bunch of crummy teams that never seem to deliver, filled with players you would never draft if there were a corporate fantasy league. In sports, these guys would be called out so often that they would be human highlight films for disappointment.

In our business, though, the teams compensate their managers outrageously, and no one ever says boo about them. Maybe everyone just belongs to the same club and they don't want to be uncomfortable when they drink their gin and tonics with this mob? Or maybe people just don't care.

I do.

119.    In regards to ADT, Cramer stated the following:

How do you have a play on housing and security that's down 14% for the year? *How can you have a company that's totally in denial about how poorly its business is really performing? Does the company have a handle at all on how to grow its business beyond its practice of overpaying for acquisitions? How could it disappoint for so many quarters? Does it even have a chief financial officer?* Sure, I am mad at myself that my Action Alerts PLUS charitable trust got beat by this one, but ADT did appear to know what it was doing, and *management put on a good show. Plus, this is a company that bought high in one of those ridiculous accelerated-stock-purchase plans that ill-informed managements are talked into by the brokers, followed by a slashed credit rating as the stock gets hammered.* Watch ADT have to issue equity now. I think AT&T (T) is eating this company's lunch. *Management should put the "for sale" sign up and move on.*

120.    Of course, as the Board and Audit Committee materials reveal, the Individual Defendants were well aware of the Company's lackluster performance and prospects, yet continued to carefully script the message to shareholders and maintain the ruse that they were confident in ADT's ability to continue to deliver value to investors.   ADT220-0001649. Moreover, as subsequent events also reveal, Meister and Corvex were well-aware of ADT's true financial position and were plotting their exit strategy in a way that would maximize their return on their ADT investment, at the expense of ADT and its other shareholders.

61

121.    On September 24, 2013, ADT suddenly announced a private offering of senior notes.  The Company "announced the pricing of its offering of $1,000,000,000 of 6.250 percent senior unsecured notes due 2021."  ADT stated that it intended "to use the net proceeds from the offering primarily to repay $150 million in borrowings under its revolving credit facility, repurchase outstanding shares of its common stock and for other general corporate purposes, including acquisitions."

122.    Also in September, Goldman Sachs and Centerview Partners prepared discussion materials for the Individual Defendants providing, among other things, a "Situation Update" on recent demands made by Corvex.  In late August, having seen firsthand the true state of ADT's financial outlook and prospects, "Corvex proposed an accelerated timeframe for increasing net leverage to 3.0x by the end of FY2014 (and 2.7x by the end of Q1 2014) and using the majority of debt proceeds to repurchase shares."  ADT220-0001843.  Management's previous timetable at the July Board meeting had been to steadily increase leverage to 3.0x by Q1 2015 with capital allocation being more heavily weighted to M&A.  Notably, "[a]doption of [the] Corvex capital allocation timetable was presented as a condition to Keith Meister's exit from the Board."  *Id.* Corvex also indicated "that it would participate in any large share repurchase plan although level of participation would be dependent on stock price."  *Id.*  Of course, with knowledge that the Board members' real concern was entrenchment, "Corvex [] indicated that if its leverage timeframe [was] not adopted, it would present an alternative capital allocation framework (a "Public LBO") and run a competing slate of directors to be voted on at ADT's 2014 AGM."  *Id.* These threats had the desired reaction.

123.    The Board met, without Meister, on September 7, 19 and 20, 2013 to discuss Corvex's demands, it being an almost forgone conclusion that the Board and management would

give Meister and Corvex virtually anything if it would hasten Meister's departure from the Board.  ADT220-0001853-1855; ADT220-2201-2202.

124.    On October 20, 2013, Defendant Gursahaney sent an email to certain of the Individual Defendants, including the Board, regarding the preliminary 4Q'13 and FY'13 results, noting that ADT had come in about $15 million below its FCF forecast and about $25 million below its SSFCF estimate.  The primary drivers of the shortfall were attrition, higher Pulse take rates and Pulse upgrades that increased subscriber acquisition costs and higher capital expenses as the Company accelerated some IT spending associated with its new Pulse product platform. ADT220-0002228-2232.

125.    The Board and Audit Committee met on November 11, 2013 to discuss the FY'14 outlook, including the draft Form 10-K and draft earnings release.  ADT220-0002237-2440; ADT220-0002656-2658; ADT220-0002659-2669.   Defendants Coligan, Heller, Hyle, Meister, Geltzeiler, and Gursahaney attended the November 11, 2013 Audit Committee meeting.  All of the directors and Defendant Geltzeiler attended the November 11, 2013 Board meeting.

126.    On November 18, 2013, the Board met again, this time to discuss the dividend and management's share repurchase recommendation.  ADT220-0002670-2693.  At the meeting, the Board adopted management's recommendation and increased the current share repurchase authorization from $2.0 billion to $3.0 billion.  *Id.*

127.    On November 20, 2013, the Company announced its fourth quarter and fiscal year 2013 results.  The following was included in the press release, in pertinent part:

> The ADT Corporation (NYSE: ADT) today reported diluted earnings per share of $0.45 for the fourth quarter of 2013. Excluding special items for the separation from Tyco, and merger and restructuring costs, diluted earnings per share was $0.46. This compares to earnings per share excluding special items of $0.43 in the fourth quarter of last year. Using the company's cash tax rate, which factors in the

benefit of the company's net operating losses, diluted earnings per share before special items was $0.75[1].

Recurring revenue, which made up 92% of total revenue in the quarter, was up 4.7%. Recurring revenue growth was driven by 388 thousand gross additions, including the Devcon Security acquisition, and an increase in ending average revenue per customer, which rose 3.7% to $40.31. This was partially offset by customer attrition, which rose 10 basis points sequentially to 13.9%. ADT closed the quarter with 6.5 million customer accounts, 1.5% higher than last year. Total revenue of $846 million increased 4.2% compared to the fourth quarter of 2012.

*     *     *

ADT's Chief Executive Officer, Naren Gursahaney, commented on the company's results, "I am pleased with our progress during our first year as a standalone public company. We continue to build on our industry leading position in residential and small business life safety, security, and automation. In the fourth quarter, we again delivered solid recurring revenue growth driven in large part by the success of Pulse and our acquisition of Devcon Security."

*     *     *

## RETURN OF CAPITAL

Under its previously announced three-year, $2 billion share repurchase program, the company repurchased 5 million of its shares for $206 million during the fourth quarter. Additionally, since quarter end, the company repurchased 7 million shares for $300 million. From inception, the company has repurchased 35.5 million shares for $1.6 billion under this program, resulting in a 15% reduction to outstanding shares.

The company announced today that it has entered into an accelerated share repurchase agreement with JPMorgan Chase Bank, under which it will repurchase approximately $400 million of its common stock. The company will acquire the shares under its previously authorized share repurchase program and will fund the repurchase from available cash on hand. Under the terms of the agreement with JPMorgan Chase Bank, ADT will pay JPMorgan Chase Bank $400 million on November 22, 2013 and on that date will receive initial deliveries of approximately 8 million shares, representing a substantial majority of the shares expected to be retired over the course of the agreement. The total number of shares ultimately repurchased under the agreement will generally be based on the volume-weighted average share price of the company's common stock during the calculation period of the accelerated share repurchase program, less a discount. The accelerated share repurchase program is expected to be completed by March 25, 2014, although the completion date may be accelerated at JPMorgan Chase Bank's option after an initial fixed period. The actual number of shares

64

repurchased will be determined at the completion of the accelerated share repurchase program.

Between the shares already repurchased and the accelerated share repurchase program, we expect to complete the three year, $2 billion share repurchase program in the first half of fiscal 2014. As a result, the company's board of directors has increased the current share repurchase authorization by an additional $1.0 billion, expiring on November 27, 2015 unless it is terminated earlier by the company.

The company's board of directors has authorized a 60% increase in the company's quarterly dividend to $0.20 per share, up from $0.125 per share, beginning with the next dividend declaration.

128.    On November 20, 2013, the Company also filed with the SEC its annual report for the fiscal year ended September 27, 2013 on Form 10-K.   The Form 10-K was signed by Defendants Colligan, Donahue, Dutkowsky, Gordon, Heller, Hyle, Meister, and Paliwal, and repeated the  Company's previously announced financial results.

129.    In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Gurshaney and Geltzeiler, stating that the financial information contained in the Form 10-K was accurate and it fairly presented, in all material respects, the financial condition and results of operations of the Company.  The Form 10-K contained additional certifications by Defendants Gurshaney and Geltzeiler asserting that the report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***[.]"

C.    **The Truth Regarding the Individual Defendants' Wrongful Course of Conduct Begins to Emerge**

130.    On November 24, 2013, having capitulated to Meister's demands, the Board met "to review and approve a repurchase of ADT Common Stock from Corvex Management LP, which is ultimately controlled by Keith Meister, a director of the Company."  ADT220-0002700-

2704.  In the transaction, ADT would purchase 10,240,000 shares from Corvex, with a per share price of $44.01, based on the trading price of ADT's stock at the close of market on the prior trading day, November 22, 2013, for a total purchase price of $450,662,400.  ADT220-0002700. In exchange, Meister would resign from the Board and Corvex would enter into an extension of its obligations under the current standstill agreement for five years and a mutually-acceptable press release announcing the transaction.  ADT220-0002700.

131.  Although there was little question that the Board would yield to Meister and Corvex, it obtained the opinions of Goldman Sachs and Centerview Partners to bless the ill-advised transaction and to create the impression that the transaction had received thorough and balanced consideration.  Centerview Partners claimed, "based upon the totality of the circumstances and a review of precedential transactions, that it is reasonable for the Company to repurchase the shares at the current market price."  ADT220-0002701.  Similarly, Goldman Sachs stated that "based upon a similar review of precedential transactions, the fact that the proposed price was below the median of ADT's 52-week trading range and below the median analyst target price, and the fact that the proposed transaction would permit ADT to retire a large number of shares at once without paying a premium to the current market price or a significant transaction fee, that the proposed purchase price is reasonable."  *Id.*[20]

---

[20]  Plaintiff Zimmerman's Section 220 demand specifically requested "[a]ll documents relating to the Company's entry into an agreement dated November 24, 2013 with Corvex . . . to repurchase 10.24 million shares of the Company's common stock from Corvex for $44.01 per share."  The failure to produce the Goldman Sachs and Centerview Partners analyses and Plaintiffs' inability to conduct an analysis with the guidance of an expert consultant is prejudicial to Plaintiffs to the extent Defendants intend to rely on the Goldman Sachs and Centerview Partners analyses to substantiate that the transaction with Corvex is fair and reasonable, and subject to the business judgment rule.  The failure to produce such relevant records creates a negative inference such that the only reasonable conclusion is that these "analyses" were grossly inadequate and merely a half-hearted effort by the Individual Defendants to garner support for their wrongful course of conduct.

132.     Five days after the announcement of the Company's fourth quarter and fiscal year 2013 results, on November 25, 2013, ADT surprised investors when it announced that it was repurchasing a large chunk of shares held by Corvex, which represented the vast majority of Meister/Corvex's ADT common stock position in a private transaction at $44.01 per share.  In addition, Meister immediately resigned from ADT's Board.  The investing public had no idea that Meister had been plotting his exit since August or that the Board was repurchasing the Corvex shares only to secure their leadership positions with the Company.

133.     On the same day, Morningstar Research issued a report discussing the abrupt departure of Meister and the sale of common stock, noting that the "share sale by Corvex sends a negative signal to the market that ADT is no longer the great investment it was originally thought"; and that "Corvex likely scored around a 10% gain on its stock purchases . . . but . . . [i]n its  50-slide presentation to investors a year ago, Corvex argued that ADT was worth anywhere from $61 to $83 . . .."

134.     As noted by financial analyst Simon Lack, "[a] more shareholder-oriented CEO, or a better negotiator, would have been less desperate to rid the board of Meister, but ADT instead destroyed at least $26 million of value for the company by overpaying for its shares.  We owned ADT ourselves and would have at least liked the opportunity to make the same sale as Corvex with the same information, but equal treatment was not afforded to all the other shareholders."[21]

---

[21]  Lack, Simon "The Corvex Discount on ADT," INVESTING.COM, (November 28, 2013), http://www.investing.com/analysis/the-corvex-discount-on-adt-193642.

135.    In reaction to the news, ADT's stock price immediately dropped $2.55 per share or 6% from $44.01 per share on Friday November 22, 2013 to $41.46 per share on November 25, 2013 on extremely heavy trading volume.

136.    On December 2, 2013, ADT announced the completion of its Corvex buyback. The Company stated that "[o]n November 29, 2013, [ADT] completed the previously announced repurchase from [Corvex] of 10,240,000 shares of the Company's common stock (the 'Share Repurchase') for a price per share equal to $44.01." On this news, ADT shares fell further, sinking to $38.80 per share on December 13,2013.

137.    In response to the Corvex repurchase, a December 30, 2013 *Wall Street Journal* article entitled "Secret Buybacks Are Unfair to Shareholders: A company about to purchase a director's stock should, at the least, file notice beforehand,"[22] noted that share buybacks by ADT and two other companies for the benefit of three well-known activist investors is alarming. The article stated that "[t]he mere fact that any director is selling stock, particularly a large amount, conveys substantive information. At a bare minimum, it suggests that the stock may no longer be an attractive investment. These directors have valuable information while the public is playing a game of blind man's bluff."

138.    On January 27, 2014, ADT filed a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2014 Proxy"), which asked shareholders to vote on the following matters:

- Election of the Directors: Thomas Colligan, Richard Daly, Timothy Donahue, Robert Dutkowsky, Bruce Gordon, Naren Gursahaney, Bridgette Heller and Kathleen Hyle;

---

[22] *See* Levin, John, "Secret Buybacks Are Unfair to Shareholders: A company about to purchase a director's stock should, at the least, file notice beforehand," WALL STREET JOURNAL, (Dec. 30, 2013), *available at* http://online.wsj.com/news/articles/SB10001424052702303345104579282192002671798.

- The ratification of the appointment of Deloitte & Touche LLP as ADT's independent registered public accounting firm for fiscal year 2014; and

- To approve, by non-binding vote, named executive officer compensation.

139. The 2014 Proxy described corporate governance, director responsibilities, and the duties of each committee, Board risk management, and information about the nominees.

140. The 2014 Proxy also outlined the purported Fiscal Year 2013 Business Highlights, which included the following:

- We added over 1.1 million new customers on a gross basis and maintained our market share in the face of increased competition;

- We more than doubled recurring monthly revenue growth in our Small Business unit;

- The percentage of new Residential Small Business customers who selected our interactive ADT Pulse offering (our "Pulse Take Rate"), as opposed to a traditional home or small business security system, grew to 32% in the fourth quarter, and to 26% for the year, up from 10% for fiscal year 2012;

- We added 117,000 customers via the acquisition of Devcon Security Holdings, Inc.; and

- ***We repurchased 28 million of our outstanding shares and paid out $112 million in dividends during fiscal year 2013.***

141. However, the 2014 Proxy was false and misleading as it failed to disclose to investors the material information regarding the Company's share repurchase plan, its dealings with Meister and Corvex, the Company's financial condition and future business prospects, and their impact on the Company that would affect shareholder votes on the proposed items.

142. Then, prior to the open of the financial markets on January 30, 2014, ADT announced disappointing financial results that failed to meet previously provided expectations and guidance, including unexpectedly high attrition rates. The Company's reported net income was the lowest for ADT for any three month period since its spinoff from

Tyco.

143.   In reaction to the disappointing results, ADT's stock price declined $6.41 per share, or 17%, from $37.81 per share on January 29, 2013 to $31.40 per share on January 30, 2014, on unusually high trading volume.   In the days following, ADT's share price continued to fall to under $29 per share.   From its Relevant Period high, *over $3.5 billion* of ADT's market capitalization had been wiped out.

144.   On January 30, 2014, Barclays issued an analyst report, entitled "ADT Corporation – F1Q14: Thoughts + Model," questioning management's credibility.   The report  stated:

> A far worse-than-expected quarter out of ADT which *raises the question of management's credibility and the unusually structured deal the company made with a board member announced on 11/25/13.* For context, the company agreed to buy 10.24M shares directly from a board member's firm at price set on the day before the company announced this shareholder was selling down the position and leaving the board. *We had a number of questions from investors regarding the structure of this deal at the time it was made and given today's earnings we suspect more questions will arise.* Beyond the credibility questions, this quarter's accelerating churn rate, shortfall in customer adds, and large margin miss only add to concerns over impacts from competition on growth and pricing.

145.   In regards to this stock drop, a 24/7 Wall St. article entitled "ADT Brings the Death of Growth" it stated that *"[i]f you just looked at the stock price and know that ADT is a security company, you might just think that ADT's corporate headquarters had been broken into."*

146.   Also on January 30, 2014, Herb Greenberg, a financial journalist for over thirty years, released an article in *The Street* entitled "Greenberg: Why ADT is Appalling" which stated the following in pertinent part:

> Earnings disappointments come a dime-a-dozen, but **ADT**'s (<u>ADT</u>) is a standout.

The company said its customer growth in its fiscal first quarter, ended Dec. 27, didn't meet its expectations and that it has "implemented actions, including improvements in our dealer channel and lead generation process, to regain subscriber traction in the future."

***Here's the problem: Over the past year, rather than investing more cash in its business than it otherwise might have, ADT has spent billions buying back shares at prices well above where the stock now trades -- with the distortion even greater in the wake of today's earnings miss.***

That highlights a problem with buybacks, in general: They're often designed to give a short-term pop in the stock to assuage antsy investors. They're also often the tool of first resort when activists land on a company's doorstep, which was the case with ADT.

And, as is the case with ADT, the result can often be ***short-term gain for long-term pain.***

A little history here: In early October 2012 ADT was spun off from **Tyco** (<u>TYC</u>). Later that month Keith Meister of the hedge fund, **Corvex Management**, filed that his fund held a 5% stake in ADT. At the same time he gave a presentation saying he thought the stock was valued at $61 and he urged the company to raise debt and buy back its shares.

Within weeks (you'll never guess!) ADT's board authorized a three-year, $2 billion buyback.

A month later Meister was appointed to ADT's board.

ADT's stock, meanwhile, zoomed higher, peaking at nearly $50 in March 2013 on the hoopla and the start of buybacks.

According to ADT's most recent 10-K:

> *During fiscal year 2013, we made open market repurchases of 15.5 million shares of our common stock at an average price of $43.01 per share. The total cost of open market repurchases for fiscal year 2013 was approximately $668 million, of which $635 million was paid during the period. Additionally, between September 28, 2013 and November 13, 2013 we repurchased 7.3 million shares of our common stock for approximately $300 million.*
>
> *On January 29, 2013, we entered into an accelerated share repurchase agreement under which we repurchased 12.6 million shares of our common stock for $600 million at an average price of $47.60 per share. This accelerated share repurchase program, which was funded with proceeds from the January 2013 Debt Offering, was completed on April 2, 2013.* (Emphasis included.)

Adding insult to injury, many of these purchases were, indeed, financed through debt offerings.

Fast-forward to Nov. 20, 2013, which is more than halfway through the company's fiscal first quarter: ADT announced that with its three-year buyback program completed in about a year, its board added another $1 billion to the buyback pot. On its earnings call today, the company says it spent $1.2 million on buybacks, including "the Corvex buyback."

Five days later, the company announced it was buying 10.24 million shares, or the bulk of Corvex's 11.1 million stake, for $44.01 per share. ***That's a far cry from his original $61 target. ADT also said that Meister was immediately exiting the board.***

Enter today. With ADT's 16% decline after the punk earnings you can't help but wonder about two things: What investors who weren't bought out with Corvex must be thinking; and, given Meister's role on the board -- and the timing of Corvex's sudden exit -- did something he learned as a board member cause him to get out while the getting was good?

Corvex didn't return my call.

**Reality Check**: The headline to this piece says it all but ADT may very well go down as a classic example of activists gone wild. They buy a big stake. They go on the board. They get bought out. As I wrote a few months ago, it smacks of new-age greenmail.

More recently I questioned whether the SEC should clamp down on special deals for activists. ***The bottom-line is really simple: Should insiders, in this case activists who go on the board, get special treatment? I think we all know what the answer should be.***

147.    Moreover, on January 31, 2014, William Blair issued a report entitled "The Wheels May Have Come Off Its Operational Execution, but ADT's Pulse Remains Vibrant." The report discussed the huge earnings and margin miss which caused ADT's stock price to decline more 17% on January 30, 2014:

**The ADT Corporation**

**The Wheels May Have Come Off Its Operational Execution, but ADT's Pulse Remains Vibrant**

- ADT Corporation reported a significantly weaker quarter than anticipated, with GAAP EPS totaling $0.39 but adjusted EPS excluding one-time items of $0.43, down 2% from a year ago *and well below consensus of $0.49 and our* $0.52 forecast. Recurring revenue growth of 4.2% versus a year ago was weak and trailed our 4.9% forecast.

- Better-than-expected Pulse take-rates and upgrades enabled stronger-than expected ARPU, *but new customer additions were shockingly weak for dealer and direct originated channels*, while net SAC surged 40%, driving ADT's net SAC creation multiple up 22% (or 20% excluding upgrade costs).

- *The shares declined 17% to new lows on three primary concerns: the apparent misallocation of capital ($1.2 billion to repurchase 25.5 million shares or 12% of fully diluted shares at year end fiscal 2013 ending last September at an average price of $46.43 per share), surging SAC costs, and lower third-party new customer referrals due to heightened advertising by new entrant competitors.*

- *Total revenues rose 3.7%, below our 4.9% projection, while EBITDA margins, targeted to rise 50 basis points this year, declined 70 basis points to 50.8% from a year ago, well below our 51.7% forecast and consensus of 51.3%. Net customer attrition rose 30 basis points sequentially to 14.2% and 80 basis points from 13.4% a year ago.*

- *New customer additions of 231,000 declined 9.4 from 255,000 a year earlier (versus our 268,000 forecast); dealer additions fell 16.0%* and direct account additions declined 5.2%. While ADT has encountered weak dealer origination problems over the past year, *the emergence of a large decline in new direct customer additions was a material new problem attributed to lower third-party referrals*.

148.    Analyst firms downgraded ADT stock, including Stifel Nicolaus which downgraded ADT to "hold" from "buy" on January 31, 2014.[23]

149.    Investors continued to sell in the days immediately following these reports, with investors selling ADT shares on nearly 20 times the average daily trading volume, driving the price down nearly 25% from the stock's close of $37.81 per share on January 29, 2014 to $28.83 per share by February 3, 2014.

---

[23] "Stifel Nicolaus Downgrades ADT (ADT) to Hold," STREETINSIDER.COM, (January 31, 2014), http://www.streetinsider.com/Downgrades/Stifel+Nicolaus+Downgrades+ADT+%28ADT%29+to+Hold/9110443.html.

150.   In the months following, reaction to ADT's share buyback program and Corvex's exit from the Company has continued to be utterly dismal.   Jeffrey Ubben, founder of $14 billion activist hedge fund firm ValueAct Capital cited ADT as an example of destructive activism.

151.   Jim Cramer, while commenting on the efficiency of Apple's stock buyback program, noted that buybacks when not properly planned can be a real problem for companies, as it was for ADT:  "Most of the time when I see buybacks that are done irrespective of price, I have to laugh.  They can be such wastes of money, like the endless Cisco (CSCO) buyback that has been done above the market price or the moronic accelerated buybacks of ADT (ADT), which had the gall to purchase 10 million shares at $44.01 back in November from a dissident shareholder, Keith Meister, who happened to be on the board representing the interests of his hedge fund, Corvex.  Unless Meister was brain dead, he must have known that business had softened dramatically.  Now the stock stands at $29.  That was opportunistic and aggressive, all right, an opportunistic and aggressive sale to the company in a transaction that should be investigated by the SEC six ways to Sunday for potential insider-trading violations."[24]

152.   In the article entitled "Activist Killing Golden Goose," Ubben noted that "Corvex, where Meister is managing partner, ***bought a stake in the company, took a seat on the board and pushed ADT to take on debt in order to buy back stock, which it did.  But Corvex exited the board and sold a large amount of shares in November for about $450 million as the stock started to lose value.***"  The article states that "ADT shares continued to decline and are down  more than 32 percent over the past year."   Ubben, citing ADT, stated that "'***In the***

---

[24]  Cramer, Jim, *Apple does the right thing with $14B buyback*, (02/07/14) accessed on 07/03/2014 at: http://money.msn.com/top-stocks/post--apple-does-the-right-thing-with-dollar14b-buyback.

*vernacular of the media, it's a win, the activist triumphs.  It's a loss — the company's worse off…'  We have to be more balanced in how we talk about this stuff because there are some real failures out there."*"

153.   ADT was also used as an example of a suspect buyback in a *Wall Street Cheat Sheet* article entitled "2 Lousy Stock Repurchase Programs."   The article stated the following, in  pertinent part:

> The case of ADT (NYSE:ADT) is ***far more suspect***. ***ADT repurchased a whopping $1.2 billion worth of stock in the fourth-quarter of 2013. That's a lot for a company that only made $421 million in its fiscal 2013***. Furthermore, the company repurchased the shares owned by hedge fund manager Keith Meister through his fund Corvex Management. Meister joined the ADT board after taking a 5 percent stake. When the stock was trading in the mid $40's last November, ADT bought back the shares held by Meister, who subsequently quit the board. The stock immediately began to fall after this. When ADT reported its earnings a couple months later, the results were very disappointing, and the stock fell 17 percent. It trades today at just $32/share.
>
> ***Given this sequence of events, it appears that ADT's buyback was designed to benefit one of its board members, and not shareholders more broadly***…First, the company was extremely aggressive in buying back stock with the price just 10 percent off of an all time high. Second, the buyback dwarfed ADTs dividend.  Third, the buyback was carried out while the company's margins were declining,  and this ***suggests that management was more interested in defending the stock  price than in generating shareholder value***.

154.   A *Wall St. Cheat Sheet* article entitled "Is Your Money Safe in ADT?" also stated that "*[s]uch an aggressive buyback is highly suspicious*.  On the surface, it appears as if ADT's board, with Meister as its ring leader, executed a classic 'pump and dump.'  This means that ***the company mislead investors and analysts who were led to believe that the numbers would be better than they thought they would be***."  The article also adds the following:

> Whether it is true or not is immaterial from an investment standpoint. If it is true, then the board and management cannot be trusted, and investors need to stay away. If it isn't, then we still have to question the ability of management and analysts to predict the results of ADT's business. This is highly problematic, as ADT's appeal as an investment is in part its predictability.

155.    Indeed, shareholders have punished ADT stock as a result of Defendants' improper conduct, sending shares of ADT crumbling, erasing *over $3.5 billion* in market capitalization from its Relevant Period high.

## VI.    THE IMPROPER STOCK REPURCHASES

156.    While the Individual Defendants were making or causing to be made materially false or misleading and improper statements, or omitting information rendering the statements made false and misleading, such that the price of the Company's stock was artificially inflated, they either directed or permitted the Company to overpay for its own stock through significant stock repurchases.

157.    Indeed, the Individual Defendants, including each Director Defendant, facilitated and allowed the Company to engage in an epic stock repurchase program whereby the Company was caused to purchase millions of its shares at artificially inflated prices.   Specifically the Individual Defendants caused the Company to go into significant debt in order to repurchase *billions of dollars* worth of artificially inflated Company stock during the Relevant Period.

158.    In fact, instead of halting the stock repurchase program altogether, the Individual Defendants actually *increased* the Company's repurchase authorization from $2.0 billion to $3.0 billion.   Notably, this decision to increase the repurchase authorization by another $1.0 billion was announced on November 20, 2013, just five days before ADT agreed to purchase the Corvex shares and Meister resigned from the Board.

159.    Indeed, the Individual Defendants caused the Company to repurchase 10.24 million shares owned by Meister-controlled Corvex at $44.01 per share, causing the Company to expend more than *$450 million* on those shares alone.   Meister was a director of ADT until November 25, 2013 – the same day the repurchase of the Corvex shares was announced.

160.   The Individual Defendants knew or recklessly disregarded the fact that the Company's stock price was artificially inflated due to the false or materially misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.

161.   Each of the Individual Defendants, including the Director Defendants, either knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of ADT including its finances, operations, and present and future business prospects through access to internal corporate documents, communications, and contacts with corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.   Despite knowing that the Company's stock was inflated due to their own and/or others' improper and misleading statements, the Individual Defendants, including the Director Defendants, collectively directed or permitted ADT to expend more than *a billion dollars* to repurchase millions of shares of Company stock.

162.   In particular, pursuant to stock repurchase programs authorized by the Individual Defendants, the Board permitted the Company to repurchase millions of shares beginning in November 2012 even though they knew, or should have known that:

(a)   Despite the positive representations concerning the Company's then current financial condition and bullish forecasts of its future financial results -- statements which the Individual Defendants caused the Company to make during the Relevant Period -- ADT was actually experiencing reduced non-Pulse demand, accelerated churn rate and attrition, and increased advertising and service costs, all of which were negatively impacting ADT's recurring revenue, margins, and earnings;

(b)      In reality, ADT was relying on its aggressive share repurchase program authorized by the Individual Defendants to artificially inflate reported EPS thereby masking an overall growth slowdown and inflating the value of stock options granted to Company insiders;

(c)      They were allowing business decisions regarding ADT's capital structure and share repurchase plan to be unduly influenced by Corvex and Meister; and

(d)      In light of these known facts, the Company did not have a reasonable basis for its 2013 and 2014 quarterly and full year financial forecasts.

163.    The Individual Defendants either knew or recklessly disregarded that the Company's share price was inflated due to the false or materially misleading statements described herein.   Nevertheless, the Individual Defendants, including the Director Defendants, caused the Company to incur huge amounts of debt in order to pay large, artificially created premiums to repurchase its own stock, despite knowing (or recklessly disregarding) that the exposure of these false or materially misleading statements and omissions would cause the Company's stock price to drop significantly.   As such, the decision made by the Individual Defendants, including the Director Defendants, to repurchase the Company's stock was not the product of valid business judgment.

164.    Under the direction of the Individual Defendants, the Company bought back its stock at well over $40 per share.  For example, the Individual Defendants caused the Company to repurchase 12.6 million shares for $600 million from Credit Suisse International at a price per share of more than $47 in connection with an accelerated stock repurchase program and another 10.24 million shares for more than $450 million from Corvex – which was controlled by then-director Meister – at $44.01 per share.  ADT's closing price on January 30, 2014 – the day after the earnings miss was announced – was $31.40 per share.  Thus, just from the Credit Suisse

International and Corvex transactions *alone*, the Company lost approximately *$325 million*. Indeed, the Company incurred real economic loss from the shares it repurchased at inflated prices during the Relevant Period.

165.   Because the price of ADT's shares was artificially inflated by way of the Individual Defendants' false and misleading statements and omissions, the Company overpaid materially for its own stock.  The stock repurchases had the effect of falsely signaling to ADT's stockholders and the public that the purchase of the Company's stock at those prices was reasonable and that ADT's decision to use debt to do so was also reasonable.  Thus, the Individual Defendants, including the Director Defendants, committed corporate waste by causing ADT to purchase more than a billion dollars of its own shares at artificially inflated prices.

## VII.   DAMAGES TO ADT CAUSED BY THE INDIVIDUAL DEFENDANTS

166.   As a result of the Individual Defendants' improprieties, the Individual Defendants have irreparably damaged ADT's credibility, corporate image and goodwill.

167.   Under the direction of the Individual Defendants, the Company bought back its shares at inflated prices of over $40 per share.  The Individual Defendants caused the Company to repurchase 12.6 million shares for $600 million from Credit Suisse International at a price per share of more than $47 in connection with an accelerated stock repurchase program.  The Company also purchased 10.24 million shares for more than $450 million from Corvex at $44.01 per share.  ADT's closing price on January 30, 2014, the day after the earnings miss was announced, was $31.40 per share.  Thus, from these transactions, the Company lost approximately $325 million.

168.    As a direct and proximate result of the Individual Defendants' actions, ADT has expended and will continue to expend significant sums of money.   Additional expenditures and  damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.    costs incurred from investigating, defending, and paying any settlement or judgment in the Securities Class Action;

b.    millions of dollars in the form of compensation and benefits the Company  paid to the Individual Defendants, who have breached their duties to ADT, which was based at least in part on ADT's artificially-inflated stock price and inflated revenues;

c.    costs incurred from the Company buying back more than a billion dollars' worth of ADT shares inflated through the Individual Defendants' misconduct;

d.    costs incurred by the leverage the Individual Defendants utilized to fund a  large portion of the stock repurchases;

e.    possible increases in borrowing costs; and

f.    costs incurred from the loss of ADT's customers' confidence in the  Company's services.

169.    Moreover, these actions have irreparably damaged ADT's corporate image and goodwill.  For at least the foreseeable future, ADT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ADT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.   Demand on the ADT Board Would Have Been Futile

170.    Plaintiffs are each current owners of ADT shares and were owners of ADT shares during the Relevant Period in which the Individual Defendants' wrongful course of conduct alleged herein occurred.

171.    Plaintiffs bring this action derivatively to redress injuries suffered, and to be suffered, by ADT as a direct result of the violations of federal and state law, including breaches of fiduciary duty, abuse of control, unjust enrichment, corporate waste and issuing materially false and misleading proxy statements in violation of Section 14(a) of the Exchange Act by the Individual Defendants.

172.    Plaintiffs have not made any demand upon the Board to bring an action on behalf of the Company asserting claims herein to recover damages for the injuries suffered by ADT, since such demand would be a futile, wasteful and useless act, and is therefore excused for the reasons stated herein.  The current Board has failed to seek recovery for any of the wrongdoings alleged herein.  Moreover, there is no evidence that the Board even subjected any of the Individual Defendants to disciplinary action.  At the time this action was commenced, the Board consisted of Defendants Colligan, Donahue, Dutkowsky, Gordon, Gursahaney, Heller, and Hyle and non-defendant Richard J. Daly.  All of the current ADT Board, with the exception of Mr. Daly ("Daly"),[25] have been named as Individual Defendants herein.

173.    The unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be in the Company's benefit to recover the damages

---

[25]   Daly was appointed to the ADT Board of Directors on January 9, 2014.  He is a member of the Compensation Committee.

caused by the Individual Defendants' wrongdoings and to assert these derivative claims.

174.  Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Director Defendants.  The Director Defendants are subject to liability for breaching their fiduciary duties to the Company by, among other things, causing ADT to pursue an improper, unethical, and illegal course of conduct in its business practices, as discussed above.

175.  The Director Defendants' wrongful conduct was continuous and occurred throughout the applicable time period.  It resulted in ongoing and continuous harm to the Company.  The Director Defendants participated in and/or failed to adequately address, correct, and/or disclose such conduct.

**B.     Defendants Face A Substantial Likelihood of Liability**

176.  Demand is excused because the Director Defendants face a substantial likelihood of liability in this action as a result of their acts alleged herein.  *See e.g., ¶¶* 72, 80, 84-86, 91-93, 97, 104, 107, 109-113, 120, 122-126, 130-132.

177.  In addition, the Director Defendants face a substantial likelihood of liability and have caused ADT to face a substantial likelihood of liability from the Securities Class Action filed against ADT, which alleges that the Company and its senior executives issued false and misleading statements and omissions, including the following:

- "We expect recurring revenue to continue to grow at the rate we've seen over the past several quarters at approximately 4.9% to 5.2% . . . ."

- "Attrition has stabilized . . . [and] competitors continue to have little impact on attrition and in fact, we think the level of concern that has been expressed by some over the past few weeks is overblown . . . . [T]o date nothing has really changed . . . ."

- "[W]e are affirming our guidance [that recurring revenue growth for] fiscal year 2013 . . . will be about 5% . . . . [W]e expect cost-to-serve to be flat . . . [and] margins should modestly improve as we continue to grow

the revenue base. . . . [We] expect . . . to come in at the high end of our full-year EBITDA margin guidance . . . ."

- "[A]nything we do at this stage is going to be consistent with the $2 billion three-year share repurchase program that we announced back in November . . . . [W]e are at our target leverage . . . [and] are sticking to what we laid out back in November."

178.   By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of ADT.  The Director Defendants received compensation and director remuneration at the same time in which they were breaching their fiduciary duties owed to the Company.

179.   The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

180.   In addition, demand is also excused because the Director Defendants engaged in or ratified the wrongdoing alleged herein as these defendants reviewed, prepared, signed, or had access to the materially false and misleading press releases, SEC filings, and financial statements described herein.  All of the pertinent information regarding ADT's operations, business, and prospects was provided to the Director Defendants and it was the duty of these Defendants to properly evaluate this information and provide thorough guidance and governance to the Company.   As such, these Defendants cannot be expected to prosecute claims against themselves  and/or persons or entities with whom they have extensive inter-related business and professional  and personal  entanglements,  including the Director Defendants, if Plaintiffs demanded that they do so.  The Director Defendants, because of these relationships (as further

described below), have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of ADT.

181.    Further, the Director Defendants abused their control and wasted ADT's corporate assets by authorizing and effectuating the repurchase of more than a billion dollars worth of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

182.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit, Compensation, and Nominating and Governance Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of ADT to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

> 1.    **The Audit Committee Defendants Face a Substantial Likelihood of Liability**

183.    Moreover, the Audit Committee Defendants — Defendants Colligan, Heller, and Hyle — as members of the Audit Committee, were responsible for reviewing the Company's financial reports.  Indeed, ADT's Audit Committee Charter stated that the Audit Committee

Defendants are charged with maintaining "[t]he integrity of the financial statements of the Company" and "[t]he effectiveness of the Company's internal controls."

184.    The Audit Committee Defendants breached their fiduciary duties by failing to perform their designated duties and responsibilities as delineated in the Audit Committee Charter by causing and by failing to identify, detect, and prevent material misstatements in the Company's financial statements, and failing to put in place or maintain proper internal controls. As a result of their breaches of duties of care, good faith, and loyalty, the Audit Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

2.    **The Compensation Committee Defendants Face a Substantial Likelihood of Liability**

185.    The Compensation Committee Defendants — Defendants Donahue and Dutkowsky — as members of the Compensation Committee during the Relevant Period, are/were responsible for evaluating and approving the operation, structure and effectiveness of the Company's compensation plans, programs and policies.  In furtherance of these obligations, the Compensation Committee consulted with the Board regarding the Company's risk exposures and whether the Company's compensation plans, policies, and practices created risks that were likely to have a material adverse effect on the Company.

186.    The Compensation Committee Defendants breached their fiduciary duties by failing to perform their designated duties and responsibilities as delineated in the Compensation Committee Charter by putting their personal interests before that of the Company's — since the Individual Defendants' short-term compensation, was determined at least in part, by the successful financial performance of the Company, in violation of their duty of loyalty and failing to properly allocate the impact of risk among the Company's executives and shareholders.  As a

result of their breaches of fiduciary duties, the Compensation Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

### 3. The Nominating and Governance Committee Members Face a Substantial Likelihood of Liability

187.   The members of the Nominating and Governance Committee — Defendants Colligan, Donahue, and Gordon — were/are responsible in assisting the Board in its responsibilities relating to Board membership and corporate governance.   The Nominating Committee's responsibilities include developing, implementing and/or overseeing the Company's corporate governance guidelines and procedures and codes of ethics.

188.   As set forth herein, these Defendant members of the Nominating Committee failed to meet such responsibilities.   As a result of failing to oversee and implement the Company's governance principles, demand upon these Defendants is futile.

### C. The Individual Defendants Lack Independence

189.   Demand is also excused because the Individual Defendants, as members of the Board, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action as a result of their participation or approval in the wrongs alleged herein in addition to the following set of facts which taken as a whole, unequivocally show that the Individual Defendants have conflicts of interest and lack sufficient independence to exercise business judgment.

190.   Defendant Gursahaney is not independent and therefore is incapable of seriously considering a demand because he served as a high-ranking officer of the Company — President, Chief Executive Officer, and a Director of ADT — during the Relevant Period. The Company paid Gursahaney $4,949,818 in total compensation in 2012 and $7,170,763 in total compensation in 2013.   Gursahaney additionally signed ADT's false and misleading Form

10-Qs and certified the false and misleading Form 10-K during the Relevant Period. As such, defendant Gursahaney is incapable of impartially considering a demand because he has an interest in maintaining his principal occupation and substantial compensation that he receives in connection with said occupation. Demand is additionally futile with regard to Defendant Gursahaney as he may be responsible for damages in connection with the wrongdoings alleged herein.

191.   Defendant Gursahaney also cannot disinterestedly consider a demand to bring suit against himself because he is named as a defendant in the Securities Class Action which alleges that he made many of the misstatements described in this Complaint. Thus, if Gursahaney were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action.

192.   Gursahaney also is an employee of the Company that derives substantially all of his income from his ADT employment, making him not independent, as stated in the most recent Definitive Proxy dated January 27, 2014. Gursahaney cannot consider any demand to sue himself for breaching his fiduciary duties to ADT because that would threaten his livelihood.

193.   Defendant Gursahaney also lacks independence as in addition to his employment at the Company and the pending Securities Class Action, Gursahaney was the President of Tyco Security Solutions, the world's largest electronic security provider to residential, commercial, industrial, and governmental customers and the largest operating segment of Tyco. Gursahaney joined Tyco in 2003 as Senior Vice President of Operational Excellence. He then served as President of Tyco Engineered Products and Services and President of Tyco Flow Control. Defendants Donahue, Gordon, and Paliwal also had connections to Tyco as they were directors

87

of Tyco International Ltd.[26]

194.     Defendant Hyle lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of her dereliction of her duties as a member of the Audit Committee and as a result of her signing the false and misleading SEC filing on Form 10-K during the Relevant Period.

195.     Defendant Heller lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of her dereliction of her duties as a member of the Audit Committee and as a result of her signing the false and misleading SEC filing on Form 10-K during the Relevant Period.

196.     Defendant Gordon lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of his past directorship at Tyco, where he served alongside Defendants Donahue and Paliwal, and likely interacted with Gursahaney, as the President of Tyco Security Solutions; as a result of his dereliction of his duties as a member of the Nominating and Governance Committee; and as a result of his signing the false and misleading SEC filing on Form 10-K during the Relevant Period.

197.     Defendant Donahue lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of his past directorship at Tyco, where he served alongside Defendants Gordon and Paliwal, and likely interacted with Gursahaney, as the President of Tyco Security Solutions; as a result of his dereliction of his duties as the chair of the Compensation Committee and a member of the Nominating and Governance Committee; and as a result of his signing the false and misleading SEC filing on

---

[26] Defendant Gordon was a director of Tyco from 2003 to 2012.  Defendant Donahue was a director of Tyco from 2008 to 2012.  Defendant Paliwal was a director of Tyco from 2011 to 2012.

Form 10-K during the Relevant Period.

198.    Defendant Dutkowsky lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of his dereliction of his duties as a member of the Compensation Committee and as a result of his signing the false and misleading SEC filing on Form 10-K during the Relevant Period.

199.    Defendant Colligan lacks independence and as a result is incapable of considering a demand to commence and prosecute this action as a result of his dereliction of his duties as a member of the Audit and the Nominating and Governance Committees and as a result of his signing the false and misleading SEC filing on Form 10-K during the Relevant Period.

200.    The actions of the Board and the relationships between and among the Individual Defendants as described above has impaired the Board's ability to exercise its business judgment and has rendered it incapable of reaching and independent decision regarding the acceptance of Plaintiffs' demands.

201.    Under the factual circumstances described herein, the Individual Defendants have put their personal interests over those of the Company and as such are more concerned with protecting themselves than they are concerned with prosecuting this action.

202.    ADT has been, and will continue to be, subjected to lawsuits for the wrongdoings alleged herein, yet the Individual Defendants have not filed any lawsuits against themselves or others responsible for said wrongful conduct. Thus, the Individual Defendants are breaching their fiduciary duties to the Company and demand upon them is futile.

203.    Plaintiffs have not made any demand on shareholders of ADT to institute this action since such demand would be a futile and useless act for the following reasons:

a.      ADT is a publicly traded company with thousands of shareholders of record;

b.      Making a demand on such a large number of shareholders would be impossible for Plaintiffs, whom have  no means of collecting the names, addresses, or phone numbers of ADT  shareholders; and

c.      Making demand on all shareholders would force Plaintiffs to incur excessive expense and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

204.    The Company has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to ADT.  Plaintiffs, as shareholders of the Company, seek damages and other relief on behalf of ADT, in an amount to be proven at trial.

**D.      Demand is Futile as to All Director Defendants for Additional Reasons**

205.    If ADT's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this complaint by directors and officers liability insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiffs are informed and believe that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by ADT against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of ADT, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to

file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

206.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting ADT by prosecuting this action.  Therefore, demand on ADT and its Board is futile and is excused.

207.    ADT has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

208.    In committing the wrongful acts complained of herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

209.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company had adopted unethical, improper, and illegal financial and operational practices,  including relying on aggressive share repurchases to artificially inflate its reported earnings per share; (ii) maintain the Individual Defendants' directorial and/or executive positions at ADT and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of

ADT, regarding the Individual Defendants' management of ADT's operations, the Company's financial health and stability, and the Company's business prospects. In furtherance of this plan, the Individual Defendants collectively and individually took the actions set forth herein.

210. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to conceal its misrepresentation of its true business practices.

211. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: to disguise the Individual Defendants' violations of federal and state law, breaches of fiduciary duty, waste of corporate assets and abuse of control; to conceal material adverse information concerning the Company's operations, financial condition, and future business prospects; and to profit from and protect their positions as directors and/or executives of the Company and the benefits they obtained as a result.

212. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and financial results. Because the actions complained of herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

213. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the

accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## X.    CAUSES OF ACTION

### COUNT I

**(Against Defendants Colligan, Donahue,Dutkowsky, Gordon, Heller, Hyle, Gursahaney and Paliwal for Violations Of § 14(A) of The Exchange Act)**

214.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein except as to any allegations relating to recklessness and knowing conduct on the part of any Defendant.

215.   This claim for relief is not based on any allegations of knowing or reckless conduct by any Defendant.  This claim does not allege, and does not sound in fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

216.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *in contravention of such rules and regulations as the [SEC] may prescribe* as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

218.    Here, ADT's proxy statements during the Relevant Period violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that ADT had been relying on its aggressive share repurchases to disguise an overall growth slowdown and inflate the value of stock options, a fact which Defendants were aware of and participated in.

219.    In the exercise of reasonable care, Defendants should have known that the proxy statements were materially false and misleading.

220.    The misrepresentations and omissions in the proxy statements were material to Plaintiffs in voting on each proxy.   The proxy statements were an essential link in the accomplishment of the continuation of Defendants' unlawful aggressive share repurchases and financial condition concealment, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, the Company's compensation policies, and the Company's share repurchase program.

221.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT II

### (Against the Individual Defendants for Breach of Fiduciary Duty)

222.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

223.    The Individual Defendants owed and owe ADT fiduciary obligations, including the obligations of good faith, fair dealing, loyalty, and care.

224.    Among other things, the Individual Defendants owed a fiduciary duty to ADT to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate, and conformed to federal and state securities law.   The Individual Defendants

breached their fiduciary duties by failing to properly supervise and monitor the adequacy of ADT's internal controls and by allowing materially false and misleading statements and filings to be issued.

225.    In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders and not to act in furtherance of their own self-interests.

226.    Contrary to their duties, the Individual Defendants engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that ADT complied with federal and state laws, rules and regulations, as well as the Company's own internal policies and procedures, and failed to conduct the business and affairs of the Company in a manner intended to further the interests of the Company and its shareholders.

227.    As members of the ADT Board, the Individual Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein.  Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected ADT to unreasonable risks of loss and expenses.

228.    Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions, in abdicating their oversight responsibilities to the Company, and in failing to take reasonable and prudent steps to protect the Company for the primary purpose of entrenching themselves in office, has subjected the Company to liability for violations of federal and state law, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers

and/or directors of the Company.  As a result of the Individual Defendants' breaches, ADT has lost market capitalization, has compromised the financial integrity and stability of the Company, and has had its reputation in the business community and financial markets irreparably tarnished.

229.    By reason of the foregoing, ADT was damaged.

230.    Plaintiffs, on behalf of ADT, have no adequate remedy at law.

## COUNT III

**(Against All the Individual Defendants for Contribution and Indemnification)**

231.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

232.    ADT is alleged to be liable to various persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to ADT.

233.    ADT's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants as alleged above, and ADT is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, ADT by virtue of the Individual Defendants' misconduct.

234.    By reason of the foregoing, ADT was damaged.

235.    Plaintiffs, on behalf of ADT, have no adequate remedy at law.

## COUNT IV

**(Against All the Individual Defendants for Waste of Corporate Assets)**

236.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

237.    Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of ADT's internal controls and by allowing the Company to engage in an illegal, unethical, and improper course of conduct.

238.    As detailed herein, the Individual Defendants diverted corporate assets for improper and unnecessary purposes.  Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies expended by ADT.

239.    The Individual Defendants wasted ADT's corporate assets by authorizing and effectuating the repurchase of more than a billion dollars of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, cannot be attributed to any rational business purpose and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

240.    The Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors during the Relevant Period, despite their breaches of fiduciary duties, exposing ADT to civil liability, and causing the Company to incur potentially millions of dollars in legal costs.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

241.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duties, ADT has wasted valuable corporate assets.

242.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

243.   By reason of the foregoing, ADT was damaged.

244.   Plaintiffs, on behalf of ADT, have no adequate remedy at law.

## COUNT V

### (Against All the Individual Defendants for Abuse Of Control)

245.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

246.   The Individual Defendants owed duties as controlling persons to ADT's public shareholders not to use their positions of control within the Company for their own personal interests and contrary to the interest of the Company's public shareholders.

247.   The conduct of the Individual Defendants amounted to an abuse of their abilities to control ADT in violation of their obligations to ADT and the Company's public shareholders.

248.   As a result of the Individual Defendants' abuse of control, ADT has sustained and will continue to sustain irreparable injury, for which there is no adequate remedy at law.

## COUNT VI

### (Against the Individual Defendants and Corvex for Unjust Enrichment)

249.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

250.   Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of ADT. The wrongful conduct was continuous and resulted in ongoing harm to the Company.  The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or director remuneration while breaching their fiduciary duties to the Company, as alleged herein.

251.   Further, Corvex, which was and is controlled by Meister, was unjustly enriched as it received millions for its ADT shares that it knew far exceeded what the actual value of those

shares would have been but for the Individual Defendants' false and misleading statements and omissions.

252.    Plaintiffs, as shareholders of ADT, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

253.    By reason of the foregoing, ADT was damaged.

254.    Plaintiffs, on behalf of ADT, have no adequate remedy at law.

## COUNT VII

### (Against the Individual Defendants and Corvex for Aiding and Abetting Fiduciary Violations)

255.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

256.    The wrongful conduct alleged herein was continuous, connected, and on-going since November 2012.   The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

257.    The Individual Defendants and Corvex had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by ADT and the decision to repurchase stock that was artificially inflated, and had the power and/or ability to directly or indirectly control or influence one another.

258.    Corvex and each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

259.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

260.    Plaintiffs, on behalf of ADT, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Directing the Individual Defendants to account to ADT for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.      Directing ADT to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to ADT's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on the following corporate governance  policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to regulate the Board's future authorizations of stock repurchases;

- a provision to permit the shareholders of ADT to nominate at least three candidates for election to the Board;

- a proposal to form a standing finance committee of the Board who shall be responsible for, among other things, overseeing and reviewing financial matters affecting the Company including reviewing financial transactions involving the issuance of debt or equity securities for the purposes of raising funding or refinancing indebtedness or other obligations of ADT, and entrance into new credit facilities, leases, and other forms of financing;

- a proposal to ensure the accuracy of the qualifications of ADT's directors, executives, and other employees; and

- a provision to appropriately test and then strengthen the internal disclosure and control functions;

C.      Granting equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants, including Corvex's assets, to assure Plaintiffs' effective remedy;

D.      Awarding to ADT restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants.

E.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

F.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 5, 2014

Respectfully submitted,

**SAXENA WHITE P.A.**

By: _s/Jonathan M. Stein_
Joseph E. White, III
Florida Bar No. 621064
jwhite@saxenawhite.com
Jonathan M. Stein
Florida Bar No. 0009784
jstein@saxenawhite.com
Lester R. Hooker
Florida Bar No. 0032242
lhooker@saxenawhite.com
2424 North Federal Highway, Suite 257
Boca Raton, FL  33431
Tel:  (561) 394-3399
Fax:  (561) 394-3382

**JOHNSON & WEAVER, LLP**
Frank J. Johnson (admitted _pro hac vice_)
110 West "A" Street, Suite 750
San Diego, CA  92101
Tel:  (610) 230-0063
Fax:  (619) 255-1856

**JOHNSON & WEAVER, LLP**
Michael I. Fistel, Jr. (admitted _pro hac vice_)
michaelf@johnsonandweaver.com
40 Powder Springs Street
Marietta, GA 30064
Tel:  (770) 200-3104

**FARUQI & FARUQI, LLP**
Stuart J. Guber
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Tel:  (215) 277-5770
Fax:  (215) 277-5771

_Co-Lead Counsel For Plaintiffs_

**HYNES KELLER & HERNANDEZ, LLC**
Beth A. Keller
100 South Bedford Road, Suite 340
Mt. Kisco, NY 10549
Tel:  (914) 752-3040
Fax:  (914) 752-3041

**LEE & AMTZIS, P.L.**
Eric Lee
Florida Bar No. 961299
lee@leeamlaw.com
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Tel:  (561) 981-9988

**SHEPARD, FINKELMAN, MILLER & SHAH, LLP**
Scott R. Shepherd
Florida Bar No. 69655
Nathan C. Zipperian
Florida Bar No. 61525
1640 Town Center Circle, Suite 216
Weston, FL  33326
Tel:  (954) 515-0123
Fax:  (866) 300-7367

*Additional Counsel For Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 5, 2014, I presented the foregoing to the Clerk of

the Court for filing and uploading to the CM/ECF system.


_____*s/Jonathan M. Stein*_____
JONATHAN M. STEIN

## VERIFICATION

I, Roy Barnes, Counsel for Teamsters Local 456 Annuity Fund ("Local 456"), verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint, and that the allegations as to Local 456 are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  August ___, 2014

_____

(Signature of Roy Barnes)

## VERIFICATION

I, Charles Zimmerman, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint, and that the allegations as to myself are true and correct and that the other allegations upon information and belief are true and correct.

Date: August 1, 2014

_____
Charles Zimmerman